# No. 19-3237

---

# United States Court of Appeals
# for the Tenth Circuit

---

**ERIC S. CLARK**

Plaintiff-Appellant

v.

**CITY OF WILLIAMSBURG, KANSAS**

Defendant-Appellee

---

Appeal from the U.S. District Court

for the District of Kansas

The Honorable Holly L. Teeter, District Judge

( 2:17-cv-02002-HLT )

---

**BRIEF OF APPELLANT**

---

**Eric S. Clark ( pro se )**
1430 Dane Ave
Williamsburg, Kansas 66095
Phone: (785) 214-8904

ORAL ARGUMENT : 15 min. (will have an attorney appear)

ii

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1,

Plaintiff-Appellant hereby states that no corporation is involved

concerning the Appellant of this case.

iii

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................... ii

TABLE OF CONTENTS ........................................... iii

TABLE OF AUTHORITIES ........................................ vi

PRIOR OR RELATED APPEALS ……………………………….. ix

JURISDICTIONAL STATEMENT ............................................ 1

STATEMENT OF THE ISSUES ................................................ 2

STATEMENT OF THE CASE ....................................................... 3

SUMMARY OF ARGUMENT ....................................................... 3

**ISSUE I.** ………………………………………………..……. 7

  The District Court erred by improperly interpreting an ordinance

(i.e., erred in interpretation of law).

**ISSUE II.** ……………………………………………………..……. 11

The District Court erred by improperly severing a provision of

law (ordinance).

**ISSUE III.** ……………………………………………………..……. 15

The District Court erred by improperly framing the

First Amendment issue for trial.

iv

**ISSUE IV.** …………………………………………..……… 18

The District Court erred by finding lack of standing for other

provisions of the regulations.

**ISSUE V.** ……………………………………………….… 27

The District Court erred by granting summary judgment to the CITY

on the Fourth Amendment claim -- either by improperly drawing

inferences in favor of the movant rather than the non-movant and/or

by improperly finding a fact not actually asserted by any party.

**ISSUE VI.** ………………………………………..……… 37

The District Court erred in its determination of law concerning the

Fourth Amendment as applied to the undisputed evidence.

**CONCLUSION / RELIEF**    **…………………………….....  57**

REQUEST FOR ORAL ARGUMENT ……………………….... 58

CERTIFICATE OF COMPLIANCE WITH PRIVACY   ………... 59

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ………... 60

CERTIFICATE OF SERVICE ……………………………..…… 61

v

# TABLE OF AUTHORITIES

## U.S. CONSTITUTION

U.S. Const., amend I

U.S. Const., amend IV

## FEDERAL SUPREME COURT CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 ……………….. 27, 36

*Florida v. Jardines*, 569 U.S. 1 (2013)
……………..…… 6,30,31,33,37,43,44,45,50,52,53,54

*Kentucky v. King*, 563 U.S. 452(2011) ……………………….. 50

*N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964) ……………… 23

*Police Dep't of Chi. v. Mosley*, 408 U.S. 92 (1972) …………… 23

*United States v. Jones*, 565 U.S. 400 (2012) ……………….. 37

## FEDERAL TENTH CIRCUIT

*Adams v. Am. Guarantee Liability Ins. Co.*, 233 F.3d 1242
    (10th Cir. 2000)      ……………………………….. 47

*Banks v. Reynolds*, 54 F.3d 1508 (10th Cir.1995) ……………. 16

*Bonney v. Wilson*, 817 F.3d 703 (10th Cir. 2016) ……..… 7,11,15

*Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433
    (10th Cir. 1979)      ………………………………… 27

*Christian Heritage Acad. v. Okla. Secondary Sch.
    Activities Ass'n*, 483 F.3d 1025 (10th Cir. 2007) ……... 27

vi

*Eck v. Parke, Davis & Co.*, 256 F.3d 1013 (10th Cir. 2001)   ….. 27

*Merida Delgado v. Gonzales*, 428 F.3d 916 (10th Cir. 2005) ……… 18

*Mimics, Inc. v. Village of Angel Fire*, 394 F.3d 836 (10th Cir. 2005) .. 48

*United States v. Carloss*, 818 F.3d 988 (10th Cir. 2016) (Gorsuch, J.,

    dissenting)  …………………………………….…..………… 37,50

*United States v. Cavely*, 318 F.3d 987 (10th Cir. 2003)   …………… 50

*United States v. Polly*, 630 F.3d 991 (10th Cir. 2011)  …………… 27,37

*United States v. Shuck*, 713 F.3d 563 (10th Cir. 2013) .. 27,31,35,37,52,53

*White v. Gen. Motors Corp.*, 908 F.2d 669 (10th Cir. 1990)   …..…. 27

**OTHER FEDERAL CIRCUIT CASES**

*Alvarez v. Montgomery Cty.*, 147 F.3d 354 (4th Cir. 1998)   ……... 54

*McConnell v. Fed. Election Comm'n*, 251 F. Supp. 2d 176 (D.D.C. 2003);

    *aff'd* 540 U.S. 93 (2003)   ……………………………... 18,23

*United States v. Anderson*, 552 F.2d 1296 (8th Cir. 1977)   ………. 54

*United States v. Daoust*, 916 F.2d 757 (1st Cir. 1990)  …………… 55

*United States v. Garcia*, 997 F.2d 1273 (9th Cir. 1993)  …………... 52,54

*United States v. Raines*, 243 F.3d 419 (8th Cir. 2001)  …………… 53

*United States v. Thomas*, 430 F.3d 274 (6th Cir. 2005)  …………… 55

vii

## FEDERAL DISTRICT CASES

*City of Antioch v. Candidates' Outdoor Graphic Service,*
  557 F. Supp. 52    (N.D. Cal. 1982) ........................... 26

*Curry v. Prince George's County,* 33 F. Supp. 2d 447
  (D. Md. 1999) ................................................. 26

*Outdoor Sys. v. City of Merriam,* 67 F. Supp. 2d 1231
  (D. Kan. 1999) ................................................ 11

*United States v. Diaz,* 2009 W.L. 3675006, at *2 (N.D. Fla.
  October 30,  2009, affirmed 404 Fed. Appx. 381
  (11th Cir. 2010) ............................................. 51,54

## KANSAS STATE LAW

K.S.A. 25-2711    ........................................... 7,8,11,26

## STATE CASES

*Van v. Travel Information Council,* 628 P.2d 1217
  (Ore. Ct. App. 1981) ......................................... 26

*Collier v. City of Tacoma,* 854 P.2d 1046 (Wash. 1993) (en banc) ... 26

*City of Painesville Building Department v. Dworken & Bernstein Co.,*

  No.  99-1769 (Ohio 2000) ...................................... 26

## OTHER AUTHORITIES

1 Wayne R. LaFave et al., Search & Seizure § 2.3(f)
  (5th ed., 2012 update) ....................................... 31,52

viii

## CITY OF WILLIAMSBURG, KANSAS ORDINANCES

WILLIAMSBURG, KAN., ZONING REGS.  (passim)

# PRIOR OR RELATED APPEALS

There are no prior or related appeals concerning this case.

## JURISDICTIONAL STATEMENT

This District Court had jurisdiction over this case under the Constitution of the

United States, Article III § 2 and pursuant to 28 U.S.C. § 1331 (federal question).

This Court of Appeals has jurisdiction over this case pursuant to 28 U.S.C. § 1291.

**This appeal arises from a final decision of the District Court.**

## STATEMENT OF THE ISSUES

**ISSUE I.**

The District Court erred by improperly interpreting an ordinance (i.e., erred in interpretation of law).

**ISSUE II.**

The District Court erred by improperly severing a provision of law (ordinance).

**ISSUE III.**

The District Court erred by improperly framing the First Amendment issue for trial.

**ISSUE IV.**

The District Court erred by finding lack of standing for other provisions of the regulations.

**ISSUE V.**

The District Court erred by granting summary judgment to the CITY on the Fourth Amendment claim -- either by improperly drawing inferences in favor of the movant rather than the nonmovant and/or by improperly finding a fact not actually asserted by any party.

**ISSUE VI.**

The District Court erred in its determination of law concerning the Fourth Amendment as applied to the undisputed evidence.

## STATEMENT OF THE CASE

This case involved First and Fourth Amendment claims and; the District Court granted the summary judgment motion of Plaintiff / Appellant ("CLARK") as to Count I (First Amendment) but on a narrow basis (i.e., finding only one provision to be unconstitutional ) and; therefore, dismissed some of the challenges pertaining to that Count based on finding of lack of standing. The District Court granted the summary judgment motion of Defendant / Appellee ("CITY") as to Fourth Amendment claim.  A jury trial was held concerning damages pertaining to the narrowed Count I only and; final judgment was entered after the trial.

## SUMMARY OF ARGUMENT

The main issue in this case is error concerning interpretation of law. Interpretation of law is this appellate court's forte, thus most of the review will be de novo and without deference to the District Court's legal analyses.

The issues raised are intertwined or interconnected in that error in one issue can fall like a domino to cause error in another issue; thus, while attempt was made to delineate the issues at the lowest granular level, those grains inevitably clump together in various ways.

At a bird's level view of the First Amendment claim, the CITY had enacted, and enforced, an ordinance which restricts placement of signs on CLARK's private property causing First Amendment injury to CLARK, including the prohibition of

3

political signs from the right of way of CLARK's property.  The improper severing

caused an improper framing of the First Amendment issue for trial. Beyond

errors affecting assessment of damages, additional prospective relief is needed

because the improper severing allows the CITY to be free to resume its

enforcement in a manner that is even more restrictive than when CLARK initially

filed the complaint.

The District Court's misinterpretation impliedly concluded that severing one

exemption would cure the unconstitutionality of the entire ordinance. Based on its

reasoning, the District Court appears to have failed to apprehend that within the

severed exemption was a primary *authorizing* provision for allowing political signs

on CLARK's residential property -- apart from also enumerating a "right of way"

*restriction* for political signs (which the District Court appeared to view as the sole

constitutionality problem). The District Court's severance of that authorizing

provision changed the controlling law(ordinance) such that previously permitted

political signs were no longer authorized on CLARK's property (even outside of

the right of way) leaving the regulation bare of authorization for any political signs

except for one token expression of "[f]lags or emblems of a government or of a

political, civic, philanthropic, educational or religious organization".  A State law

preemption (enacted after the City's ordinance – thus having no bearing of the

CITY's original intent for enacting its regulations) also now allows political signs

4

in the unpaved portion of a right of way for certain periods of time surrounding elections; however, even with that State preemption, CLARK argued that the ordinance is unconstitutional including as to the length of time that political signs are permitted in the unpaved portion of the right. The District Court did not reach those constitutional arguments presumably because the District Court concluded, in error, that severing the one provision would allow political signs to be placed in the right of way year around.

