FILED
United States Court of Appeals
Tenth Circuit

January 14, 2021

Christopher M. Wolpert
Clerk of Court

# UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

_____

ERIC S. CLARK,

      Plaintiff - Appellant,

v.

CITY OF WILLIAMSBURG, KANSAS,

      Defendant - Appellee.

No. 19-3237
(D.C. No. 2:17-CV-02002-HLT)
(D. Kan.)

_____

## ORDER AND JUDGMENT[*]
_____

Before **TYMKOVICH**, Chief Judge, **BRISCOE**, and **BACHARACH**, Circuit Judges.
_____

Plaintiff Eric Clark, a resident of the City of Williamsburg, Kansas (the City), filed this action claiming that the City's attempted enforcement of its sign ordinance against him violated his First Amendment rights, and that the City's code enforcement officer violated his Fourth Amendment rights by walking onto his property and attempting to speak with him.  The district court granted partial summary judgment in favor of Clark on his First Amendment claim, but granted summary judgment in favor of the City on Clark's Fourth Amendment claim.  The First Amendment claim proceeded to a jury trial on the issue of damages, where the

_____

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

jury awarded Clark one dollar in nominal damages.  Clark now appeals the district court's summary judgment rulings in favor of the City on his First and Fourth Amendment claims.  Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm the judgment of the district court.

I

Clark lives in a house located in a sparsely populated area within the northern limits of the City.  The front of the house faces the east.  A gravel driveway runs from the back of the house, where there is a small parking lot type of area, around the south of the house and eastward to a road (K-273 Highway, also known as Dane Avenue) that runs north and south along the eastern boundary of Clark's property.

Clark purchased the property on July 29, 2003.  It is undisputed that in the early 1970s the prior owners deeded a total of .49 acres of the property, located on the eastern edge directly adjacent to the existing public road, to the State Highway Commission of Kansas for highway purposes.  It is disputed whether the City now has rights in that .49 acres of the property; the City maintains that it does, while Clark denies this.

On February 13, 2015, Tony De La Torre, a code enforcement officer employed part-time by the City, conducted an inspection of what he believed to be the City's right-of-way in front of Clark's residence.  Ten days later, on February 23, 2015, De La Torre sent Clark a written "NOTICE OF VIOLATION" (hereinafter Notice of Violation).  ROA at 581.  The Notice of Violation stated that De La Torre, during his inspection, "found that there [we]re three large barrels, several signs, and

2

other affixed objects . . . located with [sic] the City's eighty foot easement" that "w[ould] need to be removed." *Id*. The Notice of Violation further stated that "[u]nder the City['s] . . . Ordinance, political signs shall not be placed on or otherwise affixed to any public building or sign, right of way, sidewalks, utility pole, street lamp post, tree, or other vegetative matter, Public Park, or other public property." *Id*. The Notice of Violation stated that De La Torre would "be conducting a re-inspection of the right of way on March 9, 2015," and it advised that "[i]f the violations [we]re not corrected a citation m[ight] be issued and objects removed from the City easement." *Id*. Lastly, the Notice of Violation stated that if Clark "ha[d] any questions" or believed he "received th[e] letter in error," he should "contact City Hall immediately by phone . . . or actions w[ould] continue toward resolution." *Id*.

On February 25, 2015, Clark sent a letter to De La Torre acknowledging the Notice of Violation. *Id*. at 583. The letter noted, in part, that the Notice of Violation "failed to identify the specific lawful authority for alleging any violation." *Id*. The letter further stated that, "[t]o [Clark's] knowledge, [he was] not in violation," and it in turn asked De La Torre to "please provide the specific law/code/ordinance/etc" that he "believe[d] [wa]s being violated." *Id*. The letter also stated that if De La Torre was "unaware of liability under 42 U.S.C. 1983, and costs (§ 1988)," he should "become familiar with [his] exposure to personal liability as well as liability to the City." *Id*.

On March 16, 2015, De La Torre returned to Clark's property with the intent of speaking to Clark about, and hopefully resolving, the alleged violations. *Id*. at

3

464, ¶ 26; *Id*. at 530 (De La Torre deposition).  De La Torre parked his vehicle on the

City's right-of-way near the road and began walking up the gravel driveway towards

Clark's house.  *Id*. at 464, ¶ 26.  On that day, there were no "No Trespass" signs

posted on the property anywhere between the road and the house.  *Id*. at 462, ¶ 15.

There was no sidewalk or worn path leading to the front porch and door of the house.

The front porch was covered and Clark had placed a tarp over the front porch to

partially enclose it.  There was a chair and an old mattress near the entrance to the

front porch, and a visitor would have had to squeeze by the chair and the mattress to

enter the front porch area. According to De La Torre, "[i]t was very evident that there

was no way that [he] could get to the front porch because of the objects that were on

the porch."  *Id*. at 530.  Because of that, and because he also "heard someone in the

back" of Clark's house, he proceeded to walk up the gravel driveway and toward the

back of the house, rather than attempting to approach the front porch and front door

of the house.  *Id*.

At the back of Clark's house, Clark had hung sheets on ropes to form a ten-

foot square canopy with fabric walls that enclosed the back door to the house.  De La

Torre walked to within ten feet or less of this enclosure and called out for Clark.

Clark exited the rear door of his house, walked through and exited the square fabric

canopy, and began yelling at De La Torre to get off of his property. [1]  According to

---

[1] According to Clark, he asked De La Torre to leave three or four times, and approximately 10 to 15 seconds expired between each request.
.

De La Torre, Clark then turned and went inside his house.  De La Torre returned to his vehicle and left.  According to Clark, De La Torre did not leave until Clark threatened to call the sheriff.  De La Torre was physically present on Clark's property for approximately three to six minutes (De La Torre estimated it was three to four minutes, while Clark estimated it was five to six minutes).

On March 18, 2015, Clark sent a lengthy letter to the City.  The letter acknowledged that Clark's property "border[ed] a right of way," but asserted that Clark "ha[d] the right to place anything anywhere on [his] private property that [wa]s subject to right of way usage so long as it d[id] not unduly interfere with the purposes of the right of way."  *Id*. at 592.  The letter warned the City that it was violating, or threatening to violate, Clark's Constitutional rights, and it advised that Clark might file suit against the City.

Following receipt of Clark's letter, the City's Mayor met with the City Attorney, who recommended that the City not continue its investigation of potential ordinance violations by Clark.  The Mayor and the City Council subsequently met and purportedly decided not to pursue the Notice of Violation any further.  The Notice of Violation, however, has never been formally withdrawn by the City.

