RECEIVED
U.S. COURT OF APPEALS
10TH CIRCUIT
2021 JAN 26 PM 1:36

# No. 19-3237

## United States Court of Appeals

## for the Tenth Circuit

**ERIC S. CLARK**

Plaintiffs-Appellants

**v.**

**CITY OF WILLIAMSBURG, KANSAS**

Defendant-Appellee

Appeal from the U.S. District Court

for the District of Kansas

The Honorable Holly L. Teeter, District Judge

( 2:17-cv-02002-HLT )

## PETITION FOR REHEARING EN BANC

**Eric S. Clark ( pro se )**
1430 Dane Ave
Williamsburg, Kansas 66095
Phone: (785) 214-8904

## TABLE OF CONTENTS

REQUEST FOR REHEARING AND HEARING EN BANC   …..… 3

ISSUES PRESENTED ………………………………………… 4

QUESTIONS OF EXCEPTIONAL IMPORTANCE ……………… 5

OTHER QUESTIONS OF IMPORTANCE …………………...…… 6

STANDARD OF REVIEW  …………………………………...…… 7

ARGUMENT ……………………………………………...…… 8

    FIRST AMENDMENT  …………………………………...…… 8

    FOURTH AMENDMENT  ……...………………………...…… 12

CONCLUSION  …………………………...…………………… 20

RELIEF  ……… …………………………...…………………… 21

**Request for rehearing EN BANC:**

Clark moves the court to circulate this request for a vote on holding

an *en banc* rehearing.

This request for rehearing involves questions of departure from

Tenth Circuit precedents and contravention of precedent of the Supreme

Court of the United States and; addresses questions of exceptional

importance concerning the Fourth Amendment and its corresponding

implied license analysis. The majority opinion of the Court of Appeals for

the Tenth Circuit (19-3237, Dk. 010110465214 ) conflicts with decisions

of the United States Supreme Court including *Florida v. Jardines*,

569 U.S. 1 (2013).  The opinion of the Court of Appeals for the

Tenth Circuit also conflicts with age old precedents (passim) of both,

the Tenth Circuit and the United States Supreme Court, concerning

equal application of legal analysis, specifically that of construing

summary judgment motions against the movant (and in favor of the

nonmovant) which is to ensure cases are decided on the merits, especially

those cases, like the present one, involving the First Amendment

protection of the fundamental  right of free speech.

3

**ISSUES PRESENTED:**

**This court erred** in failing to view the evidence in the light most favorable to Mr. Clark, as required, and that applies to the analysis of both claims (First and Fourth Amendment).

FIRST AMENDMENT

**This court erred** by failing to properly fully address *retrospective* injury for which there was standing through a <u>credible threat</u> of enforcement <u>at the time</u> of the *retrospective* injury and by failing to correct the improper framing of the issue for trial.

**This court erred** by failing to find standing  (even after severance) for protected [e.g., religious] speech in the right of way based on the court's errant finding concerning mention of other objects [e.g., a cross] in the Notice of Violation.

FOURTH AMENDMENT

**The majority of this court erred**  when it concluded that there was "no search".  See "we conclude that no search occurred" (Op. at 21) (* "we" not being representative of Judge Bacharach), and **the majority of this court erred** (plainly) in deciding to 'conclude that no "knock and talk" occurred in this case.' (Op. at 24).

**Questions of exceptional importance:**

- Does the reasonableness of a search set the bounds for determining the "implied license"?  -or-  Does the "implied license" set the bounds for determining whether a search is reasonable?

- Is a "knock and talk" a search when there is an objectively identifiable purpose of seeking to obtain information?

- If a search for certain information turns up empty, does that mean no search occurred? Put another way - Is it proper to conclude that when an officer is *seeking* to <u>obtain information</u> and fails to gather any information (i.e., fails to obtain the objective or purpose of the seeking) then that means that **<u>no search</u>** occurred?

- Does summary judgment require viewing facts and inferences in favor of the nonmovant?

See Op. dissent at 10, "If we **view** the evidence **in the light most favorable** to Mr. Clark, **as required**, a reasonable factfinder could infer that" . . . (emphasis added)

**Other Questions of importance:**

- Does an officer exceed the scope of the license to approach appellant's front door when that door demonstrates that visitors are not welcome and the officer, nonetheless, continues on the property going to the back of the house (where no door can be seen from any publicly accessible place)?

- When a judge on an appellate court disagrees with the granting of summary judgment by the district court, can the district court's statement that "no reasonable jury could find otherwise" (Op. at 21) be anything but error?

Does the majority believe that their **colleagues on the Tenth Circuit** are not proper representatives of **any reasonable jury**? Or does the majority hold some special contempt for Judge Bacharach particularly?

See Op. dissent (Judge Bacharach) at 8,

> "**A factfinder could reasonably infer** that visitors would not ordinarily expect permission to enter a back yard based only on a sound suggesting that work was being done there, particularly when obstructions outside the front door indicate that uninvited visitors are not welcome." (emphasis added)

See also Op. dissent at 11,

> "viewing the evidence favorably to Mr. Clark, **a factfinder could reasonably infer** that hearing a sound does not serve as an implied license to enter the back yard." (emphasis addd)

6

Even if the majority refuses to draw reasonable inferences concerning Mr. Clark, it should not refrain from drawing reasonable inferences about Judge Bacharach and should accept that he is a proper representative of "any reasonable jury". And if accepting that he is, must reverse.

The dissent noted that there is "discretion to affirm on other grounds if supported by the record." Op. of dissent at 15, but the grounds that there was simply "no search" is not only <u>not supported by the record</u>, but the record easily supports that there was a search even if failing to draw inferences in Mr. Clark's favor (as should have been done).

**Standard of Review:**

Errors of law are subject to *de novo* review.

In this case, that includes viewing the evidence in the light most favorable to Mr. Clark, as required by law (equal protection in application, i.e., due process).

# ARGUMENT

## FIRST AMENDMENT

Beyond the error of drawing facts and inferences favorably toward the movant rather than the nonmovant, **this court erred** by failing to properly address *retrospective* injury for which there was standing through a <u>credible threat</u> of enforcement <u>at the time</u> of the injury and by failing to correct the improper framing of the issue for trial.

The court correctly noted that the "Notice of Violation, however, has never been formally withdrawn by the City." (Op. at 5) and the temporary suspension of enforcement pending "further review" does not change that fact and the City did not even argue that the court should moot relief for <u>past</u> injury. The court mentioned mootnesss in footnote 4 (Op. at 14) but that was a context of *prospective* injury.

Why was it not error for the district court hold a trial for *retrospective* damages concerning "political signs" but it was not error to bypass a trial for *retrospective* damages concerning other signs (also protected speech)? In addition to enforcement against political signs, enforcement against the other signs at issue also caused restrospective injury by chilling Clark's speech but that injury was not allowed to be addressed at trial because of

the improper framing of the issue *after* severance by the district court.

See Aplt. Reply Brief at 1 :

> "despite that "lack of a future credible threat of enforcement" is a valid theory for mooting *prospective* relief, the authorities cited by the City are all distinguishable. Further, even if not distinguishable, that could only serve to allow this Court to skip an analysis for *prospective* injury but Clark's claims raise that the improper interpretation affected *retrospective* relief in addition to prospective relief." (emphasis in original)

This court's opinion  noted one of the letters Clark sent to the City, e.g.,

"On February 25, 2015, Clark sent a letter to De La Torre" (Op. at 3) but

in another letter Clark clearly indicated "I am fearful (chilling effect) of

placing any **new objects** until after I have received notice that the City's

threat is removed ." See ROA V. I at 587 (emphasis added)

See Clark's response to CITY's motion at ROA V. I. at 865, "Plaintiff

incorporates all the statements of fact from Plaintiffs motion [ECF No.

79, pp. 1-10] as response to Defendant's motion [ECF No. 91/92]".

And the **STATEMENT OF FACT** in ECF 79 at 5, ¶ 21, which is at

**ROA V. I. at 152** is

> "Clark was fearful of placing **any new objects** until after he received notice that the City's threat was removed." (emphasis added)

The very same enforcement action which created a chilling effect

concerning Clark's "political signs" applies equally in regard to the

other signs and expressions of speech (including religious speech) in

Clark's right of way, through the chill on placement of any new objects

(such as crosses which are symbolic speech) concerning the burial place

of a family pet. Even after severance of a provision, these right-of-way

restrictions on such expression remain, thus, Clark has current standing

(see error concerning standing next) to file a new lawsuit based on the

chill which has continued throughout the pendency of the current lawsuit

as the City has never affirmatively avowed that it would permanently

cease enforce of the restrictions and there is clearly record of past

enforcement (basis of the instant suit). See Aplt. Reply Br. at 5:

> 'District Court found to mean that "that decision is **not permanent**"
> (ECF 114 at 8 [ROA V. I. at 1088]) (emphasis added) and accordingly
> concluded "Clark has asserted sufficient grounds to confer standing." '

While this court conceded that,

> "In the event that the City lifts the moratorium it has imposed on
> enforcement of its regulations and in turn attempts to enforce other
> portions of its sign ordinance against Clark, Clark would then have
> the opportunity to file a new lawsuit challenging the City's actions."
> (Op. at 15)

even the District Court recognized "that [moratorium] decision is

**not permanent**" such that it could bar current standing.

CURRENT STANDING for a NEW LAWSUIT

The U.S. Supreme Court has held that plaintiffs need not "demonstrate that it is literally certain that the harms they identify will come about" to establish standing. *Clapper* v. *Amnesty Int'l USA*, 568 U. S. 398, 414, n. 5 (2013) and; has decided a *credible threat* of enforcement of a statute can suffice for injury-in-fact even where plaintiffs did not confirm that their future speech would violate the law. See *Susan B. Anthony v. Driehaus*, 134 **S. Ct.** 2334, 2338 (2014). A *credible threat* of enforcement can be shown where the statute at issue prohibits the activity the plaintiff wishes to do and the potential for enforcement has not been disavowed. See *United States v. Sup. Ct. of N.M.*, 839 F.3d 888, 901 (**10th Cir.** 2016). And past activities are not indispensable to finding standing. See *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1087 (**10th Cir.** 2006).

When this court referred to the other signs and objects alleged to be in the right of way by the Notice of Violation for which enforcement had chilled Clark, **this court erred** in concluding that:

> "Clark **concedes that these objects were not mentioned in the Notice of Violation**, but he asserts that De La Torre mentioned those items during his deposition in this matter. Aplt. Br. at 17." (Op at 16) (emphasis added).