Because the First Amendment issue for trial was framed based solely upon harm from the single severed provision, rather than the ordinance being found to be more broadly unconstitutional, CLARK argues that there is a reasonable probability that, but for the improper framing of the issue for trial, the result of the proceeding would have been different. CLARK was only permitted to address harm relevant to the lone severed provision rather than the harm caused by the broader regulation which was argued as unconstitutional.

The Fourth Amendment claim is based on the CITY's code enforcer coming onto CLARK's property and exceeding the limits of the implied license; thereby, conducting an unconstitutional search, i.e., unconstitutionally trespassing on to the property. CLARK argues that finding no Fourth Amendment violation was error based on the District Court misapprehending facts, misapplying the law concerning

the implied license (See *Florida v. Jardines*, 569 U.S. 1(2013)) and; importantly, misapplying the standard for summary judgment through improperly finding a fact and/or, improperly drawing inferences, in favor of the movant which resulted in not allowing the claim to be decided on the true merits by the finder of fact. Those erroneous inferences/facts lead to lack of proper adjudication and relief as the issue was dismissed rather than allowed to go to the trier of fact.

## ISSUE I.

**The District Court erred by improperly interpreting an ordinance
(i.e., erred in interpretation of law).**

### *STANDARD OF REVIEW*

Interpretation of law is subject plenary review and that de novo review owes

"no deference to the district court's legal analysis." *See Bonney v. Wilson*, 817 F.3d

703, 711 (10th Cir. 2016).

### *ARGUMENT*

CLARK raised improper interpretation (i.e., "errant conclusions of law") citing:

> "The court's judicial severance of Article 8 § 4.(A).6" . . . "that change
> causing Article 8 §§ 9.(B).1 & 9.(B).4 to be primary controlling law for
> political signs on Clark's residential property other than applying the State
> pre-emption of K.S.A. 25-2711and a token expression allowed by Article 8
> § 4.(A).1." ECF 157-1 at 3 [ROA V. I. at 1172]

The District Court misapprehended controlling law which can be seen in the

District Court's  conclusions that "[i]t can be easily separated **without affecting**

**the meaning of the other provisions.**" (emphasis added) (ECF 114 at 20 [ROA V.

I. at 1101]) and that "[r]emoving it would simply **put political signs back on par**

**with other signs**." (emphasis added) *Id.* These are errant conclusions of law

because without that now severed exemption, the only political signs permitted are

those allowed by State law pre-emption (which is constitutionally insufficient) and

a token political expression allowed by Article 8§ 4.(A).1.

    CLARK also "argued the length of time allowed by the State law pre-

emption statute at K.S.A. 25-2711 would also be unconstitutional. See ECF 79 at

78-79 [ROA V. I. at 225-226] addressing "HOW LONG". See ECF 157-1 at 3

[ROA V. I. at 1172].

The District Court ruling is in ECF 114 at 1[ROA V. I. at 1081], "the Court

finds that Article 8, § 4.A.(6) is an unconstitutional content-based restriction". See

also ECF 114 at 20 [ROA V. I. at 1101], "Article 8, § 4.A.(6) is severed from the

City's sign ordinance."

The result of the misinterpretation is that District Court declared, and

severed, only one provision of the regulations as unconstitutional.  The District

Court apparently misunderstood the effect of severing that one provision (i.e., the

error of the District Court concerning interpretation of law).

The District Court reasoned that:

> '[a]lthough Article 8, § 4.A.(6) is listed as an "Exemption" to the sign
> ordinance, it actually sets more restrictive rules for political signs.
> Removing it would simply put political signs back on par with other
> signs.' ECF 114 at 20 [ROA V. I. at 1101].

The conclusion that severing that provision "would simply put **political signs**

back **on par with other signs**" (emphasis added) is in error because the

properly interpreted content based authorization scheme inherently does not

place signs on par with each other unless they are within the same classification.

See ECF 38-1 at 60 [ROA V. I. at 79] at Article 8, §2, "<u>Classification of signs</u>:

8

A. Functional Types:"  None of the classified types describe political signs and,

thus, political signs are **not on par** with any of the other signs described by those

classifications.  While the District Court acknowledged that the severed exemption

provision "sets more restrictive rules for political signs"(ECF 114 at 20 [ROA V. I.

at 1101]), the District Court failed to apprehend that the same exact provision is

what actually *authorized* political signs. Severing that provision, apart from

eliminating "more restrictive rules for political signs", also eliminated the

authorization for [the vast majority of] political signs *because* the regulations

do not permit signs except if they comply with the remainder of the regulations[1]

and; the remainder of the regulations *do not* authorize any political signs save for

one token expression[2]  contained in another exemption that was not severed by

the District Court. The remainder of the regulations are heavily content based

classifications (See ECF 38-1 at 60-61 [ROA V. I. at 79-80])  which provide

**no authorization for political signs** apart from those authorized by the

---

[1] See ECF 38-1 at 60 [ROA V. I. at 79] at Article 8 "SIGN REGULATIONS"
within  § 1: "After the effective date of this regulation, no sign shall be
erected, enlarged, constructed or otherwise installed without first obtaining a
zoning permit, and a zoning permit shall be legally issued only when in
compliance with these sign regulations."

[2] See ECF 38-1 at 63 [ROA V. I. at 82] at Article 8 § 4.A(1)
("Total exemptions"):
     "Flags or emblems of a government or of a political, civic,
     philanthropic, educational or religious organization, displayed
     on private property."

"Total exemptions" section (ECF 38-1 at 63, at Article 8 § 4.A [ROA V. I. at 82])

which, after the District Court's severing of 4.A.(6), leaves 4.A.(1) as the *only*

authorization for *any* political signs – and that is but a lone token expression (i.e.,

ECF 38-1 at 63, at Article 8 § 4.A.(1) [ROA V. I. at 82] "Flags or emblems of a

government or of a political, civic, philanthropic, educational or religious

organization, displayed on private property.") CLARK argues that the content

based regulations would fall well short of being constitutional under any proper

analysis considering that a lone token expression is left, along with the State law

exemption, are now the only "political signs" authorized on CLARK's private

property because "political signs" do not fall within any of the content-based

descriptions of the other authorizations for permitted signage applicable to

residential property ,e.g., see ECF 38-1 at 67-68 [ROA V. I. at 86-87] Article 8

§9(B) of the sign code which only authorizes certain signage (i.e., certain

"Functional Types") for residential zones and; CLARK's property is in a

residential zone district. See ECF 79 at 3, ¶12 [ROA V. I. at 150], "Clark's

property is "in a residential zone district".

## ISSUE II.

**The District Court erred by improperly severing a provision of law (ordinance).**

### *STANDARD OF REVIEW*

Whether and what to sever is a matter of law and is subject plenary review and

that de novo review owes "no deference to the district court's legal analysis." *See*

*Bonney v. Wilson*, 817 F.3d 703, 711 (10th Cir. 2016).

Severability is determined using state law.

In Kansas, the question is whether

> 'the act would have been passed without the objectional portion and if
> the statute would operate effectively to carry out the intention of the
> legislature with such portion stricken . . . .' *Outdoor Sys. v. City of
> Merriam*, 67 F. Supp. 2d 1231, 1241 (1999)

### *ARGUMENT*

CLARK raised improper severing citing that:

> "The court's judicial severance of Article 8 § 4.(A).6" . . . "that change
> causing Article 8 §§ 9.(B).1 & 9.(B).4 to be primary controlling law for
> political signs on Clark's residential property other than applying the State
> pre-emption of K.S.A. 25-2711and a token expression allowed by Article 8
> § 4.(A).1." ECF 157-1 at 3 [ROA V. I. at 1171]

and that:

> "without that now severed exemption, **the only "Political signs"
> permitted** are those allowed by State law pre-emption (which is
> constitutionally insufficient) and a token political expression allowed
> by Article 8§ 4.(A).1." (emphasis in original)
> ECF 157-1 at 9 [ROA V. I. at 1177]

11

The District Court ruling is in ECF 114 at 20 [ROA V. I. at 1101], "Article 8, § 4.A.(6) is severed from the City's sign ordinance."

The core reasoning by the District Court was in ECF 114 at 20 [ROA V. I. at 1101], "Article 8, § 4.A.(6) is a self-contained exemption to the sign ordinance. It can be easily separated without affecting the meaning of the other provisions." Notably, this reasoning skirted the question identified by the District Court itself in ECF 114 at 19 [ROA V. I. at 1099], 'the question is whether "the act would have been passed without the objectional portion and if the statute would operate effectively to carry out the intention of the legislature with such portion stricken".' The ordinance in this case was very specific about the legislature's intention concerning allowing political signs, specifically identifying that even though the City needed to enact the regulations to place "reasonable time limits" (ECF 38-1 at 64 [ROA V. I. at 83]), "[t]he City recognizes that the expression of political speech is an important and constitutionally protected right." *Id.* Having expressly provided its intent about that particular provision within the comments made part of the enacted ordinance, comments which recognized the importance of the right to political speech and that the right is constitutionally protected, it is no stretch to conclude that if the *authorization for political signs* within that provision are severed, then the remaining regulations would not allow the regulations to "operate effectively to carry out the intention of the legislature". Further, because the intent

12

sought to address an important constitutionally protected right, the  only reasonable conclusion is that the regulations would *not* "have been passed without the objectional portion."

Under the proper interpretation of the ordinance, to argue for severance, one would have to attribute an intent of not allowing political signs in the face of the legislature knowing that placing political signs was part of an important protected constitutional right. In summary, the legislative intent expressed by comments within the ordinance itself clearly demonstrates that the severed provision is not separable from the remaining regulations and; this is why the District Court should have, at least, severed the entire Article 8 ("SIGN REGULATIONS") [ROA V. I. at 22-122].