On July 10, 2015, Clark attended a session of the City's Municipal Court.  On the docket that day were two status hearings for other defendants; Clark did not have a matter on the docket.  Clark, however, proceeded to "disrupt[] the proceedings and would not permit the judge to open court."  *City of Williamsburg v. Clark*, No. 115,921, 2016 WL 5171918 at *1 (Kan. Ct. App. Sept. 16, 2016).  During the court

5

session, Clark (a) refused to stop videotaping the proceedings, despite being told to stop by the court, (b) questioned the Municipal Court judge's authority to conduct the proceedings, (c) refused to identify himself by name, and (d) refused to remain silent. The judge, in response, found Clark in direct contempt of court and sentenced him to two hours in jail.  ROA at 132, ¶ 31.  Clark unsuccessfully appealed that matter to the Kansas Court of Appeals.  *City of Williamsburg*, 2016 WL 5171918 at *1, 6.

On July 22, 2015, the City suspended the Code Enforcement Officer position due to budget constraints.  De La Torre left the City's employment as a Code Enforcement Officer and has not been replaced.  Since approximately that time, the City has also been without a municipal court judge, and no judge has held a municipal judicial proceeding in the City since May 2016.

On May 20, 2019 (approximately 11 days after the district court in this case determined that one subsection of the challenged sign ordinance was unconstitutional), the City Council passed a motion imposing a moratorium on enforcement of any provision of the City's sign regulations pending "further study." ROA at 1141.

II

On January 23, 2017, Clark, appearing pro se, initiated this action by filing a complaint pursuant to 42 U.S.C. § 1983 against the City.  ECF No. 1.  The complaint alleged, in pertinent part, that "[t]he City implemented policies which were the moving force behind the deprivation of the constitutionally protected rights of Clark, including the First and Fourth Amendments' rights to freedom of expression and

right to be free from unreasonable searches." *Id*. at 11. Count I alleged a violation of Clark's First Amendment rights. Count II alleged a violation of Clark's Fourth Amendment rights. The complaint asked for relief in the form of damages and declaratory and injunctive relief, including enjoining the City from enforcing its sign regulations and from entering any part of Clark's property without an invitation from Clark in writing.[2]

On June 1, 2018, Clark filed a motion for partial summary judgment seeking a "liability determination" as to his claims. ROA at 146. Clark asserted in his brief in support that "[b]ut for the City's [sign]" ordinance, he "would have placed political signs . . . in the unpaved portion of the right of way" on his property "nearer than 20 feet from the centerline of the road and left them in place . . . from July 4, 2016 to December 31, 2016 and . . . would have placed political signs outside of any right-of-way, but within an area of his private property which the City enforces its right of way restrictions . . . and left them in place . . . from July 4, 2015 to December 31, 2016." *Id*. at 150, ¶ 10. Clark further asserted that his "property is 'in a residential one district' and" that, "but for the City's regulation (Article 8, § 4(A)(6))," he "would have placed newly personalized political signs outside of any right-of-way and in excess of ten(10) [sic] square feet." *Id*., ¶ 12.

---

[2] On February 14, 2018, Clark filed an amended complaint that was substantially similar to the original complaint. Both the original and amended complaints included claims for inverse condemnation or an unconstitutional taking of Clark's property by the City. Those claims are not at issue in this appeal.

With respect to his Fourth Amendment claim, Clark argued that "[t]he moving force of actions which violated [his] . . . right to be free from unreasonable searches . . . was the City's Zoning Regulations which direct[ed] such enforcement action . . . ." *Id*. at 182.  Clark also argued that "the City's lack of guidance (failure to train) to the City's Code Enforcement Officer" resulted in a violation of his Fourth Amendment rights. *Id*.  According to Clark, De La Torre violated his Fourth Amendment rights by failing to proceed to the front door of Clark's house and, instead, "explor[ing] another path that lead[]" towards the back of Clark's house and "hollering or yelling in effort to make contact" with Clark. *Id*. at 185.

Lastly, with respect to his First Amendment claim, Clark argued, in pertinent part, that the City's sign ordinance was "content based" and infringed on his First Amendment rights. *Id*. at 194.  In support, he argued that the ordinance "prohibit[ed], through a chilling effect," his "ability . . . to express himself freely on certain topics at certain times, in certain manners, and in certain places." *Id*. at 200.

On August 9, 2018, the City filed its own motion for summary judgment. With respect to Clark's First Amendment claim, the City argued that Clark lacked standing to challenge the City's sign ordinance.  In support, the City noted that most of the provisions of that ordinance "ha[d] never been applied nor even threatened to be applied to him or his property," and that the one provision that was implicitly relied on in the Notice of Violation (which addressed signs located on the City's rights-of-way) was never actually enforced against Clark. *Id*. at 477.  The City also argued that "[e]ven if Clark had standing to challenge the" subsection of the

ordinance that "restrict[ed] signs on public property, that [sub]section d[id] not transgress the First Amendment" because it was content neutral. *Id*. at 481. Lastly, the City argued that the court should sever any offending portions of the ordinance.

As for Clark's Fourth Amendment claim, the City argued that De La Torre's brief entry onto Clark's property on March 16, 2015, did not constitute an illegal search prohibited by the Fourth Amendment. More specifically, the City argued that "[b]ecause De La Torre never left the driveway, never entered any 'curtilage' of Clark's residence and never performed any search subject to Fourth Amendment restrictions, his three to four-minute entry onto Clark's property in an effort to talk with [Clark] did not transgress the Fourth Amendment." *Id*. at 493. The City also argued that, even if De La Torre had violated Clark's Fourth Amendment rights, he was not acting pursuant to any City policy and, thus, the City was not responsible for his actions.

On May 9, 2019, the district court issued a memorandum and order that granted in part and denied in part both parties' motions. The district court granted partial summary judgment in favor of Clark on his First Amendment claim "that Article 8, § 4.A.(6)" of the City's sign ordinance "[wa]s an unconstitutional content-based restriction." *Id*. at 1081. The district court also concluded that Clark lacked standing to challenge any other provisions of the City's sign ordinance, and thus granted summary judgment in favor of the City as to that portion of Clark's First Amendment claim. *Id*. at 1081-82. As to Clark's Fourth Amendment claim, the

9

district court granted summary judgment in favor of the City on the grounds that "there was no search of Clark's property." *Id*. at 1-2.

On May 17, 2019, May 20, 2019, and May 21, 2019, Clark filed motions to amend the judgment. The district court denied those motions on June 19, 2019.

On July 17, 2019, the case proceeded to a jury trial on the issue of damages relating to Clark's First Amendment claim. At the conclusion of the evidence, the jury found that Clark did not suffer compensatory damages as a result of the Notice of Violation, and it awarded him $1 in nominal damages.