That conclusion is **in error** because Clark did **not concede** that "these objects" were not mentioned in the Notice of Violation. In fact,

11

Clark noted that the objects(including a cross) **had "explicit mention"** in

the NOTICE OF VIOLATION through the express use of the terms

"several signs" and "other objects". See Aplt. Br. at 17:

> "The City argued in its Response, at 16, that "The only
> provision of the sign code addressed with Clark was the
> provision limiting the duration of political signs on the City's
> right-of-way." That is simply incorrect, as the **Notice of
> Violation was explicitly enforced against "several signs"**
> (See ECF 92 at 18 [ROA V.1. 466]) for which at least one of
> those signs was identified as "Kittens Crossing", being one of
> "three homemade signs" (See ECF 92 at 31 [ROA V.I. at
> 479]). That sign would not fall under the provision limiting
> the duration of only "political" signs. In addition, the **explicit
> mention of "other objects" (See ECF 92 at 29 [ROA V.I.
> 477]) in the Notice of Violation**, plainly go beyond the
> provision addressing "limiting the duration of political
> signs"." (emphasis added)

The only reason for not addressing damages for some <u>past</u> injury is that

> 'the district court "erred by **improperly framing** the
> First Amendment issue for trial." Aplt. Br. at 15.'
> Op. at 15 (emphasis added)

## FOURTH AMENDMENT

Beyond the error of drawing facts and inferences favorably toward

the movant rather than the nonmovant, **the majority of this court erred**

as a matter of law when it concluded that there was "no search".  See "we

conclude that no search occurred" (Op. at 21) (* "we" not being

representative of Judge Bacharach), and **it was also plain error** to

'conclude that no "knock and talk" occurred in this case.' (Op. at 24).

This takes on domino importance because the court did not address

an argument raised because of it. See Op. at 23-24:

> "in Issue VI of his appellate brief, Clark argues, in pertinent part, that
> "[t]here should be no dispute that a 'knock and talk' is a search" that,
> to be reasonable, must "not stray outside of the implied license."[7] Aplt.
> Br. at 38. Again, **we need not address this argument because**, in
> light of the undisputed evidence presented in this case, **we conclude
> that no "knock and talk" occurred in this case.**" (emphasis added)

Further, that caveat of "in light of the undisputed evidence presented in

this case" is faulty in the conclusion of "undisputed" (this goes to

properly applying the summary judgment standard).

For purposes of the Fourth Amendment, the United States Supreme

Court precedent has held (including demonstration in *Jardines, et al.*) that

unless a property or agent of the property demonstrates otherwise, any

visitor may approach to speak with the occupant of a residence and;

when the visitor has the purpose of seeking information, that is a search

albeit a reasonable search. In the context of police investigations, these

approaches to talk have been termed "knock and talks". When such a

knock and talk has a purpose of seeking information, while it can be a

reasonable search, it is nonetheless, a search.

Such reasonable searches become unreasonable when they exceed the implied license, just as any search by any visitor would become unreasonable when the visitor exceeds the implied license.

The court correctly noted that :

> 'When the Government obtains information by physically intruding' on persons, houses, papers, or effects, a search within the original meaning of the Fourth Amendment has "undoubtedly occurred." *Id.* (quotations omitted).' Op at 17.

It should be recognized that the act of *obtains* is not central to that statement, that is, whether or not a search ultimately obtains any information is ancillary to whether a search occurs. As seen in *Jardines*, having an **objective or purpose** of seeking to obtain information is dispositive of existence of a "search", the remaining question being whether it is reasonable to perform that search and, as noted in *Jardines*,

> "the question before the Court is precisely *whether* the officer's conduct was an objectively reasonable search. As we have described, that depends upon whether the officers had an implied license to enter the porch, which in turn depends upon the purpose for which they entered" *Id.* at 1416-17

See also the dissent in *Jardines* :

> "Even when the **objective** of a "knock and talk" is **to obtain** evidence that will lead to the homeowner's arrest and prosecution, the license to approach still applies." *Id.* (dissent of Justice Alito)

This indicates recognition that even if some knock and talks are not

14

searches at all, other knock and talks can be searches albeit they may be reasonable searches (i.e., by complying with the implied license).

In justifying its decision, this court's majority, in error, stated that

> "it is undisputed that De La Torre entered Clark's property with the **sole intent** of speaking consensually with Clark and attempting to resolve the alleged violations. Further, it is undisputed that he did not succeed in that goal." Op at 23.  emphasis added)

It was error to conclude that *sole intent* is undisputed based on the evidence because an "intent of speaking consensually" is not necessarily exclusive of an additional intent to seek to obtain information – i.e., both intents can be held simultaneously even in a consensual "knock and talk" and the documentary evidence (and admitted fact) in this case shows both intents. See where Clark addressed that some "knock and talk" encounters can be searches while other are not in Aplt. Reply Br. 18-19:

> "As an initial matter, the City argued "[n]o Fourth Amendment search occurred." See City's Response at 6. This is plainly erroneous and is perhaps based on a misconstruction of the dissent in *Jardines*. The dissent opined about those instances where approaches might be made in which the visitor is *not seeking information*. See *Jardines*, "(Mail carriers and persons delivering packages and flyers are examples of individuals who may lawfully approach a front door without intending to converse.) Clark argues that if there is intent to talk but the officer is not seeking any information about a crime, or violation, etc., then it could be said that the purpose is to converse and not necessarily seek information. Where an officer is "walking a beat", that would generally fit within that

view (i.e., conversing to build relationships in the community).
But walking a beat is distinctively different that **going to a
specific house about a specific violation and its purpose is
quite different than building relationships in the
community**. The dissent in *Jardines* did take issue with the
majority looking to behavior when determining the **objective
purpose of the visit** but the majority did not indicate that
looking to behavior was a requirement, just that the purpose in
that case could be determined objectively, and need not accept a
subjective claim of an officer to his/her purpose. A document
showing that an officer went to a specific house concerning a
specific crime or violation would objectively evidence a
purpose to seek information, while simply walking a beat and
stopping to talk at selected or even random houses would
provide evidence of a purpose to build relationships rather than
seeking information." (emphasis added)

The majority concluded that 'De La Torre did not complete any

"knock and talk" and gathered no information.' (Op. at 24) but that is

*not material* to determining the occurrence of, or existence of, a search.

A key point as to this "did not complete" justification -- the *initiating*

point in time has always been core to the Fourth Amendment analysis

not the completion of, or a successful result of, the process of seeking

information. That is, the 'initiating' a search by an officer even if not

'completing' the search does not negate the existence of a search.

The *duration* of a search or seizure has never been held as a basis for

determining lack of existence of a search or seizure. As an example of

a search *without gathering any information* -- an officer can look through

a purse to find a phone number  − if the officer finds no phone number,

does that mean the purse was not searched? Or if the officer gets

interrupted shortly after opening the purse and cannot complete the search

of the purse, does that mean there was "no search"?

This errant understanding by the court hearkens back to (and is likely

predicated on) the previous mention at page 21 of the opinion that:

> "Ultimately, the district court concluded it "d[id] not need to
> determine whether De La Torre entered the curtilage of Clark's
> home, because even if he did, his actions in trying to find Clark
> on the property were taken **in accordance with the implied
> license** to approach the house," and that "[n]o
> reasonable jury could conclude there was a search of Clark's
> property under these facts."6  *Id*." (Op. at 21) (emphasis added)

and the previous two mentions in the directly associated footnote 6 (Op. at

21-22 ) that 'the City argued that "De La Torre performed no search but

only sought to contact Clark by walking down his driveway to the rear of

Clark's residence."'  and that 'district court denied Clark's motion for

partial summary judgment, and granted the City's motion for summary

judgment, "on Clark's Fourth Amendment claim (**because there was

no search** of Clark's property)." *Id*. at 1081-82. ' (emphasis added)

Clark addressed this in both his Brief and Reply Brief to this court.

See Aplt. Br. at 48:

> "even though the movant (CITY) claims to controvert
> nonmovant's statement of fact, it was, nonetheless, admitted

that the code enforcer "attempted to discuss the situation regarding the code violations with Mr. Clark." which is clearly seeking information. That a search does not find what it is seeking to find does not negate that it is a search."

And see Aplt. Reply Br. at 19-20:

"The most important thing is that, regardless of how it is determined that someone has a purpose of seeking information (i.e., the seeking of information leaves no question that it is a search), and that determination of purpose should be made by drawing the facts and inferences in favor of Clark. It is a reasonable to infer from the facts that De La Torre was seeking information, i.e., information about whether or not Clark would discuss the alleged violations. ( See City's ANSWER, ECF 56 at 2 [ROA V. I. at 152]) which stated that "on March 16, 2015, the City's Code Enforcement Officer attempted to discuss the situation regarding his code violations with Mr. Clark. Mr. Clark did not want to discuss the violations"; see also Statement of Fact #61 (ECF 79 at 10-11 [ROA V.I. at 157-158]) stating 'On March 16, 2015, the Code Enforcement officer entered Clark's property without a warrant seeking information about compliance. See Exhibit 41, near bottom of document, stating "attempted to discuss".' That Exhibit 41 (See ECF 79 at 2 [ROA V.I. at 379]) provides **evidence which can be used to objectively determine that the purpose of the visit was to seek information.** To draw inference otherwise is plain error of law in applying the summary judgment standard."

As for properly treating the non-movant on summary judgment, it should be taken as true that **a search did occur** based on reasonable inferences and; the only issue should be whether the implied license was exceeded (i.e., reasonableness turns solely on that). In that regard, this court's dissent astutely reasoned why, at the very least, there are genuine issues

18

for the trier of fact (curtilage, etc.)

See Op. of dissent at 1:

> "Could a reasonable factfinder infer that the homeowner doesn't
> want visitors to enter a partially enclosed back yard? The district
> court answered "no" and granted summary judgment to the city
> on the homeowner's Fourth Amendment claim. I disagree and
> would reverse the grant of summary judgment to the city."