Notably, because the regulation scheme uses a *broad prohibition*[3] with specific authorizations to override the prohibition, the legislature could have created another "Functional Type" (under Article 8 § 2A [ROA V. I. at 79]) for a "political signs" Functional Type  and then permitted that new Functional Type under each of the Zones (Residential, Commercial/Business, etc. (e.g., under

[3]**Article 8 §1** provides that "**no sign** shall be […] **installed** without first obtaining a zoning permit, and a zoning permit shall be legally issued **only when in compliance** with these sign regulations." ECF 38-1 at 60 [ROA V. I. at 79] (emphasis added)

Article 8 § 9 [ROA V. I. at 85-89]), but an easier way to implement *authorizations*

for *all zones at once* is to create an exemption describing the functional type (e.g.,

"political signs") that is to be *authorized*, and that is clearly what the CITY did and

that is why that exemption is not separable. Severing the "political signs"

provision would be like severing a Functional Type under Article 2 §A. See

ECF 38-1 at 60 [ROA V. I. at 79]. This scheme clearly intertwines the exemption

section (including 4.(A).6 ) with the remaining provisions in order to provide

*authorizations* for various *functional types* of signs, i.e., for functional types, such

as political signs, memorial signs, etc. In its order, the District Court cited to

> '*Outdoor Sys.*, 67 F. Supp. 2d. at 1242 ("The restriction on political
> campaign signs is **not intertwined** with the remaining provisions of
> the ordinance . . . .").' (emphasis added) ECF 114 at 20 [ROA V. I. at
> 1100]

Presuming this is an inference, or conclusion, for the present case, that the

exemptions at issue are **not intertwined** with the remaining provisions, that is in

error because the exemptions clearly work in conjunction with the remaining

provisions to provide *authorization* for signs, not just restrictions. If the now

severed *authorization* were provided elsewhere and the exemption simply added

some additional restriction that would be a different matter and severance might be

proper if that were the case, but that is **not** the case; thus severing was improper.

14

## ISSUE III.

### The District Court erred by improperly framing the First Amendment issue for trial.

### *STANDARD OF REVIEW*

Framing an issue for trial is a conclusion of law based on legal analysis and is subject plenary review and that de novo review owes "no deference to the district court's legal analysis." *See Bonney v. Wilson*, 817 F.3d 703, 711 (10th Cir. 2016).

### *ARGUMENT*

This argument is predicated upon an errant interpretation (See ISSUE I) and improper severing (See ISSUE II). CLARK raised that proper interpretation and proper severance would portray damages in a different light. See ECF 157-1 at 15 [ROA V. I. at 1183]:

> "If the court does sever Article 8 in its entirety, the scope of the damages must necessarily be expanded, in which case, there are damages for which the trier of fact has not yet adjudicated."

The District Court made clear that

> "the <u>only</u> issue for trial is whether and to what extent Clark sustained any damages as a result of the City's February 23, 2015 violation notice **regarding Article 8, § 4.A.(6).**" ECF 135 at 4 [ROA V. I. at 1163] (underline emphasis in original, bold emphasis added)

The District Court's ruling necessarily framed the issue for trial as being limited to *only* one provision of the regulations. If the Article 8 were found to be more broadly unconstitutional instead, then CLARK could have shown additional

evidence of damages at trial.

There were numerous provisions of the regulations which apply directly to CLARK's property including the exemption for memorial markers. See ECF 38-1 at 63, [ROA V. I. at 82] Article 8 § 4(B)(3). With a different understanding (e.g., that the entirety of Article 8 was unconstitutional) going into trial, Clark could have shown further injury through evincing what the code enforcer's belief was when he issued the notice of violation to CLARK about "other affixed objects" (See ECF 79-1 at 13 [ROA V. I. at 239]), e.g., threatened removal of a cross and even removal of a mailbox. CLARK was only permitted to address harm relevant to the lone severed provision rather than the harm caused by the broader regulation which was argued as unconstitutional. Trial for damages on a small subset of the regulations being held unconstitutional necessarily limited addressing damages that the other provisions of Article 8 effectuated. If the regulations are more broadly severed, or more broadly declared unconstitutional, as it should be, then a new trial must be had because the error would have had a reasonable probability of affecting the outcome (i.e., there cannot be confidence in the outcome/verdict). See, e.g., *Banks v. Reynolds*, 54 F.3d 1508 (10th Cir.1995). There is ample support that a broader First Amendment Claim at trial, beyond the lone severed exemption of Article 8 § 4.A.(6), would present a reasonable probability of affecting the outcome and undermining confidence in the verdict. For example, based on

16

deposition of the code enforcement officer, that would extend so far as to prohibit

having numbers on a mailbox in that area which plaintiff uses for sending and

receiving messages and information. See ECF 102 at 49, officer's depo. at page 24,

lines 8-16 [ROA V. 102 at 49] identifying cross, 1430 sign(mailbox), support our

troops, kittens; see also 28:22-29:7 [ROA V. 102 at 53], affirming same *Id.*; see

also 73:18-25 [ROA V. 102 at 98], affirming even if the sign were a mailbox,

"Q. The 1430 sign, are you aware that that's a mailbox? A. It doesn't make any

difference. It's not supposed to be on the City right-of-way." *Id.* While "cross"

was not specifically mentioned in the enforcement letter dated February 23, 2015,

it falls within the mention of "other objects" based on the officer's deposition at

p. 73, lines 18-25, [ROA V. 102 at 98]:

> "Q. Okay. You indicated that of the things in that picture that violate
> the ordinance, you said the cross, the 1430 sign and the support our
> troops sign. A. Right."

See also p. 75, line 9 through p. 76, line 1 [ROA V. 102 at 100-101]:

> "You said the cross was in violation. Is the cross -- would you
> consider the cross to be a memorial sign? A. Not, not that. I consider a
> cross as a memorial sign but not there, not at that location. Q. Okay,
> so memorial signs vary by location? A. I guess what I'm trying to say
> is I am looking at the safety factor here, not only the easement factor,
> okay? Q. I understand a memorial sign may pose a safety factor. A.
> Right. Q. That doesn't change it from being a memorial sign, though,
> right? A. I agree."

## ISSUE IV.

**The District Court erred by finding lack of standing for other provisions of the regulations.**

### *STANDARD OF REVIEW*

A District Court's dismissal for lack of standing is reviewed de novo.

*Merida Delgado v. Gonzales*, 428 F.3d 916, 919 (10th Cir. 2005).

The general rule is that "[i]n the First Amendment context, the standing

requirements are somewhat relaxed." *McConnell v. Fed. Election Comm'n*,

251 F. Supp. 2d 176, 258 (D.D.C. 2003); *aff'd* 540 U.S. 93 (2003).

### *ARGUMENT*

CLARK raised challenges to numerous provisions. See, ECF 79 at 13-14

[ROA V. I. at 160-161] under "THE VARIOUS UNCONSTITUTIONAL

PARTS OF THE REGULATIONS". See also ECF 157-1 at 1 [ROA V. I. at

1169], "COUNT I - FIRST AMENDMENT [...] STANDING".

CLARK also raise that it was:

> "legal error to issue a final judgment which allows the remainder of the
> provisions to remain in effect because such provisions still allow Clark's
> Complaint to state a claim for which relief may be granted. See ECF 55
> [the effective complaint] at ¶¶73, 63, 41-51, and 76."
> ECF 157-1 at 2-3 [ROA V. I. at 1170-1171]

The District Court ruled on this issue at ECF 114, p. 31 [ROA V. I. at 1111],

"Clark's other challenges to the City's sign and zoning ordinances are dismissed

without prejudice for lack of standing."

The District Court opined that "the only chilling Clark has alleged is in regard to prohibitions and regulations of political signs found in Article 8, § 4.A.(6). *See* Doc. 79 at 3 (¶ 10 and ¶ 12, both challenging Article 8, § 4.A.(6))." See ECF 114 at 11 [ROA V. I. at 1091]. This was footnoted (See ECF 114, page 11 at n. 8 [ROA V. I. at 1091]) as "Statement of Fact 10 also references Article 8, § 9.B. But the conduct Clark alleges has been "chilled" is prohibited by Article 8, § 4.A.(6)." *Id.*

This is an artificial cordoning off of *the fuller set of provisions that prohibit the alleged chilled conduct* from a lone exemption which itself actually authorized some of the conduct but with certain restrictions. As intimated in ISSUE I, the chilled conduct is prohibited by a combination of provisions elsewhere in the regulations, specifically, a combination of Article 8, § 1 and Article 8, §9.B. Article 8 §1 providing that :

> "**no sign** shall be […] **installed** without first obtaining a zoning permit, and a zoning permit shall be legally issued **only when in compliance** with these sign regulations."
>  ECF 38-1 at 60 [ROA V. I. at 79] (emphasis added)

And Article 8, **§ 9(B)** identifying those signs that would be **in compliance** for CLARK's property (i.e., Residential zone). Severing Article 8, § 4.A.(6) still leaves this combination of provisions as restricting the alleged chilled conduct. The misapprehension of the District Court concerning this point apparently being

the driving force of cordoning the chilling effect to only that one provision,

seemingly dismissing the other provisions as if they play no role concerning the

alleged chilled conduct. The actual claim to provisions which caused a chill

encompassed far more than just Article 8, § 4.A.(6) and was stated as "But for

*the City's regulation* (**including** Article 8, § 4(A)(6) **and § 9(B)**), Clark would

have placed political signs [...]" ECF 79, page 3 at ¶10 [ROA V. I. at 150]

(emphasis added). Clearly, the "But for" claim of CLARK refers broadly to

"the City's regulation" and; use of "including" does not delineate only certain

provisions but allows for all of the provisions which must be read in tandem

(or *in pari materia*) based on how the regulatory scheme was written.

Failing to see how the regulation worked as a scheme, the District Court

concluded that

> "Although Clark has standing to challenge the provision of the sign
> ordinance whose language was recited nearly verbatim in the violation
> notice (Article 8, § 4.A.(6)), that does not mean Clark has standing to
> challenge the entirety of the City's sign ordinance, as he attempts to do."
> ECF 114 at 9 [ROA V. I. at 1089]

This artificial cordoning off of other provisions as being basis for the Notice of

Violation is in error. Quoting a certain provision of a regulatory scheme in a

Notice of Violation does not mean that no other provisions of the regulation was

being relied upon for the enforcement action, yet this appears to be what the

20

District Court errantly concluded, by stating:

> "although Clark has standing to challenge Article 8, § 4.A.(6), he
> lacks standing to challenge other provisions in the sign ordinance. The
> Court will therefore **only evaluate the constitutionality of that
> provision.**" (emphasis added) ECF 114 at 11 [ROA V. I. at 1019]

The mention in the notice of violation of "other objects" (See ECF 79-1 at 13

[ROA V. I. at 239] clearly demonstrates that more than Article 8, § 4.A.(6) was

being relied upon for its issuance. The reality is that other provisions served

as both, part of the basis for the notice and part of the claimed chilling effect.

It was error not to have evaluated them, that is, it was error to cordon off that one

provision of a broad interconnected regulation scheme when it is the broader

scheme serving as basis for enforcement actions (which creates the chilling effect).