Judgment was entered in the case on July 18, 2019. Clark filed a motion to amend the judgment and a motion for new trial, both of which the district court denied. Clark then filed a timely notice of appeal.

III

Clark asserts six issues in his appeal. The first four of those issues pertain to his First Amendment claim. The last two of those issues pertain to his Fourth Amendment claim. For the reasons that follow, we reject all six issues and affirm the judgment of the district court.

*The First Amendment claim*

We begin by addressing the four issues that pertain to the district court's resolution of Clark's First Amendment claim.

a) *Clark's standing to challenge regulatory provisions*

In the district court, Clark sought to challenge all provisions of the City's sign ordinance. The City, in its motion for summary judgment, argued in pertinent part

that Clark lacked standing to challenge any part of the City's sign ordinance. The district court granted in part and denied in part the City's motion and concluded that Clark lacked standing to challenge anything other than the subsection of the ordinance that was effectively cited in the Notice of Violation. In Issue IV of his opening appellate brief, Clark challenges the district court's grant of partial summary judgment in favor of the City on the issue of standing.

"We review a district court's grant of summary judgment de novo, applying the same legal standard as the district court." *Powell v. Bd. of Cty. Comm'rs of Muskogee Cty.*, 978 F.3d 1165, 1170 (10th Cir. 2020) (quotation marks omitted). Under that legal standard, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

To establish standing, a plaintiff such as Clark must show: (1) he has suffered an "injury in fact" that is concrete and particularized and actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *See Friends of the Earth v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). At the summary judgment stage, a plaintiff, in order to establish standing, must "set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (citations and quotations omitted).

11

The City's sign ordinance is found in Article 8 of the City's Zoning Regulations. Generally speaking, the ordinance classifies signs into functional and structural types, establishes general standards for the size and placement of signs, establishes exemptions from the regulations, sets forth design, construction and maintenance requirements, outlines the types and sizes of signs permitted in each type of zoning area, and establishes procedures for the removal of unsafe or illegal signs.

Section 3 of Article 8 establishes the "General Standards" for signs that are erected within the City's limits. ROA at 80-82. Section 4 of Article 8 sets forth specific "Exemptions" from the "General Standards" outlined in Section 3. *Id*. at 82-83. Of relevance here is § 4.A.(6), which states, in pertinent part, that "[t]he following signs shall be exempt from the requirements of this article":

> Political signs, not exceeding a total of 20 square feet in area on a lot of record zoned for non-residential purposes, or which is vacant and unplatted, regardless of the zoning district classification; and not exceeding a total of ten (10) square feet on a lot of record in a residential zone district. Political signs shall be displayed for no more than a four-week period preceding and a one-week period following an election. Political signs shall not be placed on or otherwise affixed to any public building or sign, right-of-way, sidewalk, utility pole, street lamp post, tree or other vegetative matter, or any public park or other public property.

> The City recognizes that the expression of political speech is an important and constitutionally protected right; that political signs have certain characteristics that distinguish them from many of the other types of signs permitted and regulated by the City, including the fact that these signs generally do not meet the regular structural design of permanent signs, given their temporary nature; that political signs therefore present a potential hazard to persons and property; and that the

12

> City must impose reasonable time limits on the display of political signs
> for these reasons.

*Id.*

The district court concluded that Clark lacked standing to challenge any

provision of Article 8, except for § 4.A.(6).  It was that subsection, the district court

concluded, that De La Torre implicitly referenced in the Notice of Violation that he

issued to Clark.  Although Clark argues on appeal that the entirety of the City's sign

ordinance should have been addressed and declared unconstitutional, he points to no

evidence that could establish that he was personally impacted, let alone injured, by

the application of any of the other provisions of the ordinance.  More specifically,

there is no evidence that any City officer found that the signs posted on Clark's

property were in violation of any of the other provisions of the City's sign ordinance,

or in turn that any City officer ever pursued removal of such signs by issuing written

notice to Clark pursuant to the procedures outlined in Article 8, § 10 of the City's

sign ordinance.[3]  *See Winsness v. Yocom*, 433 F.3d 727, 732 (10th Cir. 2006) ("The

mere presence on the statute books of an unconstitutional statute, in the absence of

enforcement or credible threat of enforcement, does not entitle anyone to sue, even if

they allege an inhibiting effect on constitutionally protected conduct prohibited by

---

[3] Clark, in his opening brief, argues that some of the other provisions of Article 8 would apply to him and would prevent his political signs if, as the district court directed, Article 8, § 4.A.(6) is severed from Article 8.  Aplt. Br. at 19.  Those arguments, however, are entirely speculative and do not reflect what actually happened in this case.

the statute."). Further, it is undisputed that the City decided not to pursue the Notice of Violation that was issued by De La Torre.

In light of this undisputed evidence, we agree with the district court that Clark lacks standing to challenge any provision other than Article 8, § 4.A.(6).[4]

### b) *The district court's severance of Article 8, § 4.A.(6)*

The district court granted partial summary judgment in favor of Clark on his First Amendment claim, concluding that Article 8, § 4.A.(6) of the City's sign ordinance "[wa]s a content-based regulation that d[id] not pass strict scrutiny." ROA at 1091. The district court in turn severed Article 8, § 4.A.(6) "from the City's sign ordinance." *Id*. at 1100.

In Issues I and II of his opening appellate brief, Clark argues that the district court erred in "conclud[ing] that severing one exemption," i.e., Article 8, § 4.A.(6), "would cure the unconstitutionality of the entire ordinance." Aplt. Br. at 4. In support, Clark argues that "the District Court appears to have failed to apprehend that within the severed exemption was a primary authorizing provision for allowing political signs on CLARK's residential property — apart from also enumerating a 'right of way' restriction for political signs (which the District Court appeared to

---

[4] We also note two other relevant facts: there is no compliance officer currently employed by the City, and the City has "pass[ed] a moratorium on enforcement of any part of the sign code pending further analysis of the constitutionality of the code." Aple. Br. at 13. These facts appear to render moot Clark's challenge to any portion of the City's sign ordinance other than Article 8, § 4.A.(6). *See Jordan v. Sosa*, 654 F.3d 1012, 1023-24 (10th Cir. 2011) (discussing constitutional and prudential mootness).

view as the sole constitutionality problem)." *Id.* (emphasis omitted). Clark argues that "[t]he District Court's severance of that authorizing provision changed the controlling law(ordinance) [sic] such that previously permitted political signs were no longer authorized on CLARK's property (even outside of the right of way) leaving the regulation bare of authorization for any political signs except for one token expression of '[f]lags or emblems of a government or of a political, civil, philanthropic, educational or religious organization'." *Id.* Lastly, Clark argues that "[b]ecause the First Amendment issue for trial was framed based solely upon harm from the single severed provision, rather than [the City's sign] ordinance being found to be more broadly unconstitutional, . . . there is a reasonable probability that, but for the improper framing of the issue for trial, the result of the proceeding would have been different." *Id.* at 5.