The majority relied on *United States v. Carloss*, 818 F.3d 988, 993 (10th

Cir. 2016) (Op. at 23) but while some "knock and talk" encounters are

not searches, that is not necessarily true for every "knock and talk" as

discussed in more depth above. And, importantly, facts and inferences are

to be addressed favorably to the nonmovant at summary judgment, and

there was documentary evidence about both, approaching to talk (i.e.,

knock and talk occurred) and seeking information (i.e., this knock and talk

was a search, leaving only its reasonableness at issue).  See ROA at 663,

**"De La Torre told Clark** that he was just there to discuss the situation."

while in back of Clark's house. i.e., "talk". And, as the majority

acknowledges, there was admission by the moving party that the officer

was "attempting to resolve the alleged violations". (Op. at 23) That is

*de facto* seeking to obtain information concerning alleged violations. i.e.,

"search".  Based on the evidence as shown in the case, there was a "talk"

(i.e., knock[holler] and talk) and there was a "search".

**CONCLUSION**

1. It was error to draw facts and inferences favorably toward the movant rather than the nonmovant for each of the claims.

2. It was error to fail to address *retrospective* relief of injury based on signs and expressive objects other than just political signs.

3. It was error to conclude lack of standing for speech in the right of way (even after severance).

4. It was plain error to 'conclude that no "knock and talk" occurred in this case.' (Op. at 24) The evidence is that there were words exchanged ("talk") between the officer and the home owner, the <u>*only*</u> difference being 'hollering' substituted for 'knocking'.

5. It was error of law to conclude that there was "no search" (See "we conclude that no search occurred" (Op. at 21))

To save judicial resources, incorporation is hereby made of the 16 page dissenting opinion of *Eric S. Clark v. City of Williamsburg, Kansas*, No. 19-3237, Bacharach, J., concurring in part and dissenting in part, most importantly, the portion identifying that "Summary judgment is **appropriate <u>only</u>** if the city showed the absence of a genuine dispute of material fact." *Id.* at 3 and that "we must view the evidence in the light most favorable to Mr. Clark." *Id.* at 4.

**RELIEF:**

The errors of the district court, and of this court, are correctable errors.

This Court of Appeals should vacate the judgment and issue an opinion

correcting those errors.

FIRST AMENDMENT: This court should vacate the verdict and

judgment of the District Court and; instruct the District Court to

assess constitutionality of, and retrospective damages for, the broader

scope of the First Amendment violation (i.e., chill on placing signs other

than just "political signs").

FOURTH AMENDMENT: This Court of Appeals should reverse the

grant of summary judgment to the movant, based on the *evidence* in the

record and reasonable inferences drawn in favor of the nonmovant, and

remand to assess relief of damages, nominal or otherwise.

Respectfully submitted,


Eric S. Clark
1430 Dane Ave
Williamsburg, Kansas [66095]
Phone: 785-214-8904

## CERTIFICATE OF COMPLIANCE

with required PRIVACY redactions.

Appellant hereby certifies that:

1. All required privacy redactions have been made to Appellant's motion.

**Eric S. Clark ( pro se )**
1430 Dane Ave
Williamsburg, Kansas 66095
Phone: (785) 214-8904

## CERTIFICATE OF COMPLIANCE

with Type-VOLUME LIMIT, Typeface Requirements, and

Type Style Requirements

Appellant hereby certifies that:

1) This petition complies with the type-volume imitation.

2) This petition contains less than **3,900 words** apart from those parts which are ordinarily exempted from counting by Fed. Rules App. P. 32(a)(7)(B)(iii), with the argument and concluding sections containing **3,432 words**

3) This petition complies with the typeface requirements of Fed. Rules App. P. 32(a)(5) and the type style requirements of Fed. Rules App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman typeface.

**Eric S. Clark ( pro se )**
1430 Dane Ave
Williamsburg, Kansas 66095
Phone: (785) 214-8904

## CERTIFICATE OF SERVICE

Appellant hereby certifies that service was made by mailing

true and correct copies of the foregoing

PETITION FOR REHEARING AND SUGGESTION FOR

REHEARING EN BANC  and certifications

by deposit in the United States Mail, Postage prepaid,

on January 25, 2021 addressed to:


J. Steven Pigg, Andrew D. Holder, Seth Aaron Lowry
FISHER, PATTERSON, SAYLER & SMITH, L.L.P.
3550  S.W.  5th  St.
Topeka, KS 66606

and to:

Alan V. Johnson
Sloan Eisenbarth Glassman McEntire & Jarboe, LLC  − Topeka
534 South Kansas Avenue
Suite 1000
Topeka, KS 66603−3456

and the original and seven copies to:

Clerk, The United States Court of Appeals for the Tenth Circuit
The Byron White U.S. Courthouse
1823 Stout Street
Denver, CO 80257


Eric S. Clark
1430 Dane Ave
Williamsburg, Kansas [66095]
785-214-8904

FILED
United States Court of Appeals
Tenth Circuit

**January 14, 2021**

Christopher M. Wolpert
Clerk of Court

## UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT

ERIC S. CLARK,

Plaintiff - Appellant,

v.

CITY OF WILLIAMSBURG, KANSAS,

Defendant - Appellee.

No. 19-3237
(D.C. No. 2:17-CV-02002-HLT)
(D. Kan.)

---

### ORDER AND JUDGMENT[*]

---

Before **TYMKOVICH**, Chief Judge, **BRISCOE**, and **BACHARACH**, Circuit Judges.

---

Plaintiff Eric Clark, a resident of the City of Williamsburg, Kansas (the City), filed this action claiming that the City's attempted enforcement of its sign ordinance against him violated his First Amendment rights, and that the City's code enforcement officer violated his Fourth Amendment rights by walking onto his property and attempting to speak with him. The district court granted partial summary judgment in favor of Clark on his First Amendment claim, but granted summary judgment in favor of the City on Clark's Fourth Amendment claim. The First Amendment claim proceeded to a jury trial on the issue of damages, where the

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

jury awarded Clark one dollar in nominal damages. Clark now appeals the district court's summary judgment rulings in favor of the City on his First and Fourth Amendment claims. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm the judgment of the district court.

I

Clark lives in a house located in a sparsely populated area within the northern limits of the City. The front of the house faces the east. A gravel driveway runs from the back of the house, where there is a small parking lot type of area, around the south of the house and eastward to a road (K-273 Highway, also known as Dane Avenue) that runs north and south along the eastern boundary of Clark's property.

Clark purchased the property on July 29, 2003. It is undisputed that in the early 1970s the prior owners deeded a total of .49 acres of the property, located on the eastern edge directly adjacent to the existing public road, to the State Highway Commission of Kansas for highway purposes. It is disputed whether the City now has rights in that .49 acres of the property; the City maintains that it does, while Clark denies this.

On February 13, 2015, Tony De La Torre, a code enforcement officer employed part-time by the City, conducted an inspection of what he believed to be the City's right-of-way in front of Clark's residence. Ten days later, on February 23, 2015, De La Torre sent Clark a written "NOTICE OF VIOLATION" (hereinafter Notice of Violation). ROA at 581. The Notice of Violation stated that De La Torre, during his inspection, "found that there [we]re three large barrels, several signs, and

2

other affixed objects . . . located with [sic] the City's eighty foot easement" that
"w[ould] need to be removed." *Id*. The Notice of Violation further stated that
"[u]nder the City['s] . . . Ordinance, political signs shall not be placed on or
otherwise affixed to any public building or sign, right of way, sidewalks, utility pole,
street lamp post, tree, or other vegetative matter, Public Park, or other public
property." *Id*. The Notice of Violation stated that De La Torre would "be conducting
a re-inspection of the right of way on March 9, 2015," and it advised that "[i]f the
violations [we]re not corrected a citation m[ight] be issued and objects removed from
the City easement." *Id*. Lastly, the Notice of Violation stated that if Clark "ha[d]
any questions" or believed he "received th[e] letter in error," he should "contact City
Hall immediately by phone . . . or actions w[ould] continue toward resolution." *Id*.

On February 25, 2015, Clark sent a letter to De La Torre acknowledging the
Notice of Violation. *Id*. at 583. The letter noted, in part, that the Notice of Violation
"failed to identify the specific lawful authority for alleging any violation." *Id*. The
letter further stated that, "[t]o [Clark's] knowledge, [he was] not in violation," and it
in turn asked De La Torre to "please provide the specific law/code/ordinance/etc"
that he "believe[d] [wa]s being violated." *Id*. The letter also stated that if De La
Torre was "unaware of liability under 42 U.S.C. 1983, and costs (§ 1988)," he should
"become familiar with [his] exposure to personal liability as well as liability to the
City." *Id*.

On March 16, 2015, De La Torre returned to Clark's property with the intent
of speaking to Clark about, and hopefully resolving, the alleged violations. *Id*. at

3

464, ¶ 26; *Id.* at 530 (De La Torre deposition).  De La Torre parked his vehicle on the

City's right-of-way near the road and began walking up the gravel driveway towards

Clark's house.  *Id.* at 464, ¶ 26.  On that day, there were no "No Trespass" signs

posted on the property anywhere between the road and the house.  *Id.* at 462, ¶ 15.

There was no sidewalk or worn path leading to the front porch and door of the house.

The front porch was covered and Clark had placed a tarp over the front porch to

partially enclose it.  There was a chair and an old mattress near the entrance to the

front porch, and a visitor would have had to squeeze by the chair and the mattress to

enter the front porch area. According to De La Torre, "[i]t was very evident that there

was no way that [he] could get to the front porch because of the objects that were on

the porch." *Id.* at 530.  Because of that, and because he also "heard someone in the

back" of Clark's house, he proceeded to walk up the gravel driveway and toward the

back of the house, rather than attempting to approach the front porch and front door

of the house.  *Id.*

At the back of Clark's house, Clark had hung sheets on ropes to form a ten-

foot square canopy with fabric walls that enclosed the back door to the house.  De La

Torre walked to within ten feet or less of this enclosure and called out for Clark.

Clark exited the rear door of his house, walked through and exited the square fabric

canopy, and began yelling at De La Torre to get off of his property. [1]  According to

---

[1] According to Clark, he asked De La Torre to leave three or four times, and
approximately 10 to 15 seconds expired between each request.

.

De La Torre, Clark then turned and went inside his house. De La Torre returned to

his vehicle and left. According to Clark, De La Torre did not leave until Clark

threatened to call the sheriff. De La Torre was physically present on Clark's property

for approximately three to six minutes (De La Torre estimated it was three to four

minutes, while Clark estimated it was five to six minutes).

On March 18, 2015, Clark sent a lengthy letter to the City. The letter

acknowledged that Clark's property "border[ed] a right of way," but asserted that

Clark "ha[d] the right to place anything anywhere on [his] private property that [wa]s

subject to right of way usage so long as it d[id] not unduly interfere with the purposes

of the right of way." *Id.* at 592. The letter warned the City that it was violating, or

threatening to violate, Clark's Constitutional rights, and it advised that Clark might

file suit against the City.