In his complaint, CLARK cited to numerous sections of the sign regulations (See

ECF 55 at 8-12 [ROA V. I. at 133-137]) and alleged broadly that "[t]he City's

regulations are facially unconstitutional" (ECF 55 at 12, ¶65 [ROA V. I. at 137])

and described COUNT I as "First Amendment right" and "continuing prior

restraint" (ECF 55 at 14, ¶73 [ROA V. I. at 139]). This Court should evaluate those

other provisions for which CLARK has standing and for which the District Court

left unaddressed. Those would include, at minimum, other provisions that directly

apply to CLARK's property under Article 8 [ROA V. I. 79-90] including

§ 1(B)(2), **§ 2(A)**, §§ 4(A)(1-7), §§ 4(B)(1-5) [subsection 6 having been already

found unconstitutional by the District Court] and **§ 9(B)** (1,4,6). Notably,

Article 8 **§2(A)** is the core definition of sign classifications for which CLARK is

<u>still subject to unconstitutional restrictions</u> on his First Amendment right. And

CLARK did argue that every one of those provisions was unconstitutional. See

three argument sections at ECF 79 pages 55-56 [ROA V. I. at 202-203]

respectively titled:

"<u>**Article 8**</u>, § 2(A)(l-7), § 9(A)(l), § <u>9(B)(l)</u>, § 9(C)(l), § 9(D)(l)" and

"<u>**Article 8**</u>: § 9(A)(4), § 9(A)(6), § 9(A)(7), § <u>9(B)(4)</u>" and

"<u>**Article 8**</u>, § <u>4(A)(l-5)</u>" (underline emphasis added).

The pretrial order provided legal claims and theories including "[f]or both

the First Amendment and the Fourth Amendment, the City's zoning ordinance is

facially unconstitutional and; even if facially constitutional, was unconstitutional

as applied." ECF 84 at 12 [ROA V. I. at 437]. This was followed up with First

Amendment specific theories including "overly broad and/or vague". See ECF 84,

pp. 13-14 [ROA V. I. at 438-439]. Of the numerous challenged restrictions posited

in the pretrial order, several applied directly to CLARK's property as they either

apply generally or to those in residential zones including Article 8: § 1.(B).(2), §§

2.(A).(2-7), §§ 4.(A).(1-7), §§ 4.(B).(1-5), and §§ 9.(B).(1,4,6). See §9(B), ' "R-S"

Residential - Suburban, "R-1" Residential – Low Density, "R-2" Residential –

Medium Density,  "R-3" Residential - High Density, "M-P" Manufactured Home

Park'; see also ECF 79 at 3, ¶12 [ROA V. I. at 150], 'Clark's property is "in a

22

residential zone district"' which statement of fact was incorporated into CLARK's
non-movant response. See ECF 100 at 27 [ROA V. I. at 865].

The general rule is that "[i]n the First Amendment context, the standing
requirements are somewhat relaxed." *McConnell v. Fed. Election Comm'n,*
251 F. Supp. 2d 176, 258 (D.D.C. 2003); *aff'd* 540 U.S. 93 (2003).
This is directly in keeping with the many overlapping principles embodied
in the constitution which were designed to protect the "profound national
commitment to the principle that debate on public issues should be uninhibited,
robust, and wide-open," *N.Y. Times Co. v. Sullivan,* 376 U.S. 254, 270 (1964), and
ensures that "our people are guaranteed the right to express any thought, free from
government censorship." *Police Dep't of Chi. v. Mosley,* 408 U.S. 92, 96 (1972).
In this case, facial challenges of overbreadth and vagueness  under the First
Amendment are appropriate for the entirety of the provisions which served as
basis for issuance of a notice of violation to CLARK and; those provision were far
more widespread that the single provision severed by the District Court.
In this case, other provisions, such as Article 8, **§ 9.(B)**.(6), could have been
determined to have been facially unconstitutional and violative of CLARK's
constitutional rights and provided that any harm caused should be submitted to,
and determined by, the trier of fact.

Among the other provisions challenged by CLARK where provisions

23

which apply directly to CLARK's property including Article 8,§ 9.(B). The

exemption for memorial markers also being a provision of contention (See

Article 8 § 4(B)(3), ECF 38-1 at 63 [ROA V. I. at 82]). Even if not declared

facially unconstitutional, CLARK could have shown that provision of the

regulation was unconstitutional as-applied by evincing the code enforcer's belief

at trial about his enforcement concerning "other objects" (See ECF 79-1 at 13

[ROA V. I. at 239]), e.g., threatened removal of a cross and mailbox - See ECF

100 at 31 [ROA V. V. I. at 869]:

> "Based on deposition of the code enforcement officer, that would
> extend so far as to prohibit having numbers on a mailbox in that area
> which plaintiff uses for sending and receiving messages and
> information. See Exhibit 4, officer's depo. 24:8-16 identifying cross,
> 1430 sign(mailbox), support our troops, kittens; see also 28:22-29:7,
> affirming same; see also 73:18-25, affirming that even if the sign were
> a mailbox ("Q. The 1430 sign, are you aware that that's a mailbox? A.
> It doesn't make any difference. It's not supposed to be on the City
> right-of-way.")."

See also ECF 100 at 24 [ROA V. I. at 862]:

> 'While the cross was not specifically identified in the enforcement
> letter dated February 23, 2015 but may have been included in the
> mention of "other objects" based on the officer's deposition at p. 73,
> lines 18-25,
> > "Q. Okay. You indicated that of the things in that picture that
> > violate the ordinance, you said the cross, the 1430 sign and the
> > support our troops sign. A. Right.'

See also ECF 100 at 24 [ROA V. I. at 862]:

"You said the cross was in violation. Is the cross -- would you
consider the cross to be a memorial sign? A. Not, not that. I consider a
cross as a memorial sign but not there, not at that location. Q. Okay,
so memorial signs vary by location? A. I guess what I'm trying to say
is I am looking at the safety factor here, not only the easement factor,
okay? Q. I understand a memorial sign may pose a safety factor. A.
Right. Q. That doesn't change it from being a memorial sign, though,
right? A. I agree."

See also the exemption of memorial signs in the regulations (ECF 38-1 at 63,

Article 8 §4.A.(3) [ROA V. I. at 82])

In conclusion, finding lack of standing rather than addressing the other

constitutional challenges to the regulations was error. At minimum, the

District Court should have addressed the challenges to Article 8: § 1(B)(2),

§§ 2(A)(2-7), §§ 4(A)(1-7), §§ 4(B)(1-5), and **§ 9(B)**(1,4,6) which work in

conjunction (regulation scheme) to produce unconstitutional restrictions.

( **§ 9(B)** being expressly claimed as causing chilling effect ECF 79, page 3 at ¶10

[ROA V. I. at 150] ) The challenges to the constitutionality of these various other

provisions of the regulation scheme can be analyzed as a matter of law, thus, this

court could perform that analysis rather than remand that issue.

CLARK's fuller analyses concerning the various provisions can be found in

ECF 79 at 53-79 [ROA V. I. at 200-226. See also ECF 120 [ROA V. I. at 122-

1125], CLARK's motion for reconsideration of the First Amendment issue.

Most importantly, the District Court, having severed Article 8 § 4.(A).(6),

**left intact** §§ 4.(B).(1) and 4.(B).(4) **as controlling law** concerning political signs

on CLARK's property, and, thus, CLARK currently **is not permitted** to have

any political signs on his residential private property at all apart from what is now

allowed under the State preemption statute of K.S.A. 25-2711(See ECF 38-1 at 105

[ROA V. I. at 124]) and a token expression allowed by the CITY's Article 8

§ 4.(A).1. The time limits set forth in that State statute [ROA V. I. at 124] provide

insufficient opportunity for CLARK to use political speech on signage at his home.

The constitutionality of time limits is not without guidance including principles of

review laid out by the U.S. Supreme Court and other courts which have more

directly addressed the specific issue by following those principles. (See, e.g., *Curry*

*v. Prince George's County*, 33 F. Supp. 2d 447 (D. Md. 1999)) At least three cases

have struck down sixty day limits (i.e. more than K.S.A. 25-2711 allows) as

inadequate. See *City of Antioch v. Candidates' Outdoor Graphic Service*, 557 F.

Supp. 52, 61 (N.D. Cal. 1982); *Van v. Travel Information Council*, 628 P.2d 1217,

1227 (Ore. Ct. App. 1981); *Collier v. City of Tacoma*, 854 P.2d 1046, 1058

(Wash. 1993) (en banc).) In closing on this issue,

> "[a]lthough the Supreme Court has not considered the issue, the
> overwhelming majority of courts that have reviewed sign ordinances
> imposing durational limits for temporary political signs tied to a
> specific election date have found them to be unconstitutional"
> Supreme Court of Ohio - *City of Painesville Building Department v.*
> *Dworken & Bernstein Co.* (2000).

## ISSUE V.

**The District Court erred by granting summary judgment to the CITY on the Fourth Amendment claim -- either by improperly drawing inferences in favor of the movant rather than the nonmovant and/or by improperly finding a fact not actually asserted by any party.**

### *STANDARD OF REVIEW*

"[R]eview de novo the entry of summary judgment and draw all reasonable inferences in the nonmovants' favor." *Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1016 (10th Cir. 2001).

"All disputed facts must be resolved in favor of the party resisting summary judgment." *White v. Gen. Motors Corp.*, 908 F.2d 669, 670 (10th Cir. 1990).

"[R]eview de novo the ultimate determination of reasonableness under the Fourth Amendment.'" *United States v. Shuck*, 713 F.3d 563, 567 (10th Cir. 2013) (quoting *United States v. Polly*, 630 F.3d 991, 996 (10th Cir. 2011)).

*Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n*, 483 F.3d 1025, 1030 (10th Cir. 2007) ("Cross motions for summary judgment are to be treated separately; the denial of one does not require the grant of another." (quoting *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979))).

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52(1986)("whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.")

### *ARGUMENT*

CLARK raised this issue at ECF 157-1 at 1 [ROA V. I. at 1169], "COUNT II –

FOURTH AMENDMENT [...] SUMMARY JUDGMENT STANDARD". See

ECF 157-1 at 17 [ROA V. I. at 1185]:

> "The core holding of the court is found in ECF 114 at 26 [...] This
> holding demonstrates that inferences were drawn in favor of the
> movant and failed to draw inferences in favor of the non-movant."

The District Court ruled on the issue at ECF 114, p. 31 [ROA V. I. at 1111],

"THE COURT FURTHER ORDERS that the City is granted summary judgment

on Clark's Fourth Amendment claim".