Because Clark lacks standing to challenge any part of the City's sign ordinance other than Article 8, § 4.A.(6), we conclude it is unnecessary for us to address these arguments. In the event that the City lifts the moratorium it has imposed on enforcement of its regulations and in turn attempts to enforce other portions of its sign ordinance against Clark, Clark would then have the opportunity to file a new lawsuit challenging the City's actions.

c) *Framing of the First Amendment issue for trial*

In Issue III of his opening brief, Clark argues that the district court "erred by improperly framing the First Amendment issue for trial." Aplt. Br. at 15. Clark asserts that "[t]his argument is predicated upon an errant interpretation (See ISSUE I)

15

and improper severing (See ISSUE II)." *Id*.  According to Clark, "[t]he District Court's ruling necessarily framed the issue for trial as being limited to *only* one provision of the" City's sign ordinance. *Id*. (emphasis in original).  He argues that "[i]f . . . Article 8 were found to be more broadly unconstitutional instead, then [he] could have shown additional evidence of damages at trial." *Id*. at 15-16.  Clark asserts that "[w]ith a different understanding (e.g., that the entirety of Article 8 was unconstitutional) going into trial, [he] could have shown further injury through evincing what [De La Torre's] belief was when he issued the notice of violation to [Clark] about 'other affixed objects', e.g., threatened removal of a cross and even removal of a mailbox."[5]  *Id*. at 16 (citation omitted).

For the reasons already discussed, we conclude that the district court did not err in limiting the damage issues at trial to those pertaining to Article 8, § 4.A.(6). Simply put, Clark lacks standing to challenge any other provision of the City's sign ordinance.

### *The Fourth Amendment claim*

We now turn to the two challenges that Clark asserts in his appeal to the district court's resolution of his Fourth Amendment claim.  In Issue V of his opening appellate brief, Clark argues that the district court "erred by granting summary judgment to the CITY on the Fourth Amendment claim — either by improperly

---

[5] Clark concedes that these objects were not mentioned in the Notice of Violation, but he asserts that De La Torre mentioned those items during his deposition in this matter.  Aplt. Br. at 17.

drawing inferences in favor of the movant rather than the nonmovant and/or by improperly finding a fact not actually asserted by any party." Aplt. Br. at 27 (capitalization in original). In Issue VI, Clark argues that the district court "erred in its determination of law concerning the Fourth Amendment as applied to the undisputed evidence" and he concedes that "[t]he issue is somewhat derivative of" Issue V. *Id*. at 37. Thus, in sum, Clark is challenging the district court's grant of summary judgment in favor of the City with respect to Clark's Fourth Amendment claim.

We begin our analysis of Clark's arguments by briefly reviewing the Supreme Court case on which Clark has consistently relied in support of his Fourth Amendment claim, *Florida v. Jardines*, 569 U.S. 1 (2013). In *Jardines*, the Supreme Court "consider[ed] whether using a drug-sniffing dog on a homeowner's porch to investigate the contents of the home is a "search" within the meaning of the Fourth Amendment." *Id*. at 3. At the outset of its opinion, the Court noted that "[t]he Fourth Amendment provides in relevant part that the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.'" *Id*. at 5. In other words, the Court noted, the Fourth Amendment "establishes a simple baseline, one that for much of our history formed the exclusive basis for its protections: When the Government obtains information by physically intruding' on persons, houses, papers, or effects, a search within the original meaning of the Fourth Amendment has "undoubtedly occurred." *Id*. (quotations omitted). The Court then noted that "when it comes to the Fourth

Amendment, the home is first among equals," and that "the area immediately surrounding and associated with the home," i.e., the home's curtilage, is "part of the home itself for Fourth Amendment purposes." *Id*. at 6 (quotations omitted). The curtilage, the Court noted, "is intimately linked to the home, both physically and psychologically, and is where "privacy expectations are most heightened." *Id*. at 7 (quotations omitted).

Because "the officers' investigation" in *Jardines* "took place in a constitutionally protected area," i.e., the front porch of the home, the Court "turn[ed] to the question of whether [the investigation] was accomplished through an unlicensed physical intrusion." *Id*. Addressing that question, the Court noted that "[w]hile law enforcement officers need not shield their eyes when passing by the home on public thoroughfares, an officer's leave to gather information is sharply circumscribed when he steps off those thoroughfares and enters the Fourth Amendment's protected areas." *Id*. (quotations and citation omitted). The Court in turn noted that it has recognized an "implicit license" that "typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Id*. at 8. Thus, the Court held, "a police officer not armed with a warrant may approach a home and knock, precisely because that is no more than any private citizen might do." *Id*. "But," the Court also held, "introducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence is something else." *Id*. at 9. The Court explained:

There is no customary invitation to do that. An invitation to engage in canine forensic investigation assuredly does not inhere in the very act of hanging a knocker. To find a visitor knocking on the door is routine (even if sometimes unwelcome); to spot that same visitor exploring the front path with a metal detector, or marching his bloodhound into the garden before saying hello and asking permission, would inspire most of us to—well, call the police. The scope of a license—express or implied—is limited not only to a particular area but also to a specific purpose. * * * Here, the background social norms that invite a visitor to the front door do not invite him there to conduct a search.

*Id*. (emphasis in original) (footnote omitted).

Having outlined the holding in *Jardines*, we next turn to the district court's analysis and rejection of Clark's Fourth Amendment claim. The district court recognized at the outset that Clark was "alleg[ing] that De La Torre performed an unlawful search of his property on March 16, 2015," and that "Clark attribute[d] this to the City's zoning ordinance or else the City's failure to train its code enforcement officers, either of which he contend[ed] ma[de] the City liable for De La Torre's actions." ROA at 1103. The district court noted, however, that the threshold question was whether De La Torre's actions were unconstitutional in the first place. *Id*. As to that issue, the district court noted that Clark's theory was "that De La Torre entered his property seeking information about whether Clark would remove the signs and did so in a manner that 'exceeded the implied license of *Florida v. Jardines*.'" *Id*. (quoting ECF No. 79 at 34–35). More specifically, the district court noted that "Clark t[ook] issue with the fact that De La Torre did not knock on his front door but instead walked down the driveway after hearing noises toward the back" of the house. *Id*.