Following receipt of Clark's letter, the City's Mayor met with the City

Attorney, who recommended that the City not continue its investigation of potential

ordinance violations by Clark. The Mayor and the City Council subsequently met

and purportedly decided not to pursue the Notice of Violation any further. The

Notice of Violation, however, has never been formally withdrawn by the City.

On July 10, 2015, Clark attended a session of the City's Municipal Court. On

the docket that day were two status hearings for other defendants; Clark did not have

a matter on the docket. Clark, however, proceeded to "disrupt[] the proceedings and

would not permit the judge to open court." *City of Williamsburg v. Clark*, No.

115,921, 2016 WL 5171918 at *1 (Kan. Ct. App. Sept. 16, 2016). During the court

session, Clark (a) refused to stop videotaping the proceedings, despite being told to stop by the court, (b) questioned the Municipal Court judge's authority to conduct the proceedings, (c) refused to identify himself by name, and (d) refused to remain silent. The judge, in response, found Clark in direct contempt of court and sentenced him to two hours in jail. ROA at 132, ¶ 31. Clark unsuccessfully appealed that matter to the Kansas Court of Appeals. *City of Williamsburg*, 2016 WL 5171918 at *1, 6.

On July 22, 2015, the City suspended the Code Enforcement Officer position due to budget constraints. De La Torre left the City's employment as a Code Enforcement Officer and has not been replaced. Since approximately that time, the City has also been without a municipal court judge, and no judge has held a municipal judicial proceeding in the City since May 2016.

On May 20, 2019 (approximately 11 days after the district court in this case determined that one subsection of the challenged sign ordinance was unconstitutional), the City Council passed a motion imposing a moratorium on enforcement of any provision of the City's sign regulations pending "further study." ROA at 1141.

## II

On January 23, 2017, Clark, appearing pro se, initiated this action by filing a complaint pursuant to 42 U.S.C. § 1983 against the City. ECF No. 1. The complaint alleged, in pertinent part, that "[t]he City implemented policies which were the moving force behind the deprivation of the constitutionally protected rights of Clark, including the First and Fourth Amendments' rights to freedom of expression and

right to be free from unreasonable searches." *Id.* at 11.  Count I alleged a violation of

Clark's First Amendment rights.  Count II alleged a violation of Clark's Fourth

Amendment rights.  The complaint asked for relief in the form of damages and

declaratory and injunctive relief, including enjoining the City from enforcing its sign

regulations and from entering any part of Clark's property without an invitation from

Clark in writing.[2]

On June 1, 2018, Clark filed a motion for partial summary judgment seeking a

"liability determination" as to his claims.  ROA at 146.  Clark asserted in his brief in

support that "[b]ut for the City's [sign]" ordinance, he "would have placed political

signs . . . in the unpaved portion of the right of way" on his property "nearer than 20

feet from the centerline of the road and left them in place . . . from July 4, 2016 to

December 31, 2016 and . . . would have placed political signs outside of any right-of-

way, but within an area of his private property which the City enforces its right of

way restrictions . . . and left them in place . . . from July 4, 2015 to December 31,

2016." *Id.* at 150, ¶ 10.  Clark further asserted that his "property is 'in a residential

one district' and" that, "but for the City's regulation (Article 8, § 4(A)(6))," he

"would have placed newly personalized political signs outside of any right-of-way

and in excess of ten(10) [sic] square feet." *Id.*, ¶ 12.

---

[2] On February 14, 2018, Clark filed an amended complaint that was
substantially similar to the original complaint.  Both the original and amended
complaints included claims for inverse condemnation or an unconstitutional taking of
Clark's property by the City.  Those claims are not at issue in this appeal.

With respect to his Fourth Amendment claim, Clark argued that "[t]he moving force of actions which violated [his] . . . right to be free from unreasonable searches . . . was the City's Zoning Regulations which direct[ed] such enforcement action . . . ." *Id.* at 182. Clark also argued that "the City's lack of guidance (failure to train) to the City's Code Enforcement Officer" resulted in a violation of his Fourth Amendment rights. *Id.* According to Clark, De La Torre violated his Fourth Amendment rights by failing to proceed to the front door of Clark's house and, instead, "explor[ing] another path that lead[]" towards the back of Clark's house and "hollering or yelling in effort to make contact" with Clark. *Id.* at 185.

Lastly, with respect to his First Amendment claim, Clark argued, in pertinent part, that the City's sign ordinance was "content based" and infringed on his First Amendment rights. *Id.* at 194. In support, he argued that the ordinance "prohibit[ed], through a chilling effect," his "ability . . . to express himself freely on certain topics at certain times, in certain manners, and in certain places." *Id.* at 200.

On August 9, 2018, the City filed its own motion for summary judgment. With respect to Clark's First Amendment claim, the City argued that Clark lacked standing to challenge the City's sign ordinance. In support, the City noted that most of the provisions of that ordinance "ha[d] never been applied nor even threatened to be applied to him or his property," and that the one provision that was implicitly relied on in the Notice of Violation (which addressed signs located on the City's rights-of-way) was never actually enforced against Clark. *Id.* at 477. The City also argued that "[e]ven if Clark had standing to challenge the" subsection of the

8

ordinance that "restrict[ed] signs on public property, that [sub]section d[id] not transgress the First Amendment" because it was content neutral. *Id.* at 481. Lastly, the City argued that the court should sever any offending portions of the ordinance.

As for Clark's Fourth Amendment claim, the City argued that De La Torre's brief entry onto Clark's property on March 16, 2015, did not constitute an illegal search prohibited by the Fourth Amendment. More specifically, the City argued that "[b]ecause De La Torre never left the driveway, never entered any 'curtilage' of Clark's residence and never performed any search subject to Fourth Amendment restrictions, his three to four-minute entry onto Clark's property in an effort to talk with [Clark] did not transgress the Fourth Amendment." *Id.* at 493. The City also argued that, even if De La Torre had violated Clark's Fourth Amendment rights, he was not acting pursuant to any City policy and, thus, the City was not responsible for his actions.

On May 9, 2019, the district court issued a memorandum and order that granted in part and denied in part both parties' motions. The district court granted partial summary judgment in favor of Clark on his First Amendment claim "that Article 8, § 4.A.(6)" of the City's sign ordinance "[wa]s an unconstitutional content-based restriction." *Id.* at 1081. The district court also concluded that Clark lacked standing to challenge any other provisions of the City's sign ordinance, and thus granted summary judgment in favor of the City as to that portion of Clark's First Amendment claim. *Id.* at 1081-82. As to Clark's Fourth Amendment claim, the

9

district court granted summary judgment in favor of the City on the grounds that "there was no search of Clark's property." *Id.* at 1-2.

On May 17, 2019, May 20, 2019, and May 21, 2019, Clark filed motions to amend the judgment. The district court denied those motions on June 19, 2019.

On July 17, 2019, the case proceeded to a jury trial on the issue of damages relating to Clark's First Amendment claim. At the conclusion of the evidence, the jury found that Clark did not suffer compensatory damages as a result of the Notice of Violation, and it awarded him $1 in nominal damages.

Judgment was entered in the case on July 18, 2019. Clark filed a motion to amend the judgment and a motion for new trial, both of which the district court denied. Clark then filed a timely notice of appeal.

### III

Clark asserts six issues in his appeal. The first four of those issues pertain to his First Amendment claim. The last two of those issues pertain to his Fourth Amendment claim. For the reasons that follow, we reject all six issues and affirm the judgment of the district court.

### *The First Amendment claim*

We begin by addressing the four issues that pertain to the district court's resolution of Clark's First Amendment claim.

### *a) Clark's standing to challenge regulatory provisions*

In the district court, Clark sought to challenge all provisions of the City's sign ordinance. The City, in its motion for summary judgment, argued in pertinent part

that Clark lacked standing to challenge any part of the City's sign ordinance. The district court granted in part and denied in part the City's motion and concluded that Clark lacked standing to challenge anything other than the subsection of the ordinance that was effectively cited in the Notice of Violation. In Issue IV of his opening appellate brief, Clark challenges the district court's grant of partial summary judgment in favor of the City on the issue of standing.

"We review a district court's grant of summary judgment de novo, applying the same legal standard as the district court." *Powell v. Bd. of Cty. Comm'rs of Muskogee Cty.*, 978 F.3d 1165, 1170 (10th Cir. 2020) (quotation marks omitted). Under that legal standard, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

To establish standing, a plaintiff such as Clark must show: (1) he has suffered an "injury in fact" that is concrete and particularized and actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *See Friends of the Earth v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). At the summary judgment stage, a plaintiff, in order to establish standing, must "set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (citations and quotations omitted).

11

The City's sign ordinance is found in Article 8 of the City's Zoning Regulations. Generally speaking, the ordinance classifies signs into functional and structural types, establishes general standards for the size and placement of signs, establishes exemptions from the regulations, sets forth design, construction and maintenance requirements, outlines the types and sizes of signs permitted in each type of zoning area, and establishes procedures for the removal of unsafe or illegal signs.

Section 3 of Article 8 establishes the "General Standards" for signs that are erected within the City's limits. ROA at 80-82. Section 4 of Article 8 sets forth specific "Exemptions" from the "General Standards" outlined in Section 3. *Id.* at 82-83. Of relevance here is § 4.A.(6), which states, in pertinent part, that "[t]he following signs shall be exempt from the requirements of this article":

> Political signs, not exceeding a total of 20 square feet in area on a lot of record zoned for non-residential purposes, or which is vacant and unplatted, regardless of the zoning district classification; and not exceeding a total of ten (10) square feet on a lot of record in a residential zone district. Political signs shall be displayed for no more than a four-week period preceding and a one-week period following an election. Political signs shall not be placed on or otherwise affixed to any public building or sign, right-of-way, sidewalk, utility pole, street lamp post, tree or other vegetative matter, or any public park or other public property.
>
> The City recognizes that the expression of political speech is an important and constitutionally protected right; that political signs have certain characteristics that distinguish them from many of the other types of signs permitted and regulated by the City, including the fact that these signs generally do not meet the regular structural design of permanent signs, given their temporary nature; that political signs therefore present a potential hazard to persons and property; and that the

12

City must impose reasonable time limits on the display of political signs for these reasons.