The District Court erred in asserting the fact[4] that there was "no path to the

front porch from the driveway" (ECF 114 at 26) and; erred by drawing an

inference against the nonmovant rather than in favor of the nonmovant concerning

training some visitors to use the back entrance[5] as a factor in determining

reasonableness for the code enforcer to walk toward the back of the house (which

had no back door visible from any publicly accessible area around CLARK'S

---

[4] The fact asserted in ECF 92 at 15, ¶19 [ROA V. I. at 463] was:
"There is a front step to the front porch but no sidewalk nor any **worn**
path to the front porch. (Clark depo. 36:3-13; see also Clark depo. Ex.
27, Stipulation 34 of Pretrial Order ECF 84 - photo of front porch
Bates number 000032)." (emphasis added)

[5] See ECF 114 at 26 [ROA V. I. at 1106] where the District Court remarks
that 'Clark admits that he had "trained" at least some of his visitors to come
to the back entrance, and that he hoped the state of the front entrance would
deter visitors.'

property) and; erred in impliedly determining that "hearing someone towards the back of the house" would extend the implied license (i.e., make it reasonable) to decide to go toward the back of the house. This is error because "hearing someone" does not constitute an invitation (consent) to go to wherever you believe that someone may be located on their private property – what if that incident of "hearing someone" was your young daughters chatting while sunning in the nude by the backyard pool? Reasonable to head around there to take a poke and holler because of hearing them conversing with one another?

The District Court also erred in drawing inference against nonmovant CLARK because "he hoped the state of the front entrance would deter visitors" (ECF 114 at 26 [ROA V. I. at 1106]). Drawing an inference that visitors would then search for another unknown and unseen entrance because of the state of the front door is not an inference drawn in favor of the nonmovant as required at summary judgment. CLARK hoping for no visitors is not the same as hoping or expecting visitors would use some other door. That is, hoping the state of the front entrance would deter visitors completely is not the same as hoping that the state of the front entrance would encourage visitors to search for some unseen door. Importantly, as nonmovant, the same facts could lead to the reasonable inference that visitors would be deterred completely from attempting to make contact.  The District Court also erred by concluding that "no reasonable jury could find

29

otherwise." (ECF 114 at 26 [ROA V. I. at 1106]) because of the existence of

possible alternate views of the evidence that would favor the movant.

The words and concepts contained in *Florida v. Jardines*, 569 U.S. 1(2013)

("*Jardines*") are worth reviewing for this case. One excerpt lays out at length that

the protection afforded by the Fourth Amendment to a person's home is certainly

**not limited** to the house and areas hidden from public view:

> "This right would be of little practical value if the State's agents could stand
> in a home's porch or side garden and trawl for evidence with impunity; the
> right to retreat would be significantly diminished if the police could enter a
> man's property to observe his repose from just outside the front window.
>         We therefore regard the area "immediately surrounding and associated
> with the home"—what our cases call the curtilage—as "part of the home
> itself for Fourth Amendment purposes." Oliver, supra, at 180." *Id.*

Another excerpt lays out that compliance with the implied license is not something

for which ignorance, nor poor judgment by a code enforcer, would be an

acceptable reason for exceeding the implied license.

> "This implicit license typically permits the visitor to approach the home by the
> front path, knock promptly, wait briefly to be received, and then (absent
> invitation to linger longer) leave. Complying with the terms of that traditional
> invitation does not require fine-grained legal knowledge; it is generally
> managed without incident by the Nation's Girl Scouts and trick-or-treaters." *Id.*

The District Court properly noted CLARK's argument as:

> "Clark argues that De La Torre entered his property seeking
> information about whether Clark would remove the signs at issue and
> did so in a manner that "exceeded the implied license of *Florida v.*
> *Jardines.*" Doc. 79 at 34-35. Specifically, Clark takes issue with the

fact that De La Torre did not knock on his front door but instead
walked down the driveway after hearing noises toward the back. This,
Clark contends, was an unlawful search of the curtilage of his house.
Doc. 79 at 38." ECF 114 at 23 [ROA V. I. at 1103]

There should be no dispute that 'seeking information' constitutes a search for
purposes of the Fourth Amendment. The question is the *reasonableness* of the
search and; **exceeding the implied license** referenced by *Jardines* **makes the
search <u>un</u>reasonable** unless a warrant exists for the search or the search falls
within one of the well-defined exceptions to warrantless searches. In the present
case, there was no claim to existence of any warrant or exceptions to the warrant
requirement under the Fourth Amendment.

There is no dispute by CLARK that '[t]he "portion of the curtilage" that is
"the normal route of access for anyone visiting the premises" is only a "semi-
private area" on which [government agents] may set foot **if** (big IF) they "restrict
their movements to places visitors could be expected to go (e.g., walkways,
driveways, porches)." 1 Wayne R. LaFave et al., Search & Seizure § 2.3(f) (5th
ed., 2012 update) (footnotes omitted).' *United States v. Shuck*, 713 F.3d 563, 567
(10th Cir. 2013). The question at issue in the present case is – was the route taken
by the officer (code enforcement officer) actually "the normal route of access for
anyone visiting the premises" based on the *evidence*. That is the central dispute
and should have been resolved in CLARK's favor whether because of disputed

facts and *evidence* or properly making reasonable inferences.

The evidence does not show, nor were any facts asserted, that the officer could see some other door besides the front door from anywhere that was publicly accessible, including the part of the driveway in front of or beside the house. The District Court's analysis rested heavily on making the back door out to be the normal route of access for visitors or by making the front door out to be inaccessible. Both being a reach way too far based on the asserted facts and the *evidence* in the record especially when following the summary judgment standard of treating the Defendant's motion as the movant.

The District Court ruled that "it is undisputed that there was no path to the front porch from the driveway" (ECF 114 at 26 [ROA V. I. at 1106]) but that was not even an asserted fact by any party. See CITY's motion, ECF 92 at 15, ¶19 [ROA V. I. at 463] which contained "There is a front step to the front porch but no sidewalk nor any **worn** path to the front porch" (emphasis added). See also ECF 92 at 41 [ROA V. I. at 489] "There was no path **worn in the grass**" (emphasis added).

The District Court made this errant finding of fact in concluding there was "no path to the front porch from the driveway" in the summary judgment order (ECF 114 at 26 [ROA V. I. at 1106])  and reaffirmed that misapprehension when denying CLARK's motion to reconsider. See ECF 164 at 6 [ROA V. I. at 1230], "the inferences Clark seeks are not reasonable, especially in light of the undisputed

32

facts that there was **no path to Clark's front porch**" (emphasis added).

Clearly, leaving out "worn" as a descriptor changes the allegedly uncontroverted

fact to one that Clark certainly did dispute. In that latter order, the District Court

clearly identified its reason for concluding there was "**no** path to Clark's front

porch" was because

> 'the City's statement of facts clearly stated there was "no sidewalk nor any **worn** path to the front porch" of Clark's house. Doc. 92 at 15 (SOF 19). And **Clark did not controvert that statement**. Doc. 100 at 18 ("DSOF 15-19: Uncontroverted").' (emphasis added) ECF 164 at 6 [ROA V. I. at 1230]

The difference between "worn" and "no" is a giant chasm. All that was **actually**

asserted by the CITY was no "worn" path and, notably that is all that the *evidence*

shows. No "worn" path, it does not show that there was "no" path.

Holding to its skewed conclusion, the District Court made special note

that "Clark eventually acknowledges this, Doc. 157-1 at 25" [ROA V. I. at 1193].

But that acknowledgement by CLARK was not acknowledging the District

Court's conclusion of "no path" was correct, rather it acknowledged that it is was

not controverted that there was "no sidewalk nor any **worn** path to the front porch"

which is completely different. See Clark's actual acknowledgment:

> "'The latter was not controverted but neither does it preclude determination of a Fourth Amendment violation. Many houses do not have **paved** walkways or **worn** paths "leading up to the front door" and that circumstance does not prevent Girl Scouts from knowing how to approach and knock on the front door (See, e.g., *Jardines).'* (emphasis added) ECF 157-1 at 25 [ROA V. I. at 1193]

33

In other words, there was no reason for CLARK to have controverted the statement by the CITY for the simple reason that the conclusion/fact/inference drawn by the District Court simply was not what was asserted by that statement. And it was not asserted as fact by any party with good reason (i.e., existence of overwhelming contrary *evidence* in the record).

Many homes do not have sidewalks and receive fewer visitors than it would take to wear a path in the grass of the yard. A front step and a front door which are visible from the roadway are not made inaccessible (i.e., no path) merely because there is no sidewalk or because no path has been **worn in the grass** leading to the front door.

This finding of "no path" was misapprehension of a *significant material fact* in the analysis of the implied license at issue. In addition to misapprehension of this material fact, the District Court never once addressed the competent *evidence* of a photograph of the porch as seen from the roadway even though that *evidence* was raised. See ECF 100 at 55 [ROA V. I. at 893]:

> 'Whether the front door was "blocked" or whether or not the front door "did not appear to be used" are facts which are conclusively determinable from evidence (i.e., can be no reasonable/genuine dispute) from the evidence, i.e., see photograph of the doorway at ECF 92-8 p. 2 (CITY000032) which was shown during the officer's deposition concerning the status of the front door on that day - showing the great majority of the front door to be visible. That visibility being from the street as well (See ECF 92-6 at p. 2 and ECF 92-7 at p. 2).'

Those pictures can be seen in the record (ECF 92-6 at 2 [ROA V. I. at 543], ECF

92-7 at 2 [ROA V. I. at 545], ECF 92-8 at 2 [ROA V. I. at 547]) and should

leave **no reasonable doubt** that the front door was, in fact, **accessible** and

certainly refutes the District Court's contrary conclusion and assertion that

"no reasonable jury could find otherwise" (ECF 114 at 26 [ROA V. I. at 1106]).

It is plain error to disregard that **clear competent evidence** when drawing a

conclusion of fact (beyond inference?) about whether or not an accessible route

existed to CLARK's front door. Clark clearly raised this in a motion to amend.

See ECF 118, at page 4 [ROA V. I. at 1117]:

> 'the evidences in the record do not present sufficient information to
> conclude that the front door is "inaccessible" as a matter of law.
> Clark cited to a "photograph of the doorway at ECF 92-8 p. 2"'
>
> See ROA V. I. at 547.

See also CLARK's response to CITY's motion for summary judgment, ECF 100

at 19 [ROA V. I. at 857] concerning "DSOF 28":

> 'If this DSOF is asserting as fact the conclusion that 'there was "no
> way you could get to the front door because of the objects that were
> on the porch"' then that fact is Controverted. See, e.g., photograph of
> the doorway at ECF 92-8 p. 2 (CITY000032) which was shown
> during the officer's deposition.'