To address Clark's theory, the district court began by outlining the applicable law, with particular emphasis on *Jardines*. *Jardines*, the district court noted, "explained that an implicit license exists that allows visitors to 'approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave,'" and that "[t]he same license is extended to law enforcement officers." *Id*. at 1104 (quoting *Jardines*, 569 U.S. at 8). Clark, the district court in turn noted, was arguing "that *Jardines* drew an explicit line about what is allowed for a knock-and-talk" and that, in particular, it authorized entry only by the front path of a home. *Id*. The district court rejected Clark's interpretation of *Jardines*: "It [*Jardines*] did not hold that was the <u>only</u> permissible way to approach a house." *Id*. (emphasis in original). Rather, the district court stated, the facts of *Jardines* involved an officer "bringing a drug-sniffing dog onto the front porch [of a home] to do an investigation." *Id*. at 1104–05. The district court also noted that in *United States v. Shuck*, 713 F.3d 563 (10th Cir. 2013), we held that officers did not violate the defendant's Fourth Amendment rights by approaching the back door of his trailer and conducting a knock-and-talk. *Id*. at 1105. The district court emphasized that in reaching our conclusion, we concluded that the evidence established that approaching the back door of the trailer was the normal route of access for visitors. *Id*.

The district court concluded that "[t]he facts in *Shuck* [we]re similar to the facts in" Clark's case. *Id*. at 1106. The district court stated that it was "undisputed that there was no path to the front porch" of Clark's home "from the driveway, the

steps were partially blocked with vegetation, and items on the porch at least partially blocked the front door." *Id*. The district court also stated that Clark admitted "that he had 'trained' at least some of his visitors to come to the back entrance, and that he hoped the state of the front entrance would deter visitors." *Id*. "These undisputed facts," the district court concluded, "coupled with De La Torre hearing someone towards the back of the house, made his decision to walk that way in an attempt to contact Clark entirely reasonable," and that "no reasonable jury could find otherwise." *Id*. The district court also concluded that "[t]he fact that the front door was partially visible, as Clark contend[ed], d[id] not change the fact that De La Torre reasonably assumed that the front door was not the primary entrance." *Id*. In addition, the district court concluded De La Torre did not exceed the scope of the license because "[w]hen Clark asked him to leave, he did so," and that "[i]t [wa]s undisputed that De La Torre was at the property no more than a few minutes and left within a minute of being asked to leave." *Id*. Ultimately, the district court concluded it "d[id] not need to determine whether De La Torre entered the curtilage of Clark's home, because even if he did, his actions in trying to find Clark on the property were taken in accordance with the implied license to approach the house," and that "[n]o reasonable jury could conclude there was a search of Clark's property under these facts."[6] *Id*.

---

[6] The dissent ignores this latter part of the district court's ruling and suggests, erroneously, that the question of whether a search occurred is not properly before us on appeal. In fact, the issue of whether a search occurred for purposes of the Fourth Amendment was raised by the parties in their summary judgment pleadings and

In Issue V of his appellate brief, Clark argues that the district court erred in a number of respects in granting summary judgment in favor of the City on his Fourth Amendment claim. We need not address each of those arguments in detail, however,

---

ultimately addressed by the district court in its memorandum and order ruling on the summary judgment motions.

Indeed, Clark himself squarely presented the issue in his own motion for partial summary judgment. In that motion, Clark sought a "[l]iability determination for Fourth Amendment violation," and alleged in support that there was an "unconstitutional search." R. at 159-60 (capitalization omitted). In support, Clark alleged that De La Torre "enter[ed] upon the curtilage of Clark's property seeking information about compliance without a warrant and without any applicable exception to the Fourth Amendment warrant requirement." *Id*. at 181. He further argued that "[w]hen the government engages in physical intrusion of a constitutionally protected area in order to obtain information, that intrusion constitutes a violation of the Fourth Amendment." *Id*. Clark argued that because De La Torre "had a purpose of seeking information," and "for reason of hearing noises, skip[ped] any attempt to knock on the front door, and explore[d] another path that lead[] towards the noises heard and beg[an] hollering or yelling in an effort to make contact in order to gather the information sought, his actions became an unreasonable search of the curtilage of Clark's home." *Id*. at 185.

The City, in its response to Clark's motion for partial summary judgment and in its own motion for summary judgment, argued that De La Torre's entry onto Clark's property did not constitute an illegal search prohibited by the Fourth Amendment. *Id*. at 686. More specifically, the City argued that "De La Torre performed no search but only sought to contact Clark by walking down his driveway to the rear of Clark's residence." *Id*. The City also argued that "[e]ven if the brief presence of De La Torre on Clark's property is considered under Clark's version of the incident, no Fourth Amendment violation occurred." *Id*. at 691.

On May 9, 2019, the district court issued a memorandum and order ruling on both Clark's motion for partial summary judgment and the City's motion for summary judgment. The district court denied Clark's motion for partial summary judgment, and granted the City's motion for summary judgment, "on Clark's Fourth Amendment claim (because there was no search of Clark's property)." *Id*. at 1081-82.

As a result, we conclude that the question of whether a search occurred within the scope of the Fourth Amendment is, contrary to the dissent's assertion, properly before us on appeal. And, because we conclude that no search occurred, we conclude it is unnecessary to address the other various points raised by the dissent concerning what constitutes the curtilage of Clark's home.

because even if we were to assume that the district court erred in the respects asserted by Clark, none of those errors undermine the district court's ultimate conclusion that the City was entitled to summary judgment on Clark's Fourth Amendment claim. As the Supreme Court in *Jardines* noted, the Fourth Amendment prohibits, in pertinent part, unreasonable searches and thus prohibits the government from "obtain[ing] information by physically intruding on" a person's home. 569 U.S. at 5. Here, it is undisputed that De La Torre entered Clark's property with the sole intent of speaking consensually with Clark and attempting to resolve the alleged violations. Further, it is undisputed that he did not succeed in that goal. Although De La Torre asked to speak with Clark, Clark responded immediately by yelling at De La Torre to leave. De La Torre complied and, as a result, did not speak with Clark and thus gathered no information. In short, no "search" occurred for purposes of the Fourth Amendment. *See Jardines*, 569 U.S. at 9 n.4 ("[I]t is not a Fourth Amendment search to approach the home in order to speak with the occupant, because all are invited to do that."); *United States v. Carloss*, 818 F.3d 988, 993 (10th Cir. 2016) (concluding that officers did not conduct a Fourth Amendment search when they approached the front door of a home and attempted to consensually speak with the occupant).