*Id.*

The district court concluded that Clark lacked standing to challenge any provision of Article 8, except for § 4.A.(6). It was that subsection, the district court concluded, that De La Torre implicitly referenced in the Notice of Violation that he issued to Clark. Although Clark argues on appeal that the entirety of the City's sign ordinance should have been addressed and declared unconstitutional, he points to no evidence that could establish that he was personally impacted, let alone injured, by the application of any of the other provisions of the ordinance. More specifically, there is no evidence that any City officer found that the signs posted on Clark's property were in violation of any of the other provisions of the City's sign ordinance, or in turn that any City officer ever pursued removal of such signs by issuing written notice to Clark pursuant to the procedures outlined in Article 8, § 10 of the City's sign ordinance.[3] *See Winsness v. Yocom*, 433 F.3d 727, 732 (10th Cir. 2006) ("The mere presence on the statute books of an unconstitutional statute, in the absence of enforcement or credible threat of enforcement, does not entitle anyone to sue, even if they allege an inhibiting effect on constitutionally protected conduct prohibited by

---

[3] Clark, in his opening brief, argues that some of the other provisions of Article 8 would apply to him and would prevent his political signs if, as the district court directed, Article 8, § 4.A.(6) is severed from Article 8. Aplt. Br. at 19. Those arguments, however, are entirely speculative and do not reflect what actually happened in this case.

13

the statute."). Further, it is undisputed that the City decided not to pursue the Notice of Violation that was issued by De La Torre.

In light of this undisputed evidence, we agree with the district court that Clark lacks standing to challenge any provision other than Article 8, § 4.A.(6).[4]

*b) The district court's severance of Article 8, § 4.A.(6)*

The district court granted partial summary judgment in favor of Clark on his First Amendment claim, concluding that Article 8, § 4.A.(6) of the City's sign ordinance "[wa]s a content-based regulation that d[id] not pass strict scrutiny." ROA at 1091. The district court in turn severed Article 8, § 4.A.(6) "from the City's sign ordinance." *Id.* at 1100.

In Issues I and II of his opening appellate brief, Clark argues that the district court erred in "conclud[ing] that severing one exemption," i.e., Article 8, § 4.A.(6), "would cure the unconstitutionality of the entire ordinance." Aplt. Br. at 4. In support, Clark argues that "the District Court appears to have failed to apprehend that within the severed exemption was a primary authorizing provision for allowing political signs on CLARK's residential property — apart from also enumerating a 'right of way' restriction for political signs (which the District Court appeared to

---

[4] We also note two other relevant facts: there is no compliance officer currently employed by the City, and the City has "pass[ed] a moratorium on enforcement of any part of the sign code pending further analysis of the constitutionality of the code." Aple. Br. at 13. These facts appear to render moot Clark's challenge to any portion of the City's sign ordinance other than Article 8, § 4.A.(6). *See Jordan v. Sosa*, 654 F.3d 1012, 1023-24 (10th Cir. 2011) (discussing constitutional and prudential mootness).

view as the sole constitutionality problem)." *Id.* (emphasis omitted). Clark argues
that "[t]he District Court's severance of that authorizing provision changed the
controlling law(ordinance) [sic] such that previously permitted political signs were
no longer authorized on CLARK's property (even outside of the right of way) leaving
the regulation bare of authorization for any political signs except for one token
expression of '[f]lags or emblems of a government or of a political, civil,
philanthropic, educational or religious organization'." *Id.* Lastly, Clark argues that
"[b]ecause the First Amendment issue for trial was framed based solely upon harm
from the single severed provision, rather than [the City's sign] ordinance being found
to be more broadly unconstitutional, . . . there is a reasonable probability that, but for
the improper framing of the issue for trial, the result of the proceeding would have
been different." *Id.* at 5.

Because Clark lacks standing to challenge any part of the City's sign
ordinance other than Article 8, § 4.A.(6), we conclude it is unnecessary for us to
address these arguments. In the event that the City lifts the moratorium it has
imposed on enforcement of its regulations and in turn attempts to enforce other
portions of its sign ordinance against Clark, Clark would then have the opportunity to
file a new lawsuit challenging the City's actions.

   c)  *Framing of the First Amendment issue for trial*

In Issue III of his opening brief, Clark argues that the district court "erred by
improperly framing the First Amendment issue for trial." Aplt. Br. at 15. Clark
asserts that "[t]his argument is predicated upon an errant interpretation (See ISSUE I)

15

and improper severing (See ISSUE II)." *Id.* According to Clark, "[t]he District Court's ruling necessarily framed the issue for trial as being limited to *only* one provision of the" City's sign ordinance. *Id.* (emphasis in original). He argues that "[i]f . . . Article 8 were found to be more broadly unconstitutional instead, then [he] could have shown additional evidence of damages at trial." *Id.* at 15-16. Clark asserts that "[w]ith a different understanding (e.g., that the entirety of Article 8 was unconstitutional) going into trial, [he] could have shown further injury through evincing what [De La Torre's] belief was when he issued the notice of violation to [Clark] about 'other affixed objects', e.g., threatened removal of a cross and even removal of a mailbox."[5] *Id.* at 16 (citation omitted).

For the reasons already discussed, we conclude that the district court did not err in limiting the damage issues at trial to those pertaining to Article 8, § 4.A.(6). Simply put, Clark lacks standing to challenge any other provision of the City's sign ordinance.

### *The Fourth Amendment claim*

We now turn to the two challenges that Clark asserts in his appeal to the district court's resolution of his Fourth Amendment claim. In Issue V of his opening appellate brief, Clark argues that the district court "erred by granting summary judgment to the CITY on the Fourth Amendment claim — either by improperly

---

[5] Clark concedes that these objects were not mentioned in the Notice of Violation, but he asserts that De La Torre mentioned those items during his deposition in this matter. Aplt. Br. at 17.

drawing inferences in favor of the movant rather than the nonmovant and/or by improperly finding a fact not actually asserted by any party." Aplt. Br. at 27 (capitalization in original).  In Issue VI, Clark argues that the district court "erred in its determination of law concerning the Fourth Amendment as applied to the undisputed evidence" and he concedes that "[t]he issue is somewhat derivative of" Issue V.  *Id.* at 37.  Thus, in sum, Clark is challenging the district court's grant of summary judgment in favor of the City with respect to Clark's Fourth Amendment claim.

We begin our analysis of Clark's arguments by briefly reviewing the Supreme Court case on which Clark has consistently relied in support of his Fourth Amendment claim, *Florida v. Jardines*, 569 U.S. 1 (2013).  In *Jardines*, the Supreme Court "consider[ed] whether using a drug-sniffing dog on a homeowner's porch to investigate the contents of the home is a "search" within the meaning of the Fourth Amendment."  *Id.* at 3.  At the outset of its opinion, the Court noted that "[t]he Fourth Amendment provides in relevant part that the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.'"  *Id.* at 5.  In other words, the Court noted, the Fourth Amendment "establishes a simple baseline, one that for much of our history formed the exclusive basis for its protections: When the Government obtains information by physically intruding' on persons, houses, papers, or effects, a search within the original meaning of the Fourth Amendment has "undoubtedly occurred."  *Id.* (quotations omitted).  The Court then noted that "when it comes to the Fourth

17

Amendment, the home is first among equals," and that "the area immediately surrounding and associated with the home," i.e., the home's curtilage, is "part of the home itself for Fourth Amendment purposes." *Id.* at 6 (quotations omitted). The curtilage, the Court noted, "is intimately linked to the home, both physically and psychologically, and is where "privacy expectations are most heightened." *Id.* at 7 (quotations omitted).

Because "the officers' investigation" in *Jardines* "took place in a constitutionally protected area," i.e., the front porch of the home, the Court "turn[ed] to the question of whether [the investigation] was accomplished through an unlicensed physical intrusion." *Id.* Addressing that question, the Court noted that "[w]hile law enforcement officers need not shield their eyes when passing by the home on public thoroughfares, an officer's leave to gather information is sharply circumscribed when he steps off those thoroughfares and enters the Fourth Amendment's protected areas." *Id.* (quotations and citation omitted). The Court in turn noted that it has recognized an "implicit license" that "typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Id.* at 8. Thus, the Court held, "a police officer not armed with a warrant may approach a home and knock, precisely because that is no more than any private citizen might do." *Id.* "But," the Court also held, "introducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence is something else." *Id.* at 9. The Court explained:

> There is no customary invitation to do that. An invitation to engage in
> canine forensic investigation assuredly does not inhere in the very act of
> hanging a knocker. To find a visitor knocking on the door is routine (even
> if sometimes unwelcome); to spot that same visitor exploring the front path
> with a metal detector, or marching his bloodhound into the garden before
> saying hello and asking permission, would inspire most of us to—well, call
> the police. The scope of a license—express or implied—is limited not only
> to a particular area but also to a specific purpose. * * * Here, the
> background social norms that invite a visitor to the front door do not invite
> him there to conduct a search.

*Id.* (emphasis in original) (footnote omitted).

Having outlined the holding in *Jardines*, we next turn to the district court's

analysis and rejection of Clark's Fourth Amendment claim. The district court

recognized at the outset that Clark was "alleg[ing] that De La Torre performed an

unlawful search of his property on March 16, 2015," and that "Clark attribute[d] this

to the City's zoning ordinance or else the City's failure to train its code enforcement

officers, either of which he contend[ed] ma[de] the City liable for De La Torre's

actions." ROA at 1103. The district court noted, however, that the threshold

question was whether De La Torre's actions were unconstitutional in the first place.