The existence of this evidence (i.e., that photograph[ROA V. I. at 547]) was

noticeably absent from all of the District Court's analyses and; taking all of

the *evidence* into account, the *evidence* cannot reasonably be said to be so

one-sided that the CITY must prevail **as a matter of law**.

The District Court relied heavily on *United States v. Shuck*, 713 F.3d 563, 567 (2013) which shows that the implied license is not violated by taking 'the normal route of access for anyone visiting the premises'. CLARK does not disagree with that, but the District Court error was in coaxing an errant "no path" finding so that this case would fit within that holding. That is, attempting to show the front door as inaccessible despite raised, yet unaddressed, evidence that CLARK asserts shows just the opposite. See ECF 92-8 at 2 [ROA V. I. at 547].

Any inference drawn from CLARK training his nephew should be drawn in favor of the front door being the normal route or path of access. A normal route is not confined to only paved or worn areas. At minimum, the fact about which door would be the "normal route of access" should have gone to the trier of fact. CLARK contends that the unaddressed evidence, including pictures,  and the errant conclusion concerning "no path" tainted any inferences that should have been drawn in favor of the nonmovant. The trier of fact should have determined relevant material  facts in dispute such as whether or not a path to the front porch existed and whether or not the front door was accessible.  See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52(1986)("whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.")

## ISSUE VI.

**The District Court erred in its determination of law concerning the Fourth Amendment as applied to the undisputed evidence.**

### *STANDARD OF REVIEW*

"[R]eview de novo the ultimate determination of reasonableness under the Fourth Amendment.'" *United States v. Shuck*, 713 F.3d 563, 567 (10th Cir. 2013) (quoting *United States v. Polly*, 630 F.3d 991, 996 (10th Cir. 2011)).

### *ARGUMENT*

This issue is somewhat derivative of the issue just above (ISSUE V) because improperly drawn inferences concerning facts can lead to different applications of the law to the facts (or facts drawn by inference); thus, as a derivative, CLARK raised this issue at ECF 157-1 at 1[ROA V. I. at 1169],  "COUNT II - FOURTH AMENDMENT [...] SUMMARY JUDGMENT STANDARD".

The District Court ruled on the issue at ECF 114, p. 31 [ROA V. I. at 1111], "THE COURT FURTHER ORDERS that the City is granted summary judgment on Clark's Fourth Amendment claim". An undisputed copy of the regulations is in the record and; a copy of those regulation may be found in the record at ECF 38-1, pp. 3-103 [ROA V. I. at 22-122].

Government actors "'search" a home's curtilage simply by entering that constitutionally protected place to obtain information.' *U.S. v. Carloss*, 818 F.3d 988 (10th Cir. 2016) (Gorsuch, J., dissenting). See also *Jardines* at 6, 'When "the Government obtains information by physically intruding" on persons, houses,

papers, or effects, "a 'search' within the original meaning of the Fourth Amendment has "undoubtedly occurred." *United States v. Jones*, 565 U.S. 400, 406-407, n. 3, 132 S. Ct. 945, 181 L. Ed. 2d 911, 919 (2012).'

There should be no dispute that a 'knock and talk' is a search just as there should be no dispute that a 'knock and talk' is a *reasonable* search . . . so long as it does not stray outside of the implied license. Therein is the first part of the issue for the Fourth Amendment claim of this case, did the knock and talk remain within the implied license? And the second part being, was that properly determined "as a matter of law" at summary judgment wherein facts and reasonable inferences are to be drawn in favor of the nonmovant.

The following paragraphs (labeled A-L) are the pertinent facts and evidence which were asserted by Defendant within its motion for summary judgment (ECF 92 [ROA V. I. at 449-499]) concerning the Fourth Amendment claim, along with argument by CLARK --

**A.** "The house has doors in the front and the back." (ECF 92, p. 15 ¶ 16) [ROA V. I. at 463]

That fact does not establish the pertinent fact about which doors were visible from publicly accessible places. Movant asserted no fact about which doors were visible from publicly accessible places. Evidence in the record shows that the back door was not visible from publicly accessible places. See, e.g., ECF 79 at 37 [ROA V. I. at 184]:

> "and at the location from which the officer was discovered is
> not visible from the street in front of the house, nor is
> CLARK's backdoor visible from that location. (See ECF 79-2
> at 4, ¶¶13-14)." See ROA V. I. at 326.

See also ECF 92-5 at 2 [ROA V. I. at 541] showing hand drawn "X" at the

location where CLARK encountered the code enforcement officer.

Clark also provided an Affidavit stating:

> "Part of the area behind the house was blocked by a canopy that
> has sheets hung as walls and De La Torre was in that area for
> part of the time he spent behind the house. The **back door** was
> behind the canopy **and could not be seen without piercing
> through two walls of sheets**."

> See ECF 102 at 3, ¶5 [ROA V. I. at 963] (emphasis added)

See also ECF 92-5 at 2 [ROA V. I. at 541] which contains an aerial picture

of CLARK's property; see also ECF 92-6 at 2 [ROA V. I. at 543] and ECF

92-7 at 2 [ROA V. I. at 545] and ECF 92-8 at 2 [ROA V. I. at 547] which

contain pictures of CLARK's house as viewed from the street  (i.e., as any

visitor would view it) which provides evidence of "the normal route of

access for anyone visiting the premises".  Those pictures show no

obstructions that would prevent a visitor from walking straight from the

street to the front door beginning at a variety of places along the street in

front of CLARK's house. The porch area from those pictures can be seen

better in the picture at ECF 92-8 at 2 [ROA V. I. at 547].  Any jury looking

at those pictures could easily determine that "the normal route of access for anyone visiting the premises" would involve simply **approaching the front door**. While the defendant attempted to describe an unapproachable front door, a picture is worth a thousand words and; these pictures were before the District Court at summary judgment including the close up picture depicting the front door (See ECF 92-8 at 2 [ROA V. I. at 547]) and the relative location of that door on CLARK's property. See ECF 92-5 at 2 [ROA V. I. at 541], ECF 92-6 at 2 [ROA V. I. at 543], and ECF 92-7 at 2 [ROA V. I. at 545]. None of these pictures were addressed by the District Court even after specifically raising that issue in a motion to amend concerning ECF 92-8 [ROA V. I. at 547]. See ECF 118 at 4-5 [ROA V. I. at 1117-1118]:

> 'there is no chance, no chance, that every reasonable juror would come to that conclusion when looking at that picture. Certainly, that there was "no [paved or worn] path to the front porch from the driveway, the steps were partially blocked with vegetation, and items on the porch at least partially blocked the front door." (ECF 114 at 26) does not equate to the front door being "inaccessible".'

This failure to address plainly pertinent *evidence*, i.e., relevant and material, would be plain error even if that omission had not been specifically raised to the District Court.

**B.** "Clark trained his nephew to come to the back door." (ECF 92, p. 15 ¶ 17 [ROA V. I. at 463])

As noted earlier, this fact provides a clear reasonable inference that people without such training would not use the back door yet; the District Court clearly appeared to draw the inference that this would support reasonableness of the code enforcer walking toward the back of the house despite there being no evidence that the code enforcer was ever trained by CLARK to do so.

**C.** "A wooden railing around the perimeter of the front porch blocks entry onto the front porch except for the opening at the front step. (Clark depo. 36:20-37:3)." (ECF 92, p. 15 ¶ 20 [ROA V. I. at 463])

This fact merely establishes that the path to the front door would include going through the only opening on the front porch which would be a natural guide for the normal path to the front door as with most homes which have a semi-enclosed front porch.

**D.** "An old mattress and chair sit about a foot back from the entrance to the front porch. Somebody coming to the front door would have to squeeze by the tarp and chair to get through. (Clark depo. 95:3-96:6; Clark depo. Ex. 27)." (ECF 92, p. 15 ¶ 21 [ROA V. I. at 463])

Use of "squeeze by" is a clearly a fluid subjective term that, in the context of a path, generally means a narrowing of the path, not blockage of the path. The description of "sit about a foot back" provides no indication that CLARK believed the path would be blocked or inaccessible.

**E.** "A dead or dormant plant extends in front of and over the opening onto the front porch. (Clark depo. 96:12-16; Clark depo. Ex. 27)." (ECF 92, p. 15 ¶

22 [ROA V. I. at 463])

As with a mattress and chair above, a dead or dormant plant may narrow a path without causing the path to be blocked and without deterring or hindering anyone. While this was uncontroverted, it was conditioned as "plenty of room to walk past it." (ECF 100, p. 18 ¶ 22 [ROA V. I. at 856]) That conditional is supported by the pictures in the record though the District Court failed to address those pictures which would be worth more than thousands of words by the movant in describing what is seen in them.

**F.** 'Clark testified in his deposition at 96:7-11: "Q. Would you agree that it doesn't look like an invitation to the front door with those things sitting in front of it? A. I would hope so, but I can't really say that nobody would be deterred from going up there."' (ECF 92, p. 15 ¶ 23 [ROA V. I. at 463])

As noted earlier, an expressed "hope" and an expressed conclusion that one can't really say the hope could be realized is not even a fact pertinent to the actual status of the path to the front door. It merely indicates a preference for fewer visitors and an opinion that the preference is not likely to be realized based on the status of the path to the front door. While uncontroverted, it was conditioned as "Clark's answer to the question posed was obviously **expressing his preference** for no visitors, **not agreeing** that "it doesn't look like an invitation"." (ECF 100, p. 18 ¶ DSOF 23 [ROA V. I. at 856]) (emphasis in original) Regardless, it is fallacious logic to conclude

that if the front door does not appear "inviting" that the front door cannot be

"the normal route of access for anyone visiting the premises". None of the

CITY's zoning regulations require that  one must keep their front door in a

manner to make it appear "inviting". The fallacy, of course, is that if the

front door is less than "inviting", how much more "inviting" is a door that

you cannot even see and that you don't even know if it exists? If only one

door is visible from publicly accessible places and that door is determined

by the visitor to be not so "inviting", even the Girls Scouts know how to take

a hint. See *Jardines*.

**G.** "There was a door bell at the front door but it didn't work and Clark took it
down. (Clark depo. 39:15-19)." (ECF 92, p. 16 ¶ 24 [ROA V. I. at 464])

    The fact that a front door does not have a door bell is immaterial to

approaching and knocking on the door. Doorbells, when present, are

usually just a convenience to provide an alternative to knocking.