Finally, in Issue VI of his appellate brief, Clark argues, in pertinent part, that "[t]here should be no dispute that a 'knock and talk' is a search" that, to be reasonable, must "not stray outside of the implied license."[7] Aplt. Br. at 38. Again, we need not

---

[7] The remainder of Issue VI, as Clark himself concedes, is basically a repeat of the arguments asserted in Issue V.

address this argument because, in light of the undisputed evidence presented in this case,

we conclude that no "knock and talk" occurred in this case.  Although De La Torre

approached Clark and asked to consensually speak with him, Clark immediately and

repeatedly yelled at De La Torre to leave his property and De La Torre complied and left.

Thus, De La Torre did not complete any "knock and talk" and gathered no information.

IV

The judgment of the district court is AFFIRMED.

Entered for the Court


Mary Beck Briscoe
Circuit Judge

*Eric S. Clark v. City of Williamsburg, Kansas*, No. 19-3237, Bacharach, J., concurring in part and dissenting in part.

This case arises from efforts by the City of Williamsburg, Kansas to enforce a sign code against Mr. Eric Clark. I agree with the majority that Mr. Clark lacked standing to challenge the relevant provisions of the sign code, so I join Parts I, II, and III(a)–(c) of the majority's opinion. But I respectfully disagree with the majority's disposition of Mr. Clark's Fourth Amendment claim.

To decide this claim, we must consider the scope of a homeowner's right to privacy. In considering the scope of this right, we recognize that

- municipal officers typically enjoy the same customary privileges enjoyed by other visitors and

- most visitors would expect permission to knock on a house's front door.

So municipal officers may ordinarily knock on the front door of a house without violating the Fourth Amendment.

But what if a homeowner obstructs the front door, signaling to visitors that they are not welcome? Could a reasonable factfinder infer that the homeowner doesn't want visitors to enter a partially enclosed back yard? The district court answered "no" and granted summary judgment to the city on the homeowner's Fourth Amendment claim. I disagree and would reverse the grant of summary judgment to the city.

1.    **The city's code-enforcement officer approached the back yard after seeing that visitors were not welcome at the front door.**

Mr. Clark alleges a Fourth Amendment violation stemming from a visit by the city's code-enforcement officer, Tony De La Torre. Officer De La Torre saw that the front door was inaccessible,[1] but allegedly heard a sound in the back. So he walked up the driveway and, according to Mr. Clark, turned behind the house onto the gravel parking area. A few feet away stood an enclosure, consisting of a canopy of sheets draped around a swimming tank and the back door.

Mr. Clark heard someone entering his back yard and demanded that Officer De La Torre leave. He did.

2.    **Officer De La Torre had no implied license to enter the curtilage of Mr. Clark's house.**

The resulting issue is whether Officer De La Torre violated the Fourth Amendment by intruding into Mr. Clark's curtilage without an implied license. The issue arose when the city moved for summary judgment, denying the existence of a search on grounds that Officer De La Torre had not entered the curtilage or exceeded an implied license.

---

[1]    Mr. Clark contends that the evidence allowed a reasonable finding that the front door had been accessible to visitors. The city disagrees, as do I.

A. **We engage in de novo review and consider the evidence in the light most favorable to Mr. Clark.**

Summary judgment is appropriate only if the city showed the absence of a genuine dispute of material fact. *T-Mobile Cent., LLC v. Unified Gov't of Wyandotte Cty., Kansas City, Kan.*, 546 F.3d 1299, 1306 (10th Cir. 2008). The district court granted summary judgment to the city, so we must conduct de novo review by considering the evidence in the light most favorable to Mr. Clark. *Id.*

B. **The factfinder could reasonably consider the gravel parking area as part of the curtilage.**

The Fourth Amendment supplies protection not only for one's house but also the curtilage, which is "the area to which extends the intimate activity associated with the sanctity of a [person's] home and the privacies of life." *Reeves v. Churchich*, 484 F.3d 1244, 1254 (10th Cir. 2007) (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984)). The scope of the curtilage is a legal question. *United States v. Cousins*, 455 F.3d 1116, 1121 & n.4 (10th Cir. 2006) (en banc footnote). But this legal question turns on facts, which we consider in the light most favorable to Mr. Clark. *See United States v. Depew*, 210 F.3d 1061, 1067 (9th Cir. 2000) ("Determining whether an area is within a home's curtilage is a fact-intensive inquiry."); *Bleavins v. Bartels*, 326 F.3d 887, 891 (7th Cir. 2003) ("The inquiry into whether an area can be considered curtilage is fact-

intensive."); *see also* Part 2(A), above (stating that the court must view the evidence favorably to Mr. Clark).

In determining whether a particular area constitutes part of the curtilage, we consider four factors:

1.    proximity to the house,

2.    existence of an enclosure,

3.    use of the area, and

4.    steps taken to enhance privacy.

*United States v. Dunn*, 480 U.S. 294, 301 (1987). In considering these factors, we must view the evidence in the light most favorable to Mr. Clark. *See* Part 2(A), above. When the evidence is viewed in this light, the first, third, and fourth factors support classification of the gravel parking area as part of the curtilage.

The first factor (proximity to the house) favors Mr. Clark. Officer De La Torre walked up the driveway to the side of Mr. Clark's house and then turned behind the house onto a gravel parking area. This parking area was not clearly visible from the street.[2]

The second factor (existence of an enclosure) favors the city because Officer De La Torre did not enter the enclosed canopy.

---

[2]    The city states that Officer De La Torre remained in an area that was visible from the street. Appellee's Resp. Br. at 22. But the city provides no citation for this statement.

4

The third factor (use of the area) favors Mr. Clark's view that the gravel parking area was part of the curtilage. The area was used for parking, and only a few feet away stood the canopy over the small tank used for swimming. The factfinder could reasonably infer that parking vehicles and swimming are activities intimately tied to home life, so this factor supports treatment of the gravel parking area as curtilage. *See United States v. Alexander*, 888 F.3d 628, 633 (2d Cir. 2018) (upholding a finding that an area for parking cars was continuous with the back yard and within the curtilage); *Harris v. O'Hare*, 770 F.3d 224, 240 (2d Cir. 2014) (referring to swimming as a private activity associated with the curtilage).

The fourth factor (steps taken to enhance privacy) also supports treatment of the gravel parking area as curtilage. This area lay adjacent to Mr. Clark's house and could not clearly be seen from the street. Passersby could see into the area only by approaching the back yard.