*Id.* As to that issue, the district court noted that Clark's theory was "that De La Torre

entered his property seeking information about whether Clark would remove the

signs and did so in a manner that 'exceeded the implied license of *Florida v.*

*Jardines.*'" *Id.* (quoting ECF No. 79 at 34–35). More specifically, the district court

noted that "Clark t[ook] issue with the fact that De La Torre did not knock on his

front door but instead walked down the driveway after hearing noises toward the

back" of the house. *Id.*

To address Clark's theory, the district court began by outlining the applicable law, with particular emphasis on *Jardines*. *Jardines*, the district court noted, "explained that an implicit license exists that allows visitors to 'approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave,'" and that "[t]he same license is extended to law enforcement officers." *Id.* at 1104 (quoting *Jardines*, 569 U.S. at 8). Clark, the district court in turn noted, was arguing "that *Jardines* drew an explicit line about what is allowed for a knock-and-talk" and that, in particular, it authorized entry only by the front path of a home. *Id.* The district court rejected Clark's interpretation of *Jardines*: "It [*Jardines*] did not hold that was the <u>only</u> permissible way to approach a house." *Id.* (emphasis in original). Rather, the district court stated, the facts of *Jardines* involved an officer "bringing a drug-sniffing dog onto the front porch [of a home] to do an investigation." *Id.* at 1104–05. The district court also noted that in *United States v. Shuck*, 713 F.3d 563 (10th Cir. 2013), we held that officers did not violate the defendant's Fourth Amendment rights by approaching the back door of his trailer and conducting a knock-and-talk. *Id.* at 1105. The district court emphasized that in reaching our conclusion, we concluded that the evidence established that approaching the back door of the trailer was the normal route of access for visitors. *Id.*

The district court concluded that "[t]he facts in *Shuck* [we]re similar to the facts in" Clark's case. *Id.* at 1106. The district court stated that it was "undisputed that there was no path to the front porch" of Clark's home "from the driveway, the

20

steps were partially blocked with vegetation, and items on the porch at least partially

blocked the front door." *Id*. The district court also stated that Clark admitted "that

he had 'trained' at least some of his visitors to come to the back entrance, and that he

hoped the state of the front entrance would deter visitors." *Id*. "These undisputed

facts," the district court concluded, "coupled with De La Torre hearing someone

towards the back of the house, made his decision to walk that way in an attempt to

contact Clark entirely reasonable," and that "no reasonable jury could find

otherwise." *Id*. The district court also concluded that "[t]he fact that the front door

was partially visible, as Clark contend[ed], d[id] not change the fact that De La Torre

reasonably assumed that the front door was not the primary entrance." *Id*. In

addition, the district court concluded De La Torre did not exceed the scope of the

license because "[w]hen Clark asked him to leave, he did so," and that "[i]t [wa]s

undisputed that De La Torre was at the property no more than a few minutes and left

within a minute of being asked to leave." *Id*. Ultimately, the district court concluded

it "d[id] not need to determine whether De La Torre entered the curtilage of Clark's

home, because even if he did, his actions in trying to find Clark on the property were

taken in accordance with the implied license to approach the house," and that "[n]o

reasonable jury could conclude there was a search of Clark's property under these

facts."[6] *Id*.

---

[6] The dissent ignores this latter part of the district court's ruling and suggests, erroneously, that the question of whether a search occurred is not properly before us on appeal. In fact, the issue of whether a search occurred for purposes of the Fourth Amendment was raised by the parties in their summary judgment pleadings and

In Issue V of his appellate brief, Clark argues that the district court erred in a

number of respects in granting summary judgment in favor of the City on his Fourth

Amendment claim.  We need not address each of those arguments in detail, however,

---

ultimately addressed by the district court in its memorandum and order ruling on the
summary judgment motions.
    Indeed, Clark himself squarely presented the issue in his own motion for
partial summary judgment.  In that motion, Clark sought a "[l]iability determination
for Fourth Amendment violation," and alleged in support that there was an
"unconstitutional search."  R. at 159-60 (capitalization omitted).  In support, Clark
alleged that De La Torre "enter[ed] upon the curtilage of Clark's property seeking
information about compliance without a warrant and without any applicable
exception to the Fourth Amendment warrant requirement."  *Id.* at 181.  He further
argued that "[w]hen the government engages in physical intrusion of a
constitutionally protected area in order to obtain information, that intrusion
constitutes a violation of the Fourth Amendment."  *Id.*  Clark argued that because De
La Torre "had a purpose of seeking information," and "for reason of hearing noises,
skip[ped] any attempt to knock on the front door, and explore[d] another path that
lead[] towards the noises heard and beg[an] hollering or yelling in an effort to make
contact in order to gather the information sought, his actions became an unreasonable
search of the curtilage of Clark's home."  *Id.* at 185.
    The City, in its response to Clark's motion for partial summary judgment and
in its own motion for summary judgment, argued that De La Torre's entry onto
Clark's property did not constitute an illegal search prohibited by the Fourth
Amendment.  *Id.* at 686.  More specifically, the City argued that "De La Torre
performed no search but only sought to contact Clark by walking down his driveway
to the rear of Clark's residence."  *Id.*  The City also argued that "[e]ven if the brief
presence of De La Torre on Clark's property is considered under Clark's version of
the incident, no Fourth Amendment violation occurred."  *Id.* at 691.
    On May 9, 2019, the district court issued a memorandum and order ruling on
both Clark's motion for partial summary judgment and the City's motion for
summary judgment.  The district court denied Clark's motion for partial summary
judgment, and granted the City's motion for summary judgment, "on Clark's Fourth
Amendment claim (because there was no search of Clark's property)."  *Id.* at 1081-
82.
    As a result, we conclude that the question of whether a search occurred within
the scope of the Fourth Amendment is, contrary to the dissent's assertion, properly
before us on appeal.  And, because we conclude that no search occurred, we conclude
it is unnecessary to address the other various points raised by the dissent concerning
what constitutes the curtilage of Clark's home.

because even if we were to assume that the district court erred in the respects asserted by Clark, none of those errors undermine the district court's ultimate conclusion that the City was entitled to summary judgment on Clark's Fourth Amendment claim. As the Supreme Court in *Jardines* noted, the Fourth Amendment prohibits, in pertinent part, unreasonable searches and thus prohibits the government from "obtain[ing] information by physically intruding on" a person's home. 569 U.S. at 5. Here, it is undisputed that De La Torre entered Clark's property with the sole intent of speaking consensually with Clark and attempting to resolve the alleged violations. Further, it is undisputed that he did not succeed in that goal. Although De La Torre asked to speak with Clark, Clark responded immediately by yelling at De La Torre to leave. De La Torre complied and, as a result, did not speak with Clark and thus gathered no information. In short, no "search" occurred for purposes of the Fourth Amendment. *See Jardines*, 569 U.S. at 9 n.4 ("[I]t is not a Fourth Amendment search to approach the home in order to speak with the occupant, because all are invited to do that."); *United States v. Carloss*, 818 F.3d 988, 993 (10th Cir. 2016) (concluding that officers did not conduct a Fourth Amendment search when they approached the front door of a home and attempted to consensually speak with the occupant).

Finally, in Issue VI of his appellate brief, Clark argues, in pertinent part, that "[t]here should be no dispute that a 'knock and talk' is a search" that, to be reasonable, must "not stray outside of the implied license."[7] Aplt. Br. at 38. Again, we need not

---

[7] The remainder of Issue VI, as Clark himself concedes, is basically a repeat of the arguments asserted in Issue V.

address this argument because, in light of the undisputed evidence presented in this case, we conclude that no "knock and talk" occurred in this case. Although De La Torre approached Clark and asked to consensually speak with him, Clark immediately and repeatedly yelled at De La Torre to leave his property and De La Torre complied and left. Thus, De La Torre did not complete any "knock and talk" and gathered no information.

## IV

The judgment of the district court is AFFIRMED.

Entered for the Court

Mary Beck Briscoe
Circuit Judge

*Eric S. Clark v. City of Williamsburg, Kansas*, No. 19-3237, Bacharach, J., concurring in part and dissenting in part.

This case arises from efforts by the City of Williamsburg, Kansas to enforce a sign code against Mr. Eric Clark. I agree with the majority that Mr. Clark lacked standing to challenge the relevant provisions of the sign code, so I join Parts I, II, and III(a)–(c) of the majority's opinion. But I respectfully disagree with the majority's disposition of Mr. Clark's Fourth Amendment claim.

To decide this claim, we must consider the scope of a homeowner's right to privacy. In considering the scope of this right, we recognize that

- municipal officers typically enjoy the same customary privileges enjoyed by other visitors and

- most visitors would expect permission to knock on a house's front door.

So municipal officers may ordinarily knock on the front door of a house without violating the Fourth Amendment.

But what if a homeowner obstructs the front door, signaling to visitors that they are not welcome? Could a reasonable factfinder infer that the homeowner doesn't want visitors to enter a partially enclosed back yard? The district court answered "no" and granted summary judgment to the city on the homeowner's Fourth Amendment claim. I disagree and would reverse the grant of summary judgment to the city.

1.    **The city's code-enforcement officer approached the back yard after seeing that visitors were not welcome at the front door.**

Mr. Clark alleges a Fourth Amendment violation stemming from a visit by the city's code-enforcement officer, Tony De La Torre. Officer De La Torre saw that the front door was inaccessible,[1] but allegedly heard a sound in the back. So he walked up the driveway and, according to Mr. Clark, turned behind the house onto the gravel parking area. A few feet away stood an enclosure, consisting of a canopy of sheets draped around a swimming tank and the back door.

Mr. Clark heard someone entering his back yard and demanded that Officer De La Torre leave. He did.

2.    **Officer De La Torre had no implied license to enter the curtilage of Mr. Clark's house.**

The resulting issue is whether Officer De La Torre violated the Fourth Amendment by intruding into Mr. Clark's curtilage without an implied license. The issue arose when the city moved for summary judgment, denying the existence of a search on grounds that Officer De La Torre had not entered the curtilage or exceeded an implied license.

---

[1]    Mr. Clark contends that the evidence allowed a reasonable finding that the front door had been accessible to visitors. The city disagrees, as do I.

2

**A.    We engage in de novo review and consider the evidence in the light most favorable to Mr. Clark.**

Summary judgment is appropriate only if the city showed the absence of a genuine dispute of material fact. *T-Mobile Cent., LLC v. Unified Gov't of Wyandotte Cty., Kansas City, Kan.*, 546 F.3d 1299, 1306 (10th Cir. 2008). The district court granted summary judgment to the city, so we must conduct de novo review by considering the evidence in the light most favorable to Mr. Clark. *Id.*

**B.    The factfinder could reasonably consider the gravel parking area as part of the curtilage.**

The Fourth Amendment supplies protection not only for one's house but also the curtilage, which is "the area to which extends the intimate activity associated with the sanctity of a [person's] home and the privacies of life." *Reeves v. Churchich*, 484 F.3d 1244, 1254 (10th Cir. 2007) (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984)). The scope of the curtilage is a legal question. *United States v. Cousins*, 455 F.3d 1116, 1121 & n.4 (10th Cir. 2006) (en banc footnote). But this legal question turns on facts, which we consider in the light most favorable to Mr. Clark. *See United States v. Depew*, 210 F.3d 1061, 1067 (9th Cir. 2000) ("Determining whether an area is within a home's curtilage is a fact-intensive inquiry."); *Bleavins v. Bartels*, 326 F.3d 887, 891 (7th Cir. 2003) ("The inquiry into whether an area can be considered curtilage is fact-

3

intensive."); *see also* Part 2(A), above (stating that the court must view the evidence favorably to Mr. Clark).