**H.** "On March 16, 2015, De La Torre parked his vehicle on the City right of
way at the road and walked up the driveway. He saw no one at first but
heard someone in the back and so called for Mr. Clark. Clark came out and
immediately told De La Torre to get off his property and then turned and
went back into the house. De La Torre did not know why Clark was
returning to the house so he turned around and started walking back to his
car. (De La Torre depo. 54:4-15)." (ECF 92, p. 16 ¶ 26 [ROA V. I. at 464])

    Many aspects of this paragraph were controverted but pertinent facts

were not controverted including that the code enforcement officer

43

"parked his vehicle" and "walked up the driveway". There was no asserted

fact whether or not "walked up the driveway" was part of seeking a path to

the front door, i,e., the only door visible from publicly accessible places

around CLARK's property. That the code enforcement officer "saw no one

at first but heard someone in the back and so called for Mr. Clark." does not

indicate what path was taken or where the officer was located which are

material to showing a path was taken that falls within the implied license

referred to by *Jardines*.

**I.** "De La Torre was only at Mr. Clark's property for three to four minutes. (De La Torre depo. 54:20-23)." (ECF 92, p. 16 ¶ 27 [ROA V. I. at 464])

      This fact is irrelevant. A Fourth Amendment violation does not

reverse itself based on the duration of the violation.

**J.** "De La Torre noticed that there was "no way you could get to the front door because of the objects that were on the porch, so that's why [he] was walking up the drive, and not only that, [he] heard someone in the back." (De La Torre depo. 55:21-25). The front porch did not appear to be useable because of the items blocking the path to the front door on the porch. There was no path or walkway leading up to the front door, only the driveway. (De La Torre depo. 56:4-19)." (ECF 92, p. 16-17 ¶ 28 [ROA V. I. at 464-465])

      The only real "facts" (as opposed to opinions, conclusions or

assumptions)  asserted in that paragraph were that the code enforcement

**noticed objects**. That the code enforcement officer concluded that there was

no paved or worn "walkway leading up to the front door". The latter was not

controverted but neither does it preclude determination of a Fourth

Amendment violation. Many houses do not have paved walkways or worn

paths "leading up to the front door" and that circumstance does not prevent

Girl Scouts from knowing how to approach and knock on the front door

(See, e.g., *Jardines*). The nonmovant, CLARK, controverted this paragraph

in part at (ECF 100, p. 19, ¶ DSOF 28 [ROA V. I. at 857]) including

showing a portion of the testimony of the officer in deposition ,

"Q. You didn't even attempt to go to the porch? A. No. Q. And that's

because? A. I heard  you in the back."

This testimony about "I heard you  in back" (as if the "you"

definitively meant "CLARK") was clarified later in the deposition that

it was not meant as a fact but was meant euphemistically. See ECF 100,

p. 12, [ROA V. I. at 850], "Q. Okay. What noise? Cause I want to know how

you knew it was me back there. A. **I didn't know it was you.**"

**K.** "De La Torre estimates that he only proceeded half way to three quarters up
the driveway. De La Torre did not leave the driveway the entire time he was
on Clark's property on March 16. (De La Torre depo. 58:15-59:2)." (ECF
92, p. 17 ¶ 30 [ROA V. I. at 465])

To the extent the distance is relevant or material, that was plainly

controverted by the nonmovant (See ECF 100 at 20-21 [ROA V. I. at 858-

859], "If the fact asserted is that "he only proceeded halfway to three

quarters up the driveway." then that is Controverted.")  Being controverted,

this should not have been construed in favor of the movant. More plain error

in applying the summary judgment standard.

**L.** "De La Torre was not performing a search of Clark's property on March 16, 2015. The violations that De La Torre was addressing were all "in plain view from public roads." (De La Torre depo. 62:19-23)." (ECF 92, p. 17 ¶ 32 [ROA V. I. at 465])

That first statement is a conclusion of law, not a fact and, while the

location of violations is irrelevant to whether an unlawful search occurred

during any attempt to address those violations. Further this conclusion of

law and this asserted fact were Controverted.  See ECF 100, p. 21 at

"DSOF 32" [ROA V. I. at 859].

The totality of the facts asserted just above by the movant(CITY) were not

sufficient to grant summary judgment to the movant on the Fourth Amendment

claim under the "*as a matter of law*" standard and the District Court should have

allowed that claim to go to the trier of fact to answer such things as the following

five things which speak to material facts of the issue:

-- What door, or doors, to the house were visible from publicly accessible places?

-- Was the front door "inaccessible"?

-- What is the normal route of access for anyone visiting CLARK's house?

-- Did the code enforcer restrict his movements to places visitors

46

could be expected to go?

-- Even if areas of the curtilage trodden by the code enforcer are semi-private,

did that invade any area that CLARK had substantial expectation of privacy?

See *Adams v. Am. Guarantee Liability Ins. Co.*, 233 F.3d 1242 (10th Cir. 2000):

> 'A fact is "material" if under the substantive law it could have an
> effect on the outcome of the lawsuit. *Horizon/CMS Healthcare Corp.*,
> 220 F.3d at 1190. An issue is "genuine" if "a rational jur[or] could
> find in favor of the nonmoving party on the evidence presented." *Id.*'

If this appellate court chooses to answer such questions as the five questions posed

above, then the evidence in the record (See, e.g., pictures in the record [ROA V. I.

at 541,543,545,547] and ECF 79-2 at 4, ¶13-14 [ROA V. I. at 326]) and any

reasonable inferences drawn in favor of the nonmovant rather than the movant

would make clear that:

-- the **only** door to the house that was **visible** from publicly accessible places was

the **front door**.

-- the front door was **accessible** and even the Girl Scouts could see that was.

-- The **normal route** of access for anyone visiting CLARK's house is from the

street or driveway apron and nearly straight across a portion of the front yard

to the step in front of the porch and ahead to the **front door**.

-- The code enforcer did not restrict his movements to places visitors

could be expected to go.

-- An area of the curtilage trodden by the code enforcer, even if semi-private,

did invade CLARK's substantial expectation of privacy.

The crux of the District Court's error can be seen in CLARK's motion to amend

in which CLARK argued:

> 'Those same facts cited by the Court clearly provide basis for a
> number of inferences being drawn in favor of the Plaintiff that show
> this cannot be decided "as a matter of law".'
> ECF 118 at 3 [ROA V. I. at 1116]

There was no assertion of fact by the movant that a warrant existed or that any

of the well defined exceptions applied. See *Mimics, Inc. v. Village of Angel Fire*,

394 F.3d 836, 844 (10th Cir. 2005).

The nonmovant's (CLARK) fact at ECF 79, page 2, ¶5 [ROA V. I. at

149] clearly indicates that a warrantless search occurred ("without a warrant to

seeking to obtain information about Clark including information about compliance

with ordinances"). Seeking information is clearly a search under the Fourth

Amendment even though such seeking may be reasonable (such as a properly

executed knock and talk) and thus not be a violation. So, even though the movant

(CITY) claims to controvert nonmovant's statement of fact, it was, nonetheless,

admitted that the code enforcer "attempted to discuss the situation regarding the

code violations with Mr. Clark." which is clearly seeking information. That a

search does not find what it is seeking to find does not negate that it is a search.

There is no dispute that a warrant did not exist or that any exceptions to a warrant existed which leaves the reasonableness to be determined about whether or not the search-holler-poke around- and-talk exceeded the implied license. Question: When there is one, and only one door, the front door, which can be seen from any publicly accessible place, is merely "hearing noises" coming from somewhere behind a house sufficient to then draw a reasonable inference that an occupant is at the house somewhere and that the occupant gives consent for anyone hearing noises to come around to the back? In other words, is that sufficient to justify making warrantless entry into the curtilage to investigate the noise or to search for an unknown unseen door or an occupant? The answer should be that, under the circumstances of this case, an officer that hears a family pool party, or hears some other sounds, or noises, or even the voices of the owners, which emanates from elsewhere about *does not* relieve the officer of the duty to abide by the implied license to make a directed approach by way of a **front** path. Allowing the implied license to be magically extended (i.e., to skip a frontal approach when only a front door is visible) simply because of hearing sounds or noises would effectively eliminate Fourth Amendment protections for the curtilage of the home.

What if an officer hears sounds in the direction of a classic 1957 Chevy convertible parked in an open garage on the side of the house because the occupants are *making out* perhaps a little too loudly? License to snoop? Or no?

49

The District Court made questionable reliance on various cases, which if not abrogated (outdated) are certainly distinguishable and indicate failure to give proper effect to *Jardines* and other longer standing precedent.

The District Court cited to *United States v. Carloss*, Tenth Circuit (published), No. 13-7082(2016) ("implied license to approach a home, knock on the front door, and ask to speak with the occupants.") ECF 114 at 27 [ROA V. I. at 1107] Notably, *Carloss* cites to *Kentucky v. King*, 563 U.S. 452, 131 S. Ct. 1849, 1862 (2011) ("The home's occupant remains free to terminate the conversation or even to **avoid it altogether** by not opening the door.") to make the point that its "knock and talk" analysis did not change after *Jardines*. That "did not change" holding appears to have been indicating that so long as the door at which a knock and talk is initiated can be approached without violating the implied license, then a knock and talk remains a "reasonable search" (i.e., falls outside of Fourth Amendment protection) . It was not a blanket(nor a specific) assertion that a knock and talk at any and every door is always reasonable. The Tenth Circuit has made similar statements such as in *United States v. Cavely*, 318 F.3d 987, 994 n. 1 (10th Cir. 2003) where is was stated that the "mere fact that officers went to the front and around toward the back of appellant's house, standing alone, does not establish an invasion of the curtilage." This, too, was not a blanket assurance that officers may always go around toward the back of a house.

50

If it had, the Tenth Circuit would have to acknowledge that a resident that took extreme measures to privacy protect their backyard could not avoid a conversation altogether simply by not opening the front door as the officer could use whatever means would be necessary to overcome any privacy measures in order to go around to the backyard and be face to face with the resident. Certainly, avoiding a conversation at that point is not realistic.