Precedent supports consideration of the gravel parking area as part of the curtilage. In *Collins v. Virginia*, 138 S. Ct. 1663, 1671 (2018), the Supreme Court considered a similar area part of the curtilage. There a driveway ran alongside a house and past the front part of the house; the relevant area was the end of the driveway, enclosed on two sides by a low wall and on the third side by the house itself. *Id.* at 1670–71. Similarly, in *Lundstrom v. Romero*, 616 F.3d 1108, 1128-29 (10th Cir. 2010), we concluded that the curtilage included an area abutting the back of a house.

As in *Collins*, the relevant area was a continuation of the driveway. Mr. Clark's gravel parking area was enclosed on two sides rather than three. But unlike the area in *Collins*, Mr. Clark's gravel parking area couldn't be seen clearly from the street. As in *Lundstrom*, the area at issue was near the back of the house. In light of *Collins*, *Lundstrom*, and Mr. Clark's evidence, I would regard the gravel parking area as part of the curtilage.

### C. A genuine factual dispute exists on whether the implied license extended to the gravel parking area.

The resulting issue is whether Officer De La Torre had license, or permission, to enter the gravel parking area.

Permission can be express, but can also be implied from general societal practice. *Florida v. Jardines*, 569 U.S. 1, 8 (2013). For example, societal customs ordinarily create an expectation that someone can walk along a pathway to a front door and knock. *Id.*

The parties disagree on whether Mr. Clark's yard had a pathway to his front door. But regardless of a pathway, Mr. Clark apparently did not want visitors at his front door, for this is what they would have seen:



With this view of the front of Mr. Clark's house, would societal custom have led Officer De La Torre to think that he was welcome to go to the back yard and knock on Mr. Clark's back door? And would that sense of welcome have continued once Officer De La Torre approached the gravel parking area and saw that Mr. Clark had constructed a sheet canopy, preventing others from seeing into the area outside his back door? A reasonable factfinder could answer "no" to these questions.

In oral argument, the city was asked if Officer De La Torre would have had an implied license to enter the gravel parking area if Mr. Clark had posted a "no visitors" sign. The city answered "no." But a reasonable factfinder could consider Mr. Clark's obstructions outside his front door as a sign that he did not want uninvited visitors at *any* door.

7

The district court concluded that the implied license had extended to the gravel parking area, relying on *United States v. Shuck*, 713 F.3d 563 (10th Cir. 2013). There we reviewed the denial of a motion to suppress, so we considered the evidence in the light most favorable to the government. *Id.* at 567. But here we must do the opposite, considering the evidence in the light most favorable to Mr. Clark. *See* Part 2(A), above. *Shuck* does not help us determine whether an implied license exists if we view the evidence favorably to the homeowner.

The city argues that Officer De La Torre went to the back because he thought that Mr. Clark was there. But Officer De La Torre did not say that he had heard Mr. Clark in the back. Instead, Officer De La Torre simply said that he had heard "a sound" in the back, which led him to believe that someone was working in the back. R. at 1053–54. A factfinder could reasonably infer that visitors would not ordinarily expect permission to enter a back yard based only on a sound suggesting that work was being done there, particularly when obstructions outside the front door indicate that uninvited visitors are not welcome.

The city disagrees, citing opinions for the proposition that an implied license permits entry into the back yard when the front door is inaccessible or an occupant appears to be home and doesn't answer the door.

In arguing that entry into the back yard was permissible, the city relies largely on opinions predating *Jardines*: *Galindo v. Town of Silver*

8

*City*, 127 F. App'x 459, 466 (10th Cir. 2005) (unpublished); *United States v. Cavely*, 318 F.3d 987, 994 (10th Cir. 2003); *Estate of Smith v. Marasco*, 318 F.3d 497, 519 (3d Cir. 2003); *Alvarez v. Montgomery Cty.*, 147 F.3d 354, 357 (4th Cir. 1998); *United States v. Daoust*, 916 F.2d 757, 758 (1st Cir. 1990); *United States v. Freeman*, 426 F.2d 1351, 1352–53 (9th Cir. 1970); and *United States v. Diaz*, No.1:09cr9-SPM, 2009 WL 3675006, at *2 (N.D. Fla. Oct. 30, 2009) (unpublished), *aff'd*, 404 F. App'x 381 (11th Cir. 2010) (unpublished). In one of these opinions, the court did not provide any reasoning. *Daoust*, 916 F.2d at 758. In the other opinions, the courts reasoned that the homeowners had lacked reasonable expectations of privacy. *Galindo*, 127 F. App'x at 466; *Cavely*, 318 F.3d at 993–94; *Alvarez*, 147 F.3d at 357–58; *Freeman*, 426 F.2d at 1354; *Diaz*, 2009 WL 3675006, at *2. In the remaining opinion, the court ruled for the plaintiff, but used a pre-*Jardines* analysis based on the homeowner's expectation of privacy. *Marasco*, 318 F.3d at 521. *Jardines* affected the viability of all of these opinions by holding that the Fourth Amendment is implicated whenever an officer enters the curtilage without an express or implied license. 569 U.S. at 5–6, 9–11.

In arguing that officers could enter the back yard when an occupant does not answer the front door, the city relies on *Hardesty v. Hamburg Township*, 461 F.3d 646, 654 (6th Cir. 2006). This opinion also predated *Jardines*; and the Sixth Circuit ultimately abrogated *Hardesty*, noting that

9

its reasoning was no longer viable after *Jardines*. *Morgan v. Fairfield Cty., Ohio*, 903 F.3d 553, 565 (6th Cir. 2018).

The city also relies on two other opinions:

- *Carroll v. Carman*, 574 U.S. 13 (2014) and

- *United States v. Garcia*, 997 F.2d 1273 (9th Cir. 1993).

But these opinions shed no light on the scope of Officer De La Torre's implied license. In *Carroll*, the Court expressly declined to decide whether an officer could knock on a door other than the front door. 574 U.S. at 20. In *Garcia*, the court concluded that officers had not exceeded an implied license. 997 F.2d at 1279–80. But there the officers reasonably mistook the back door for the front door, and both doors were immediately accessible from a public area. *Id.*

\* \* \*

If we view the evidence in the light most favorable to Mr. Clark, as required, a reasonable factfinder could infer that Officer De La Torre had entered the curtilage without an implied license.

The city contends that Mr. Clark had made it clear that he did not want uninvited visitors coming to his front door, leading them instead to the back door. But a reasonable factfinder could infer that Mr. Clark had also made it clear that he didn't want uninvited visitors coming to his back door, for he had constructed a canopy supplying privacy in his back yard.

10

The back yard was not visible from the street in front of the house, so why would Officer De La Torre assume that he was welcome to enter the back yard if he wasn't welcome at the front door? Because he heard a sound toward the back? Perhaps. But viewing the evidence favorably to Mr. Clark, a factfinder could reasonably infer that hearing a sound does not serve as an implied license to enter the back yard.