In determining whether a particular area constitutes part of the curtilage, we consider four factors:

1.      proximity to the house,

2.      existence of an enclosure,

3.      use of the area, and

4.      steps taken to enhance privacy.

*United States v. Dunn*, 480 U.S. 294, 301 (1987). In considering these factors, we must view the evidence in the light most favorable to Mr. Clark. *See* Part 2(A), above. When the evidence is viewed in this light, the first, third, and fourth factors support classification of the gravel parking area as part of the curtilage.

The first factor (proximity to the house) favors Mr. Clark. Officer De La Torre walked up the driveway to the side of Mr. Clark's house and then turned behind the house onto a gravel parking area. This parking area was not clearly visible from the street.[2]

The second factor (existence of an enclosure) favors the city because Officer De La Torre did not enter the enclosed canopy.

---

[2]      The city states that Officer De La Torre remained in an area that was visible from the street. Appellee's Resp. Br. at 22. But the city provides no citation for this statement.

The third factor (use of the area) favors Mr. Clark's view that the gravel parking area was part of the curtilage. The area was used for parking, and only a few feet away stood the canopy over the small tank used for swimming. The factfinder could reasonably infer that parking vehicles and swimming are activities intimately tied to home life, so this factor supports treatment of the gravel parking area as curtilage. *See United States v. Alexander*, 888 F.3d 628, 633 (2d Cir. 2018) (upholding a finding that an area for parking cars was continuous with the back yard and within the curtilage); *Harris v. O'Hare*, 770 F.3d 224, 240 (2d Cir. 2014) (referring to swimming as a private activity associated with the curtilage).

The fourth factor (steps taken to enhance privacy) also supports treatment of the gravel parking area as curtilage. This area lay adjacent to Mr. Clark's house and could not clearly be seen from the street. Passersby could see into the area only by approaching the back yard.

Precedent supports consideration of the gravel parking area as part of the curtilage. In *Collins v. Virginia*, 138 S. Ct. 1663, 1671 (2018), the Supreme Court considered a similar area part of the curtilage. There a driveway ran alongside a house and past the front part of the house; the relevant area was the end of the driveway, enclosed on two sides by a low wall and on the third side by the house itself. *Id.* at 1670–71. Similarly, in *Lundstrom v. Romero*, 616 F.3d 1108, 1128-29 (10th Cir. 2010), we concluded that the curtilage included an area abutting the back of a house.

As in *Collins*, the relevant area was a continuation of the driveway. Mr. Clark's gravel parking area was enclosed on two sides rather than three. But unlike the area in *Collins*, Mr. Clark's gravel parking area couldn't be seen clearly from the street. As in *Lundstrom*, the area at issue was near the back of the house. In light of *Collins*, *Lundstrom*, and Mr. Clark's evidence, I would regard the gravel parking area as part of the curtilage.

### C.   A genuine factual dispute exists on whether the implied license extended to the gravel parking area.

The resulting issue is whether Officer De La Torre had license, or permission, to enter the gravel parking area.

Permission can be express, but can also be implied from general societal practice. *Florida v. Jardines*, 569 U.S. 1, 8 (2013). For example, societal customs ordinarily create an expectation that someone can walk along a pathway to a front door and knock. *Id.*

The parties disagree on whether Mr. Clark's yard had a pathway to his front door. But regardless of a pathway, Mr. Clark apparently did not want visitors at his front door, for this is what they would have seen:



11/24/2014 13:55

With this view of the front of Mr. Clark's house, would societal custom have led Officer De La Torre to think that he was welcome to go to the back yard and knock on Mr. Clark's back door? And would that sense of welcome have continued once Officer De La Torre approached the gravel parking area and saw that Mr. Clark had constructed a sheet canopy, preventing others from seeing into the area outside his back door? A reasonable factfinder could answer "no" to these questions.

In oral argument, the city was asked if Officer De La Torre would have had an implied license to enter the gravel parking area if Mr. Clark had posted a "no visitors" sign. The city answered "no." But a reasonable factfinder could consider Mr. Clark's obstructions outside his front door as a sign that he did not want uninvited visitors at *any* door.

7

The district court concluded that the implied license had extended to the gravel parking area, relying on *United States v. Shuck*, 713 F.3d 563 (10th Cir. 2013). There we reviewed the denial of a motion to suppress, so we considered the evidence in the light most favorable to the government. *Id.* at 567. But here we must do the opposite, considering the evidence in the light most favorable to Mr. Clark. *See* Part 2(A), above. *Shuck* does not help us determine whether an implied license exists if we view the evidence favorably to the homeowner.

The city argues that Officer De La Torre went to the back because he thought that Mr. Clark was there. But Officer De La Torre did not say that he had heard Mr. Clark in the back. Instead, Officer De La Torre simply said that he had heard "a sound" in the back, which led him to believe that someone was working in the back. R. at 1053–54. A factfinder could reasonably infer that visitors would not ordinarily expect permission to enter a back yard based only on a sound suggesting that work was being done there, particularly when obstructions outside the front door indicate that uninvited visitors are not welcome.

The city disagrees, citing opinions for the proposition that an implied license permits entry into the back yard when the front door is inaccessible or an occupant appears to be home and doesn't answer the door.

In arguing that entry into the back yard was permissible, the city relies largely on opinions predating *Jardines*: *Galindo v. Town of Silver*

8

*City*, 127 F. App'x 459, 466 (10th Cir. 2005) (unpublished); *United States
v. Cavely*, 318 F.3d 987, 994 (10th Cir. 2003); *Estate of Smith v. Marasco*,
318 F.3d 497, 519 (3d Cir. 2003); *Alvarez v. Montgomery Cty.*, 147 F.3d
354, 357 (4th Cir. 1998); *United States v. Daoust*, 916 F.2d 757, 758 (1st
Cir. 1990); *United States v. Freeman*, 426 F.2d 1351, 1352–53 (9th Cir.
1970); and *United States v. Diaz*, No.1:09cr9-SPM, 2009 WL 3675006, at
*2 (N.D. Fla. Oct. 30, 2009) (unpublished), *aff'd*, 404 F. App'x 381 (11th
Cir. 2010) (unpublished). In one of these opinions, the court did not
provide any reasoning. *Daoust*, 916 F.2d at 758. In the other opinions, the
courts reasoned that the homeowners had lacked reasonable expectations of
privacy. *Galindo*, 127 F. App'x at 466; *Cavely*, 318 F.3d at 993–94;
*Alvarez*, 147 F.3d at 357–58; *Freeman*, 426 F.2d at 1354; *Diaz*, 2009 WL
3675006, at *2. In the remaining opinion, the court ruled for the plaintiff,
but used a pre-*Jardines* analysis based on the homeowner's expectation of
privacy. *Marasco*, 318 F.3d at 521. *Jardines* affected the viability of all of
these opinions by holding that the Fourth Amendment is implicated
whenever an officer enters the curtilage without an express or implied
license. 569 U.S. at 5–6, 9–11.

In arguing that officers could enter the back yard when an occupant
does not answer the front door, the city relies on *Hardesty v. Hamburg
Township*, 461 F.3d 646, 654 (6th Cir. 2006). This opinion also predated
*Jardines*; and the Sixth Circuit ultimately abrogated *Hardesty*, noting that

9

its reasoning was no longer viable after *Jardines*. *Morgan v. Fairfield Cty., Ohio*, 903 F.3d 553, 565 (6th Cir. 2018).

The city also relies on two other opinions:

- *Carroll v. Carman*, 574 U.S. 13 (2014) and

- *United States v. Garcia*, 997 F.2d 1273 (9th Cir. 1993).

But these opinions shed no light on the scope of Officer De La Torre's implied license. In *Carroll*, the Court expressly declined to decide whether an officer could knock on a door other than the front door. 574 U.S. at 20. In *Garcia*, the court concluded that officers had not exceeded an implied license. 997 F.2d at 1279–80. But there the officers reasonably mistook the back door for the front door, and both doors were immediately accessible from a public area. *Id*.

\* \* \*

If we view the evidence in the light most favorable to Mr. Clark, as required, a reasonable factfinder could infer that Officer De La Torre had entered the curtilage without an implied license.

The city contends that Mr. Clark had made it clear that he did not want uninvited visitors coming to his front door, leading them instead to the back door. But a reasonable factfinder could infer that Mr. Clark had also made it clear that he didn't want uninvited visitors coming to his back door, for he had constructed a canopy supplying privacy in his back yard.

10

The back yard was not visible from the street in front of the house, so why would Officer De La Torre assume that he was welcome to enter the back yard if he wasn't welcome at the front door? Because he heard a sound toward the back? Perhaps. But viewing the evidence favorably to Mr. Clark, a factfinder could reasonably infer that hearing a sound does not serve as an implied license to enter the back yard.

**3.      We should not sua sponte affirm on an argument that the city has not raised.**

The majority doesn't consider the scope of the curtilage or existence of an implied license, relying instead on the absence of any information collected from Mr. Clark's property. But in district court and on appeal, the city denied that a search had taken place solely on the ground that Officer De La Torre had not entered the curtilage or exceeded an implied license.

**A.      The majority erroneously relies on excerpts from the city's brief in district court, where the city denied a search based on the scope of the curtilage and existence of an implied license.**

The majority points out that in district court, the city denied the existence of a search. But the city did not base the denial of a search on the failure to collect information; the city instead relied on the scope of the

11

curtilage and the existence of an implied license. The majority's two examples illustrate the difference.

First, the majority quotes the city's statement that Officer De La Torre did not conduct a search because he just "walk[ed] down [the] driveway to the rear of Clark's residence . . . ." Maj. Op. at 22 n.6. The sentence continues: "which is the commonly-used entrance to Clark's residence." R. at 686. This was the city's argument that it hadn't conducted a search because Officer De La Torre had an implied license to enter the gravel parking area.