A key point is the mention of "mere fact that officers went to the front and around toward the back of appellant's house, standing alone". Now, if you add to that a fact that "the officers cut a hole in the eight foot fence along their way that blocked their path" then the "mere" is no longer "mere" and the going around toward the back may now well be a violation of the Fourth Amendment. What if the officers headed around toward the back when there was no backdoor visible from any publicly accessible place? That holding about "mere" cannot be extended beyond the "mere" without further analysis. In this vein, another cited holding was *United States v. Diaz*, 2009 W.L. 3675006, at *2 (N.D. Fla. October 30, 2009, affirmed 404 Fed. Appx. 381 (11th Cir. 2010)) (See ECF 114 at 26-27 [ROA V. I. at 1106-1107]) "If it appears that someone is in or around a house, officers may take reasonable steps to initiate contact by going to other areas of the property." First, this pre-dates *Jardines* and, second, the key being taking of

"reasonable steps". If there are no reasonable steps, that does not mean that other steps may be taken instead. Would it be reasonable to search for a door that you have never seen and don't even know if it exists or not? That seems like it would be a fishing expedition, not a reasonable step that a any visitor would take. The exception to entering the curtilage was laid out in *Jardines*, defining the reasonable steps as entering:

> 'the "portion of the curtilage" that is "**the normal route of access for anyone visiting the premises**" is only a "semi-private area" on which police may set foot if they "restrict their movements to places visitors could be expected to go (e.g., walkways, driveways, porches)."1 Wayne R. LaFave et al., Search & Seizure § 2.3(f) (5th ed., 2012 update) (footnotes omitted).' *Id.*

The District Court relied heavily on *United States v. Shuck*, 713 F.3d 563, 567 (2013), even claiming that "[t]he facts in *Shuck* are similar to the facts in this case." ECF 114 at 26 [ROA V. I. at 1106] But that case is easily distinguished in that **the evidence showed** there were two doors which were both "a primary entrance visible to and used by the public." The District Court looked to *United States v. Garcia*, 997 F.2d 1273, 1279-80 (9th Cir. 1993) (ECF 114 at 26 [ROA V. I. at 1106]) and mention of "if the front and back of a residence are readily accessible" to hone in on whether or not CLARK's front door could be determined to be inaccessible. But, for argument only, even if CLARK's front door actually were inaccessible, does not give rise to evidence that the back door was accessible.

In fact, the back door was not accessible nor could it even be seen. ECF 100 at 59

[ROA V. I. at 897] made reference to an Affidavit by CLARK containing "The

back door was behind the canopy and could not be seen without piercing through

two walls of sheets." See ECF 102 at 3 [ROA V. I. at 963]

Returning to the front door being "inaccessible" . . . if a chair between the

porch step and the door or a "cluttered porch" were to stand as a circumstance

which would constitute a door being inaccessible, then officers would have an

open gate (metaphorically speaking) to enter the curtilage at will.

The District Court opined that "Clark argues that *Jardines* drew an explicit

line" (ECF 114 at 24 [ROA V. I. at 1104]) but Clark followed up in a motion to

amend (ECF 118 at 3 [ROA V. I. at 1116]) to clarify that *Jardines* did not hold that

was the **only** permissible way to approach a house, but that the typical (mentioned

in *Jardines*) would apply to CLARK's home where *only* the front door can be seen

from any publicly accessible place.

While the District Court noted that *United States v. Shuck*, 713 F.3d 563,

567 (2013) was decided subsequent to *Florida v. Jardines*, 569 U.S. 1, 6 (2013),

that case involved a trailer house is easily distinguished from the present case as

the officers could easily see both doors of the trailer house from a public place.

There are no public places from which you can see Clark's back door.

The District Court cited to '*United States v. Raines*, 243 F.3d 419, 421

(8th Cir. 2001) (stating that "law enforcement officers must sometimes move away from the front door when attempting to contact the occupants of a residence")' (ECF 114 at 26 [ROA V. I. at 1106]) but that is a citation that is clearly before *Jardines* and runs headlong into the holding of *Jardines* if that citation was intended to stand for the proposition that not using the usual route of access is of no concern to the analysis.

The District Court cited to '*United States v. Anderson*, 552 F.2d 1296, 1300 (8th Cir. 1977)' (ECF 114 at 26 [ROA V. I. at 1106]) but that case is highly suspect after *Jardines* concerning "going toward the back of the house after getting no answer at the front" *Id.* Likewise highly suspect is the District Court's citation to *United States v. Diaz*, 2009 WL 3675006, at *2 (N.D. Fla. Oct. 30, 2009) (ECF 114 at 26-27 [ROA V. I. at 1106-1107]) concerning "going to other areas of the property." While the conclusion in *Diaz* may seem like a mild invasion of privacy, it would allow officers to view young daughters who may be sunning in the nude by the backyard pool. What may seem reasonable on the general surface becomes alarmingly unreasonable when put to the test of factual scenarios. Likewise highly suspect, the District Court's citation to *Alvarez v. Montgomery Cty.*, 147 F.3d 354, 358 (4th Cir. 1998) (ECF 114 at 27 [ROA V. I. at 1107]) concerning "an officer's warrantless entry into the area surrounding a residential dwelling even when the officer has not first knocked at the front door". Each of these cases predating

*Jardines* are all understandably similar, yet that makes each citation just as highly suspect as the next.

And the District Court's citing to other circuits such as *United States v. Thomas*, 430 F.3d 274, 276-80 (6th Cir. 2005) (ECF 114 at 26 [ROA V. I. at 1106]) concerning "primary entrance to the home" and likewise, citing to *United States v. Garcia*, 997 F.2d 1273, 1279-80 (9th Cir. 1993) (ECF 114 at 26 [ROA V. I. at 1106]) concerning "if the front and back of a residence are readily accessible" and, likewise, *United States v. Daoust*, 916 F.2d 757, 758 (1st Cir. 1990) (ECF 114 at 26 [ROA V. I. at 1106]) concerning "if that door is inaccessible" -- go to show that the District Court must have drawn a conclusion that Clark's front door was, in **fact**, "inaccessible". Based on all of the facts and argument in the record, "inaccessible" is a clearly disputed fact and the evidences in the record do not present sufficient information to conclude that the front door is "inaccessible" as a matter of law. A photograph of the doorway at ECF 92-8 p. 2 [ROA V. I. at 547]) evidences that there is no chance that every reasonable juror would come to that conclusion when looking at that picture. Certainly, there was no paved or worn path to the front porch from the driveway and the steps were partially blocked with vegetation and items on the porch at least partially blocked the view of the front door. (See ECF 114 at 26 [ROA V. I. at 1106]) but those facts do not equate to the front door being "inaccessible" or even close to it when

you compare that enumerated description to the corresponding picture.

The District Court opined about "the fact that De La Torre reasonably assumed that the front door was not the primary entrance." (ECF 114 at 27[ROA V. I. at 1107]) but the "reasonably assumed" is **not** a fact, it is a conclusion, a conclusion which was erroneous based on inferences being drawn in favor of the nonmovant which should be applied at summary judgment. The District Court also opined that "Nor is the Court convinced that De La Torre exceeded the scope of the license." (ECF 114 at 27) While that would be enough to deny summary judgment to CLARK (as a movant), that is insufficient to instead grant summary judgment to the CITY(as movant). To grant summary judgment to the CITY(as movant) means the Court must be able to conclude, as a matter of law, that De La Torre did not exceed the scope of the license. This Court erred in so far as it made that finding and applied it as a matter of law.

The above discussion demonstrates that reasonableness is viewed in light of what the ordinary visitor would believe is acceptable in attempting to make contact with someone at a home, not viewed in the light of what an aggressive code enforcement officer would believe is acceptable. In this case, the officer's deposition referenced in nonmovant's response to movant's motion for summary judgment was provided as an Exhibit and may be found in the record at ECF 102, pp. 25-113 [ROA V. I. at 985-1071] and demonstrates clearly aggressive code enforcement as the normal course of action . . . in blatant disregard of the historical

implied license of private property and; if aggressive and blatant disregard is condoned by this appellate court, the Girl Scouts could rightly and reasonably conclude that if an occupant cannot be easily found, they may go camp out in the backyard and await the occupant's return, so that they may attempt to sell their cookies to every house they pass by.

**CONCLUSION / RELIEF**

FIRST AMENDMENT:  This court should vacate the verdict and judgment of the District Court and; instruct the District Court to assess both, damages and prospective relief, concerning the broader scope of the First Amendment violation.

FOURTH AMENDMENT:  This Court of Appeals should reverse the grant of summary judgment to the movant, and *sua sponte*, based on the *evidence* in the record, grant summary judgment to CLARK and remand to assess relief and damages, nominal or otherwise.

Respectfully submitted,


Eric S. Clark, 1430 Dane Ave, Williamsburg, Kansas [66095] 785-214-8904

# REQUEST FOR ORAL ARGUMENT

Appellant respectfully requests that this Court hear oral argument.

This appeal raises many serious Constitutional issues regarding

enumerated fundamental constitutional rights. Appellant will

have an attorney address the cause before the panel.

Respectfully submitted,

**Eric S. Clark ( pro se )**
1430 Dane Ave
Williamsburg, Kansas 66095
Phone: (785) 214-8904

## CERTIFICATE OF COMPLIANCE

with required PRIVACY redactions.

Appellant hereby certifies that:

1. All required privacy redactions have been made to
   the Appellant's brief.

**Eric S. Clark ( pro se )**
1430 Dane Ave
Williamsburg, Kansas 66095
Phone: (785) 214-8904

59

## CERTIFICATE OF COMPLIANCE

with Type-VOLUME LIMIT, Typeface Requirements, and

    Type Style Requirements

Appellant hereby certifies that:

1) A This brief complies with the type-volume imitation of Fed. Rules. App. P. 32(a)(7)(B) because the rule allows an order of the court to exceed the limits otherwise applicable and the court has issued an order, on November 8,2019, to allow the opening Brief of Appellant to exceed 13,000 words but not more than 14,200 words and; this brief contains **14,192 words**, excluding the parts of the brief exempted by Fed. Rules App. P. 32(a)(7)(B)(iii) which is in compliance with the order of the court.

2) This brief complies with the typeface requirements of Fed. Rules App. P. 32(a)(5) and the type style requirements of Fed. Rules App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman typeface.

**Eric S. Clark ( pro se )**
1430 Dane Ave
Williamsburg, Kansas 66095
Phone: (785) 214-8904

## <u>CERTIFICATE OF SERVICE</u>

Appellant hereby certifies that service was made by mailing

true and correct copies of the foregoing

BRIEF OF APPELLANT

by deposit in the United States Mail, Postage prepaid,

on November 15, 2019 addressed to:


J. Steven Pigg, Andrew D. Holder, Seth Aaron Lowry
FISHER, PATTERSON, SAYLER & SMITH, L.L.P.
3550  S.W.  5th  St.
Topeka, KS 66606

and to:

Alan V. Johnson
Sloan Eisenbarth Glassman McEntire & Jarboe, LLC  − Topeka
534 South Kansas Avenue
Suite 1000
Topeka, KS 66603−3456

and the original and seven copies to:

Clerk, The United States Court of Appeals for the Tenth Circuit
The Byron White U.S. Courthouse
1823 Stout Street
Denver, CO 80257

Eric S. Clark, 1430 Dane Ave, Williamsburg, Kansas [66095] 785-214-8904