## 3.    We should not sua sponte affirm on an argument that the city has not raised.

The majority doesn't consider the scope of the curtilage or existence of an implied license, relying instead on the absence of any information collected from Mr. Clark's property. But in district court and on appeal, the city denied that a search had taken place solely on the ground that Officer De La Torre had not entered the curtilage or exceeded an implied license.

### A.    The majority erroneously relies on excerpts from the city's brief in district court, where the city denied a search based on the scope of the curtilage and existence of an implied license.

The majority points out that in district court, the city denied the existence of a search. But the city did not base the denial of a search on the failure to collect information; the city instead relied on the scope of the

11

curtilage and the existence of an implied license. The majority's two examples illustrate the difference.

First, the majority quotes the city's statement that Officer De La Torre did not conduct a search because he just "walk[ed] down [the] driveway to the rear of Clark's residence . . . ." Maj. Op. at 22 n.6. The sentence continues: "which is the commonly-used entrance to Clark's residence." R. at 686. This was the city's argument that it hadn't conducted a search because Officer De La Torre had an implied license to enter the gravel parking area.

Second, the majority quotes the city's statement that Officer De La Torre's brief presence did not violate the Fourth Amendment. Maj. Op. at 22 n.6; R. at 691. This statement appears in an argument involving the time that Officer De La Torre took to leave, not the collection of information. R. at 691. Before discussing the time taken by Officer De La Torre, the city had spent roughly 5-1/2 pages denying the existence of a search based on its arguments involving the curtilage and implied license. R. at 686–91. Given this context, the cited statement does not encompass an argument denying the existence of a search based on the failure to collect information. *See Crowson v. Washington Cty. State of Utah*, No. 19-4118, 19-4120, ___ F.3d ___, 2020 WL 7706471, at *9 n.9 (10th Cir. Dec. 29, 2020) (to be published) (declining to consider the appellee's single-sentence argument for an alternative ground to affirm because the

12

appellee's argument was perfunctory); *Jordan v. Maxim Healthcare Servs., Inc.*, 950 F.3d 724, 742 n.14 (10th Cir. 2020) (stating that an appellee's "oblique nod" to an issue was perfunctory and likely didn't suffice to preserve an argument for affirmance).

### B.    Mr. Clark had no reason to present evidence on this issue when responding to the city's motion.

The majority points out that Mr. Clark briefly argued in district court that he was entitled to partial summary judgment because Officer De La Torre had tried to gather information. Maj. Op. at 22 n.6; R. at 181, 185. But the city did not contest this argument when seeking summary judgment. So when Mr. Clark responded to the city's summary-judgment motion, he noted the absence of a dispute over Officer De La Torre's purpose of collecting information. R. at 849. Mr. Clark could reasonably conclude that he had no need to further address the issue, for the city never contested Officer De La Torre's intent to gather information or sought summary judgment on this basis.

If the city had denied a search based on the failure to collect information, Mr. Clark might have made further arguments or presented supporting evidence. *See John G. Alden, Inc. of Mass. v. John G. Alden Ins. Agency of Fla., Inc.*, 389 F.3d 21, 25 (1st Cir. 2004) ("At a minimum, the party preparing the response must have the motivation of knowing that it is the target of a summary judgment motion."). In my view, it is "unfair

13

to affirm a summary judgment against a plaintiff for lack of evidence of an element of the cause of action unless the defendant has clearly challenged that lack of evidence in district court." *Evers v. Regents of the Univ. of Colo.*, 509 F.3d 1304, 1309–10 (10th Cir. 2007).

### C. The district court denied the existence of a search based on the existence of an implied license, not the absence of any collection of information.

The majority also points out that the district court concluded that no search had taken place. But the district court relied solely on its conclusion that Officer De La Torre had not exceeded an implied license. For example, the court summarized the city's argument:

> Defendants counter that De La Torre never entered the curtilage of Clark's property, and even if he did, he did so in taking the most common path available to visitors in an attempt to contact Clark.

R. at 1103–04. Addressing this argument, the court concluded that Officer De La Torre had an implied license to go where he did. Based solely on this implied license, the court denied the existence of a search:

> Accordingly, the Court does not need to determine whether De La Torre entered the curtilage of Clark's home, because even if he did, his actions in trying to find Clark on the property were taken in accordance with the implied license to approach the house. No reasonable jury could conclude there was a search of Clark's property under these facts.

*Id.* at 1107. But the court did not make any findings about whether Officer De La Torre had collected information.

14

**D.    As a whole, the pertinent factors weigh against affirmance on a ground that the city hasn't presented on appeal.**

But even if the majority were right about the city's argument in district court, the city's appellate arguments do not rely on the absence of information collected from Mr. Clark's property. The city's appellate arguments instead rely solely on the scope of the curtilage and existence of an implied license.[3]

Despite the city's framing of the issue, we have discretion to affirm on other grounds if supported by the record. *Elkins v. Comfort*, 392 F.3d 1159, 1162 (10th Cir. 2004). In deciding whether to exercise this discretion, we consider three factors:

1.    whether the ground was fully briefed and argued both in district court and on appeal,

2.    whether the parties had a fair opportunity to develop the factual record, and

3.    whether our decision would involve only questions of law.

---

[3]    For example, the city argues:

    [A]s noted by the dissent in *Florida v. Jardines*, 569 U.S. 1, 133 S. Ct. 1409 (2013), a "knock and talk" has as its purpose discovering information but a "knock and talk" is not a search because "all are invited to do that." 133 S. Ct. at 1424. [Officer] De La Torre's attempt to visit with plaintiff was not a search because he did no more than what "all are invited" to do by attempting to contact plaintiff in a manner that did not deviate from the implied invitation.

Appellee's Resp. Br. at 26.

15

*Id.*

In balancing these factors, reasonable minds can differ. In my view, however, these factors weigh against relying on the absence of a search based on the failure to collect information. Though the majority has raised an issue of law, the city has not briefed this issue and it turns on undeveloped facts.

In similar circumstances, we recently declined to affirm on a ground not presented in district court or on appeal, calling the practice "imprudent." *United States v. Chavez*, 976 F.3d 1178, 1203 n.17 (10th Cir. 2020). Relying on a new ground to affirm would be equally imprudent here.

\* \* \*

I would address the reasons given by the city and district court for denying the existence of a search: the scope of the curtilage and the extent of an implied license. So I respectfully dissent from the majority's rejection of the Fourth Amendment claim. In my view, Mr. Clark overcame summary judgment on this claim.