Second, the majority quotes the city's statement that Officer De La Torre's brief presence did not violate the Fourth Amendment. Maj. Op. at 22 n.6; R. at 691. This statement appears in an argument involving the time that Officer De La Torre took to leave, not the collection of information. R. at 691. Before discussing the time taken by Officer De La Torre, the city had spent roughly 5-1/2 pages denying the existence of a search based on its arguments involving the curtilage and implied license. R. at 686–91. Given this context, the cited statement does not encompass an argument denying the existence of a search based on the failure to collect information. *See Crowson v. Washington Cty. State of Utah*, No. 19-4118, 19-4120, ___ F.3d ___, 2020 WL 7706471, at *9 n.9 (10th Cir. Dec. 29, 2020) (to be published) (declining to consider the appellee's single-sentence argument for an alternative ground to affirm because the

appellee's argument was perfunctory); *Jordan v. Maxim Healthcare Servs.,*
*Inc.*, 950 F.3d 724, 742 n.14 (10th Cir. 2020) (stating that an appellee's
"oblique nod" to an issue was perfunctory and likely didn't suffice to
preserve an argument for affirmance).

### B.    Mr. Clark had no reason to present evidence on this issue when responding to the city's motion.

The majority points out that Mr. Clark briefly argued in district court
that he was entitled to partial summary judgment because Officer De La
Torre had tried to gather information. Maj. Op. at 22 n.6; R. at 181, 185.
But the city did not contest this argument when seeking summary
judgment. So when Mr. Clark responded to the city's summary-judgment
motion, he noted the absence of a dispute over Officer De La Torre's
purpose of collecting information. R. at 849. Mr. Clark could reasonably
conclude that he had no need to further address the issue, for the city never
contested Officer De La Torre's intent to gather information or sought
summary judgment on this basis.

If the city had denied a search based on the failure to collect
information, Mr. Clark might have made further arguments or presented
supporting evidence. *See John G. Alden, Inc. of Mass. v. John G. Alden*
*Ins. Agency of Fla., Inc.*, 389 F.3d 21, 25 (1st Cir. 2004) ("At a minimum,
the party preparing the response must have the motivation of knowing that
it is the target of a summary judgment motion."). In my view, it is "unfair

to affirm a summary judgment against a plaintiff for lack of evidence of an element of the cause of action unless the defendant has clearly challenged that lack of evidence in district court." *Evers v. Regents of the Univ. of Colo.*, 509 F.3d 1304, 1309–10 (10th Cir. 2007).

### C. The district court denied the existence of a search based on the existence of an implied license, not the absence of any collection of information.

The majority also points out that the district court concluded that no search had taken place. But the district court relied solely on its conclusion that Officer De La Torre had not exceeded an implied license. For example, the court summarized the city's argument:

> Defendants counter that De La Torre never entered the curtilage of Clark's property, and even if he did, he did so in taking the most common path available to visitors in an attempt to contact Clark.

R. at 1103–04. Addressing this argument, the court concluded that Officer De La Torre had an implied license to go where he did. Based solely on this implied license, the court denied the existence of a search:

> Accordingly, the Court does not need to determine whether De La Torre entered the curtilage of Clark's home, because even if he did, his actions in trying to find Clark on the property were taken in accordance with the implied license to approach the house. No reasonable jury could conclude there was a search of Clark's property under these facts.

*Id.* at 1107. But the court did not make any findings about whether Officer De La Torre had collected information.

14

**D.    As a whole, the pertinent factors weigh against affirmance on a ground that the city hasn't presented on appeal.**

But even if the majority were right about the city's argument in district court, the city's appellate arguments do not rely on the absence of information collected from Mr. Clark's property. The city's appellate arguments instead rely solely on the scope of the curtilage and existence of an implied license.[3]

Despite the city's framing of the issue, we have discretion to affirm on other grounds if supported by the record. *Elkins v. Comfort*, 392 F.3d 1159, 1162 (10th Cir. 2004). In deciding whether to exercise this discretion, we consider three factors:

1.    whether the ground was fully briefed and argued both in district court and on appeal,

2.    whether the parties had a fair opportunity to develop the factual record, and

3.    whether our decision would involve only questions of law.

---

[3]    For example, the city argues:

> [A]s noted by the dissent in *Florida v. Jardines*, 569 U.S. 1, 133 S. Ct. 1409 (2013), a "knock and talk" has as its purpose discovering information but a "knock and talk" is not a search because "all are invited to do that." 133 S. Ct. at 1424. [Officer] De La Torre's attempt to visit with plaintiff was not a search because he did no more than what "all are invited" to do by attempting to contact plaintiff in a manner that did not deviate from the implied invitation.

Appellee's Resp. Br. at 26.

*Id.*

In balancing these factors, reasonable minds can differ. In my view, however, these factors weigh against relying on the absence of a search based on the failure to collect information. Though the majority has raised an issue of law, the city has not briefed this issue and it turns on undeveloped facts.

In similar circumstances, we recently declined to affirm on a ground not presented in district court or on appeal, calling the practice "imprudent." *United States v. Chavez*, 976 F.3d 1178, 1203 n.17 (10th Cir. 2020). Relying on a new ground to affirm would be equally imprudent here.

* * *

I would address the reasons given by the city and district court for denying the existence of a search: the scope of the curtilage and the extent of an implied license. So I respectfully dissent from the majority's rejection of the Fourth Amendment claim. In my view, Mr. Clark overcame summary judgment on this claim.

 

U.S. POSTAGE PAID
PME 1-Day
OTTAWA, KS
66067
JAN 25, 21
AMOUNT
**$60.30**
R2304M110655-13

UNITED STATES
POSTAL SERVICE ®

1007        80257

Ave
g, Kansas 66095

**To:**

Clerk, The United States Court of Appeals for the Tenth Circuit
The Byron White U.S. Courthouse
1823 Stout Street
Denver, CO 80257

**UNITED STATES POSTAL SERVICE** ®

**PRIORITY MAIL EXPRESS** ®

EJ 301 032 100 US

(USE ONLY)
(ASE PRINT)
PHONE (
RIC CLARK            705- 214- 8904
130 DAVE
WILLIAMSBREG KS
66095.

**PAYMENT BY ACCOUNT (if applicable)**
USPS® Corporate Acct. No.        Federal Agency Acct. No. or Postal Service™ Acct. No.

RTIONS (Customer Use Only)

PRIORITY POSTAL SERVICE USE ONLY

☐ 2-Day        ☐ Military        ☐ DPO

PO ZIP Code: 6067
Scheduled Delivery Date (MM/DD/YY): 1/26/21
Postage: $ 60.30

Date Accepted (MM/DD/YY): 1/25/21
Scheduled Delivery Time: ☐ 10:30 AM  ☐ 3:00 PM  ☑ NOON
Insurance Fee: $
COD Fee:

Time Accepted: 11:07  ☐ AM / PM
10:30 AM Delivery Fee: $
Return Receipt Fee: $
Live Animal Transportation Fee:

Special Handling/Fragile: $
Sunday/Holiday Premium Fee: $
Total Postage & Fees: $ 60.30

Weight: 6 lbs 12.70 ozs
☐ Flat Rate
Acceptance Employee Initials: RMC
$ 60.30

DELIVERY POSTAL SERVICE USE ONLY
Delivery Attempt (MM/DD/YY)  Time  ☐ AM ☐ PM  Employee Signature
Delivery Attempt (MM/DD/YY)  Time  ☐ AM ☐ PM  Employee Signature

TENTH CIRCUIT
1823 stout St
DENVER CO
2257-

or USPS Tracking™, visit USPS.com or call 800-222-1811.
surance included.

FROM THIS CORNER

LABEL 11-B, MARCH 2019        PSN 7690-02-000-9996



UNITED STATES
POSTAL SERVICE®

1007                    80257

**From:** _____

Eric S. Clark
1430 Dane Ave
Williamsburg, Kansas 66095

**To:** _____

Clerk, The United States Court of Ap
The Byron White U.S. Courthouse
1823 Stout Street
Denver, CO 80257

---

JHOEZBUSBD06

MCI -> FX    NA DEN

WGT: 006    TOTAL: 00018
AR: DEN AT 06:00  MCIMSW A2
LV: MCI AT 21:15  01/25/21

**DEN**
JHOEZBUSBD
**E**

**99**
**80257**

**UNITED STATES**
**POSTAL SERVICE ®**

**PRIORITY**
**MAIL**
**EXPRESS®**

EJ 301 032 1

**CUSTOMER USE ONLY**
FROM: *(PLEASE PRINT)*    PHONE (    795-214-
ERIC CLARK                          8904
1430 DANE
WILLIAMSBURG KS
         66095

**DELIVERY OPTIONS (Customer Use Only)**
☐ SIGNATURE REQUIRED *Note: The mailer must check the "Signature Required" box if the mailer: 1) Requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service; OR 4) Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the addressee's mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.*
Delivery Options
☐ No Saturday Delivery (delivered next business day)
☐ Sunday/Holiday Delivery Required (additional fee, where available)*
☐ 10:30 AM Delivery Required (additional fee, where available)*
*Refer to USPS.com® or local Post Office™ for availability.*

TO: *(PLEASE PRINT)*    PHONE (
TENTH CIRCUIT
1823 STOUT ST
DENVER CO
80257-_____

IP + 4® (U.S. ADDRESSES ONLY)

For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
■ $100.00 Insurance Included.

◁ **PEEL FROM THIS CORNER**

**PAYMENT BY ACCOUNT (if applicable)**
USPS® Corporate Acct. No.    Federal Agency A

**ORIGIN (POSTAL SERVICE USE ONLY)**

| | ☐1-Day | ☐2-Day | |
|PO ZIP Code | Scheduled Delivery Date (MM/DD/YY) | |
| 66067 | 1/26/21 | |
| Date Accepted (MM/DD/YY) | Scheduled Delivery Time | |
| 1/25/21 | ☐ 10:30 AM ☐ 3:00 PM ☐ 12 NOON | |
| Time Accepted | 10:30 AM Delivery Fee | |
| 11:07 ☐AM ☒PM | $ | |
| Special Handling/Fragile | Sunday/Holiday Premium Fee | |
| $ | $ | |
| Weight ☐ Flat Rate | Acceptance Employee Initials | |
| 6 lbs. 12 oz. | RMT | |

**DELIVERY (POSTAL SERVICE USE ONLY)**
| Delivery Attempt (MM/DD/YY) | Time ☐AM ☐PM | Employee Signat |
| Delivery Attempt (MM/DD/YY) | Time ☐AM ☐PM | Employee Signa |

LABEL 11-B, MARCH 2019    PSN 7690-02-000-9996